Nos. 25-4046, 25-4047

## In the United States Court of Appeals
## for the Tenth Circuit

Utah Vapor Business Association, et al.,

*Plaintiffs-Appellants/Cross Appellees*,

v.

State of Utah, et al.,

*Defendants-Appellees/Cross Appellants*

On appeal from the United States District Court for the District of Utah,
No. 2:24-cv-00950
Honorable David Barlow

## Appellees'/Cross-Appellants' Principal and Response Brief

Sarah Goldberg
Assistant Solicitor General
David N. Wolf
Assistant Attorneys General
160 East 300 South, Fifth Floor
P.O. Box 140858
Salt Lake City, Utah 84114
(801) 366-0533
sgoldberg@agutah.gov
dnwolf@agutah.gov
*Counsel for Appellees/Cross-Appellants*

## Oral Argument is Not Requested

## Table of Contents

Introduction.................................................................................... 1

Jurisdictional Statement ................................................................ 3

Statement of the Issues ................................................................. 5

Statement of the Case ................................................................... 6

I.     The E-Cigarette Act. ............................................................. 6

    A.     The Flavor Ban. ........................................................... 6

    B.     Premarket Authorization. ............................................ 7

    C.     The Registry ................................................................ 8

    D.     The Inspection Program ............................................... 9

II.    Procedural History. ............................................................. 10

Summary of the Argument........................................................... 12

Argument...................................................................................... 14

I.     The district court did not abuse its discretion when it
    refused to enjoin the Flavor Ban............................................ 15

    A.     This Court lacks jurisdiction over the preemption
        issues because UVBA did not file a timely notice of
        appeal. ........................................................................ 15

    B.     The TCA does not preempt the Flavor Ban................. 19

        1.     U.S. tobacco regulation and the TCA. ............. 21

        2.     The TCA does not expressly preempt the Flavor
            Ban.................................................................... 24

            a.     Section 387p distinguishes between
                manufacturing and retail sales. ............... 24

            b.     The Flavor Ban is not a "tobacco product
                standard." ............................................... 28

            c.     Even if the Flavor Ban is a "tobacco
                product standard," it is not preempted

because it is exempted from preemption by
the Savings Clause. ..................................................... 35

3.     Federal law does not impliedly preempt the
Flavor Ban. ....................................................................... 39

C.     UVBA cannot satisfy the remaining preliminary
injunction elements. .................................................................. 43

II.     The district court abused its discretion by enjoining the
Inspection Program and holding UVBA was likely to succeed
on its claim that it violates the Fourth Amendment. ............................ 46

III.     The district court correctly held that the Inspection Program
is severable. .................................................................................................... 56

Conclusion ...................................................................................................... 64

## Addenda

1.     S.B. 61, Electronic Cigarette Amendments

2.     21 U.S.C. § 387p

# Table of Authorities

**Cases**

*Am. Target Advert., Inc. v. Giani,*
199 F.3d 1241 (10th Cir. 2000) ................................................................ 56

*Aposhian v. Barr,*
958 F.3d 969 (10th Cir. 2020) ................................................................. 45

*Austin v. State of Tennessee,*
179 U.S. 343 (1900) .................................................................................. 21

*Bradshaw v. Am. Airlines, Inc.,*
123 F.4th 1168 (10th Cir. 2024) .............................................................. 20

*Chamber of Com. of U.S. v. Whiting,*
563 U.S. 582 (2011) .................................................................................. 39

*Chamber of Com. v. Edmondson,*
594 F.3d 742 (10th Cir. 2010) ............................................................ 20, 24

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984) .................................................................................. 32

*Choate v. Champion Home Builders Co.,*
222 F.3d 788 (10th Cir. 2000) ........................................................ 20, 39, 40

*City of Los Angeles v. Patel*
576 U.S. 409 (2015) .................................................................................. 54

*Craig v. Provo City,*
2016 UT 40, 339 P.3d 423 ........................................................................ 57

*Day v. SkyWest Airlines,*
45 F.4th 1181 (10th Cir. 2022) ................................................................ 20

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,*
356 F.3d 1256 (10th Cir. 2004) ................................................................ 44

*Donovan v. Dewey*
452 U.S. 594 (1981) ............................................................................. 52, 53

*Emerson v. Kansas City S. Ry. Co.*,
  503 F.3d 1126 (10th Cir. 2007) ............................................................. 24, 39

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
  541 U.S. 246 (2004) .............................................................................. 32, 34

*Equal Emp. Opportunity Comm'n v. CollegeAmerica Denver, Inc.*,
  89 F.3d 1171 (10th Cir. 2017) .................................................................... 43

*Estrada v. Smart*,
  107 F.4th 1254 (10th Cir. 2024) ................................................................. 62

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) .................................................................................... 21

*Food and Drug Admin. v. Wages and White Lion Invs., L.L.C.*,
  604 U.S. 542 (2025) .................................................................................... 21

*In re Gestational Agreement*,
  2019 UT 40, 449 P.3d 69 ............................................................................ 57

*In re McDaniel*,
  973 F.3d 1083 (10th Cir. 2020) .................................................................. 30

*In re Syngenta AG MIR 162 Corn Litig.*,
  61 F.4th 1126 (10th Cir. 2023) ................................................................... 43

*Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa
  Dep't of Revenue*,
  781 F.Supp.3d 724 (S.D. Iowa 2025) .................................................... 41, 42

*Jacks v. CMH Homes, Inc.*,
  856 F.3d 1301 (10th Cir. 2017) .................................................................. 41

*Jensen v. Intermountain Healthcare, Inc.*,
  2018 UT 27, 424 P.3d 885 .......................................................................... 57

*Johnson v. Smith*,
  104 F.4th 153 (10th Cir. 2024) ................................................. 46, 47, 54, 55

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
  103 F.4th 748 (10th Cir. 2024) ............................................................. 14, 45

iv

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ............................................................................ 32

*Marshall v. Barlow's Inc.,*
    436 U.S. 307 (1978) ............................................................................ 48

*Marshall v. English,*
    No. 21-3101, 2021 WL 5985331 (10th Cir. Aug. 24, 2021) .......................... 15

*Monahan v. Talley,*
    968 F.2d 1224 (10th Cir. 1992) ................................................................ 19

*Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence,*
    731 F.3d 71 (1st Cir. 2013) ...................................................... 19, 27, 28, 35

*Nat'l Meat Ass'n v. Harris,*
    565 U.S. 452 (2012) ...................................................................... 32, 33

*New Mexico v. Trujillo,*
    813 F.3d 1308 (10th Cir. 2016) ................................................................ 15

*New York v. Burger,*
    482 U.S. 691 (1987) ............................................................................ 46

*Phibro Biodigester v. Murphy-Brown, LLC,*
    No. 22-4117, 2024 WL 4541530 (10th Cir. Oct. 22, 2024) ............................ 44

*Pimentel & Sons Guitar Makers, Inc. v. Pimentel,*
    477 F.3d 1151 (10th Cir. 2007) ................................................................ 18

*Powerex Corp. v. Reliant Energy Servs., Inc.,*
    551 U.S. 224 (2007) ............................................................................ 38

*Pryor v. Sch. Dist. No.,*
    1, 99 F.4th 1243 (10th Cir. 2024) ............................................................. 14

*R.J. Reynolds Tobacco Co. v. City of Edina,*
    60 F.4th 1170 (8th Cir. 2023) ................................... 19, 27, 28, 35, 36, 38, 40

*R.J. Reynolds Tobacco Co. v. Cnty. of Los Angeles,*
    29 F.4th 542 (9th Cir. 2022) ................... 19, 21, 22, 24, 25, 27, 28, 35, 38, 40

*S&S Pawn Shop Inc. v. City of Del City*
    947 F.2d 432 (10th Cir. 1991) ......................................................... 50, 51

*S. Ute Indian Tribe v. Leavitt,*
  564 F.3d 1198 (10th Cir. 2009) ....................................................... 17

*Schrock v. Wyeth, Inc.,*
  727 F.3d 1273 (10th Cir. 2013) ....................................................... 41

*Shaw v. Patton,*
  823 F.3d 556 (2016) ......................................................................... 59

*Smith v. Doe,*
  538 U.S. 84 (2003) ........................................................................... 58

*Tarrant Reg'l Water Dist. v. Hermann,*
  656 F.3d 1222 (10th Cir. 2011) ....................................................... 39

*Tokoph v. United States,*
  774 F.3d 1300 (10th Cir. 2014) ....................................................... 55

*U.S. Smokeless Tobacco Mfg. Co. v. City of New York,*
  708 F.3d 428 (2d Cir. 2013) ............................................................ 19

*United States v. Biswell*
  406 U.S. 311 (1972) ......................................................................... 50

*United States v. Ceballos-Martinez,*
  387 F.3d 1140 (10th Cir. 2004) ....................................................... 15

*United States v. Rogers,*
  No. 20-13307, 2022 WL 3099423 (11th Cir. Aug. 4, 2022) ............ 17

*US Airways, Inc. v. O'Donnell,*
  627 F.3d 1318 (10th Cir. 2010) ................................................. 20, 24

*V-1 Oil Co. v. Wyoming Department of Environmental Quality*
  902 F.2d 1482 (10th Cir. 1990) ................................................. 53, 54

*Vapor Tech. Ass'n v. Wooten,* No. 4:25-cv-76,
  2025 WL 1787420 (E.D.N.C. June 27, 2025) ................................. 42

*VDARE Found. v. City of Colo. Springs,*
  11 F.4th 1151 (10th Cir. 2021) ....................................................... 62

*Vega v. Jordan Valley Med. Ctr., LP,*
  2019 UT 35, 449 P.3d 31 ................................................. 56, 57, 61, 62

vi

*Wall Guy Inc. v. Fed. Deposit Ins. Corp.*,
  95 F.4th 862 (4th Cir. 2024) ........................................................ 17

*Wisconsinites for Alternatives to Smoking and Tobacco, Inc. v. Casey*,
  No. 25-cv-552, 2025 WL 2582099 (W.D. Wis. Sept. 5. 2025) ...................... 42

**Statutes**

21 U.S.C. § 387 ................................................................. 22, 39

21 U.S.C. § 387g ................................................................ 29, 31

21 U.S.C. § 387k ................................................................ 26, 27

21 U.S.C. § 387p ......................... 12, 13, 23, 25, 26, 28, 31, 32, 33, 35, 36, 37

21 U.S.C. § 387j ................................................................... 26

21 U.S.C. § 678 ................................................................... 33

28 U.S.C. § 1292 ................................................................. 4, 15

28 U.S.C. § 1331 ................................................................... 3

28 U.S.C. § 2107 .................................................................. 15

42 U.S.C. § 7543 .................................................................. 34

Utah Code § 26A-1-131 ................................ 9, 46, 51, 52, 55, 59, 60, 61

Utah Code § 26B-7-516 ............................................................. 58

Utah Code § 59-14-810 ............................... 8, 10, 42, 43, 59, 60, 61

Utah Code § 76-10-101 ................................ 6, 7, 30, 42, 43

Utah Code § 76-10-113 ................................ 6, 7, 8, 10, 59, 60

**Rules**

10th Cir. R. 32 ................................................................... 42

Fed. R. App. P. 3 ............................................................. 16, 17

Fed. R. App. P. 4 ............................................................ 4, 5, 15

vii

## Statement of Related Cases

There are no prior or related appeals.

## Glossary

**FDA**: Food and Drug Association

**TCA**: Family Smoking Prevention and Tobacco Control Act

**UVBA**: Utah Vapor Business Association

## Introduction

In 2024, the Utah legislature enacted S.B. 61, Electronic Cigarette Amendments (the E-Cigarette Act). The primary purpose of the E-Cigarette Act was to reduce the rate of youth electronic cigarette use in the state. To accomplish this goal, the E-Cigarette Act bans the sale of flavored electronic cigarettes in the state (the Flavor Ban). It also creates a registry of electronic cigarette products that can be sold in the state (the Registry), imposes requirements to be listed on the Registry, and makes it unlawful to sell an electronic cigarette product not listed on the Registry. To help enforce the Registry's requirements, the E-Cigarette Act allows local health departments to conduct warrantless administrative searches of tobacco retailers (the Inspection Program).

Utah Business Vapor Association, an industry group made up of small business retailers that sell tobacco products, including electronic cigarettes, and the Smoke House, LLC, a tobacco retailer (collectively, UVBA), sued the State of Utah (including its governor and attorney general, the Department of Health and Human Services and its executive director, and the Tax Commission and its executive director), alleging, among other things, that the Flavor Ban is preempted by the federal Family Smoking Prevention and Tobacco Control Act (the TCA) and that the Inspection Program violates the Fourth Amendment of the U.S. Constitution. Shortly before the Flavor Ban

1

was set to go into effect, UVBA moved for a temporary restraining order and preliminary injunction seeking to enjoin the Flavor Ban and the Inspection Program. In separate orders, the district court (1) refused to enjoin the Flavor Ban because UVBA is unlikely to succeed on the merits of its preemption claim, and (2) enjoined the Inspection Program because UVBA is likely to succeed on its Fourth Amendment claim. In its order enjoining the Inspection Program, the district court also held that the Inspection Program is severable and thus refused to enjoin the entire E-Cigarette Act. UVBA now appeals from the order refusing to enjoin the Flavor Ban and the portion of the order severing the Inspection Program. The State cross-appeals, challenging the order enjoining the Inspection Program.

This Court should not consider UVBA's appeal from the district court's order refusing to enjoin the Flavor Ban. UVBA didn't file a timely notice of appeal, so the Court lacks jurisdiction over it. But even if the Court reviews that order, the Flavor Ban injunction should be upheld. Just like every other court that has considered this issue, the district court correctly held that the Flavor Ban is not preempted. The TCA's unique preservation, preemption, and savings clauses show that Congress did not intend to preempt such bans.

This Court should reverse the district court's order enjoining the Inspection Program. When viewed as a whole, the Inspection Program provides a constitutionally adequate substitute for a warrant. It limits who

2

may conduct searches, the discretion as to when to conduct searches, and the scope of searches. And it provides sufficient notice and certainty to tobacco retailers about when they will be searched and the purpose and scope of the search. UVBA is thus not likely to succeed on the merits of its claim that the Inspection Program violates the Fourth Amendment.

Finally, if the Court does not reverse the district court's order enjoining the Inspection Program, it should uphold the district court's decision to sever the Inspection Program from the rest of the E-Cigarette Act. The E-Cigarette Act still furthers its purpose of preventing kids from using electronic cigarettes without the Inspection Program. The Inspection Program may only be used to enforce the Registry's requirements. It has no relationship to other parts of the E-Cigarette Act, including the Flavor Ban. And those other portions of the E-Cigrarette Act function independently of the Inspection Program and the Registry. UVBA thus cannot overcome the presumption of severability and satisfy its burden of proving the legislature would not have enacted the remainder of the E-Cigarette Act without including the Inspection Program.

## Jurisdictional Statement

The district court has subject-matter jurisdiction over this case under 28 U.S.C. § 1331 because the complaint raises federal questions under the Supremacy Clause and the Fourth Amendment. This Court has subject-

matter jurisdiction over the appeal and cross-appeal under 28 U.S.C.

§ 1292(a)(1) because they are appeals from orders denying in part and

granting in part preliminary injunctions.

The district court entered an order denying UVBA's motion for a

preliminary injunction seeking to enjoin the Flavor Ban on February 13,

2025. App. Vol. 3 at 625-46.[1] It then entered a separate order on March 24,

2025, granting UVBA's motion for preliminary injunction and enjoining the

Inspection Program but severing the Inspection Program from the E-

Cigarette Act. App. Vol. 3 at 669-87, 688-89. UVBA filed its notice of appeal

on April 21, 2025. App. Vol. 3 at 690-92. The State filed a timely notice of

cross appeal from the order enjoining the Inspection Program on April 24,

2025. App. Vol. 3 at 693-94; *see* Fed. R. App. P. 4(a)(3) (allowing party to "file

a notice of appeal within 14 days after the date when the first notice was

filed").

The State agrees that UVBA's notice of appeal from the order severing

the Inspection Program was timely and that this Court has jurisdiction over

the appeal of that order. But as discussed more fully in the Argument section,

this Court does not have jurisdiction over UVBA's appeal from the district

---

[1] References to Appellants' appendix are cited as App. Vol. _ at _.
References to the State's supplemental appendix are cited as Supp. App. at _.

court's order refusing to enjoin the Flavor Ban. That order was entered on February 13. UVBA did not file its notice of appeal until April 21—67 days after the order was entered. UVBA's notice of appeal was thus untimely as to that order. *See* Fed. R. App. P. 4(a)(1)(A) (requiring notice of appeal to be filed "within 30 days after entry of the . . . order appealed from").

### Statement of the Issues

1.    Whether the district court abused its discretion by refusing to enjoin the Flavor Ban when it held that UVBA was not likely to succeed on the merits of its claim that the Favor Ban was preempted by the TCA. (Raised at App. Vol. 3 at 487-98; ruled on at App. Vol. 3 at 625-46).

2.    Whether the district court abused its discretion by enjoining the Inspection Program. (Raised at App. Vol. 3 at 498-504, 609-14; ruled on at App. Vol. 3 at 669-87).

3.    If the district court did not abuse its discretion by enjoining the Inspection Program, whether it correctly held that the Inspection Program is severable from the rest of the E-Cigarette Act. (Raised at App. Vol. 3 at 499-500; ruled on at App. Vol. 3 at 684-86).

## Statement of the Case

### I.    The E-Cigarette Act.

In 2024, to attempt to reduce the number of kids using electronic cigarettes, the Utah legislature passed the E-Cigarette Act.[2] The E-Cigarette Act has four relevant components.

#### A.    The Flavor Ban.

First, the E-Cigarette Act makes it unlawful to "give, distribute, sell, offer for sale, or furnish to any person a flavored electronic cigarette product." Utah Code § 76-10-113(2).[3] A "[f]lavored electronic cigarette product" is "an electronic cigarette product that has a taste or smell that is distinguishable by an ordinary consumer either before or during use or consumption of the electronic cigarette product" and "includes an electronic cigarette product that is labeled as, or has a taste or smell of any fruit, chocolate, vanilla, honey, candy, cocoa, dessert, alcoholic beverage, herb, spice, or mint." *Id.* § 76-10-101(7)(a), (b). Before the E-Cigarette Act went into effect, only retailers who were licensed as a retail tobacco specialty business could sell

---

[2] A copy of the E-Cigarette Act is attached as Addendum 1.

[3] Many of the statutory provisions of the E-Cigarette Act were renumbered and revised during the 2025 legislative session. *See* Criminal Code Recodification and Cross References, H.B. 21, 66th Leg. Gen. Sess. (Utah 2025). Those changes are not material to the issues in this case. For clarity, the State cites to the 2024 versions of the statutes enacted by the E-Cigarette Act.

flavored electronic cigarette products. *Id.* § 76-10-113(1), (2). But the Flavor

Ban prohibits all retailers, including retail tobacco specialty businesses, from

selling flavored electronic cigarette products.[4] *Id.* § 76-10-113(1), (2).

Violation of the Flavor Ban is a misdemeanor. *Id.* § 76-10-113(4).

### B.    Premarket Authorization.

Second, the Act makes it unlawful to "give, distribute, sell, offer for

sale, or furnish to any person an electronic cigarette product that is not a

premarket authorized or pending electronic cigarette product." *Id.* § 76-10-

113(3). A "[p]remarket authorized or pending electronic cigarette product" is

"an electronic cigarette product that . . . has been approved by an order

granting a premarket tobacco product application . . . by the [FDA]" or was

"marketed in the U.S. on or before August 8, 2016 [and] the manufacturer

submitted a premarket tobacco product application" to the FDA that has not

been finally decided or effective, and "does not exceed: (i) 4.0% nicotine by

weight per container; or (ii) a nicotine concentration of 40 milligrams per

milliliter." *Id.* § 76-10-101(16). Selling an electronic tobacco product that is

---

[4] UVBA says that electronic cigarette products that are "premarket authorized or pending authorization from the" FDA are exempt from the Flavor Ban. Aplt. Br. at 5, 10. Not so. The Flavor Ban prohibits the sale of *all* flavored electronic cigarette products. *See* Utah Code § 76-10-113(2).

not a premarket authorized or pending electronic cigarette product is a misdemeanor. *Id.* § 76-10-113(3), (4).

## C.    The Registry

Third, the Act creates the Registry of electronic cigarette products managed by the Utah Tax Commission. Every manufacturer of an electronic cigarette product that is sold in the state must certify to the Tax Commission that it agrees to comply with the Registry's requirements and that its electronic cigarette products are premarket authorized or pending electronic cigarette products. *Id.* § 59-14-810(1). A manufacturer must submit a separate form for each electronic cigarette product sold in the state that lists, among other things, the name of the electronic cigarette product, its nicotine content, any flavors contained in the product, and information about its premarket authorization. *Id.* § 59-14-810(3)(a)(i), (ii). The Tax Commission must share this information with the Utah Department of Health and Human Services for its review and approval of the electronic cigarette product for the Registry and must publish the Registry. *Id.* § 59-14-810(3)(b), (4). It is unlawful for any person to "sell or offer for retail sale an electronic cigarette product . . . that is not included in the registry." *Id.* § 59-14-810(7). The E-Cigarette Act imposes civil and administrative penalties for violating this section. *Id.* § 59-14-810(8).

### D.    The Inspection Program

Finally, to ensure compliance with the Registry, the E-Cigarette Act allows "[a] local health department" to "examine the books, papers, and records of a retailer in this state, for the purposes of determining compliance with" the Registry's requirements. *Id.* § 26A-1-131(1). Under this "Inspection Program," "[a] local health department may make the inspections and examinations at any time during ordinary business hours, and may inspect the premises and all desks, safes, vaults, and other fixtures and furniture contained in or upon the premises for the purpose of ascertaining whether an electronic cigarette product is held or possessed in violation of [the Registry]." *Id.* § 26A-1-131(1)(b). If there has been a violation of the Registry, the local health department must conduct an "[u]nannounced follow-up examination[] . . . within 30 days." *Id.* § 26A-1-131(1)(c). Local health departments must "publish the results of all examinations at least annually and shall make the results available to the public upon request." *Id.* § 26A-1-131(1)(d). If a local health department finds an "electronic cigarette product offered for sale in violation of [the Registry]," that electronic cigarette product "is declared to be a contraband good and shall be immediately embargoed by a local health department." *Id.* § 26A-1-131(1)(e).

* * *

9

The Registry's certification requirements went into effect on August 1, 2024. *Id.* § 59-14-810(1). All other relevant portions of the E-Cigarette Act, including the sales prohibitions, were set to take effect on January 1, 2025. *Id.* §§ 59-14-810(7) (prohibition on sale of electronic cigarette products not listed on the Registry); 76-10-113(2) (Flavor Ban); 76-10-113(3) (prohibition on sale of electronic cigarette products that are not a premarket authorized or pending electronic cigarette products).

## II.    Procedural History.

Shortly before the January 1, 2025 effective date, UVBA filed a complaint against the State alleging that: (1) the Flavor Ban is preempted by the TCA; (2) the Inspection Program violates the Fourth Amendment of the U.S. Constitution and Article I, Section 14 of the Utah Constitution; (3) certain administrative rules enacted pursuant to the E-Cigarette Act violate the Utah Administrative Rulemaking Act; and (4) the E-Cigarette Act is a regulatory taking under the Fifth Amendment of the U.S. Constitution.[5] App. Vol. 1 at 20-87. The State removed the case to federal court. App. Vol. 1 at 16-17.

---

[5] UVBA voluntarily dismissed the administrative rulemaking and takings claims. Supp. App. at 100-04.

On December 23, 2025, UVBA moved for a temporary restraining order and preliminary injunction seeking to enjoin the Flavor Ban and the Inspection Program. App. Vol. 2 at 278-342. Because of the holidays and the impending effective date, the parties stipulated to entry of a temporary restraining order that barred the State from enforcing the E-Cigarette Act until the Court decided the motion for preliminary injunction. App. Vol. 3 at 570-73, 577-78.

The district court held a hearing on the motion on February 11, 2025. App. Vol. 3 at 647. Two days after the hearing, on February 13, 2025, the district court entered an order refusing to enjoin the Flavor Ban. App. Vol. 3 at 625-46. It held that UVBA is not likely to succeed on the merits of its claim that the Flavor Ban is preempted by the TCA. App. Vol. 3 at 646. In a separate docket text order, the district court asked for supplemental briefing on the Inspection Program. App. Vol. 1 at 11, Vol. 3 at 647-48. Over a month later, on March 24, 2025, the district court entered its order enjoining the Inspection Program. App. Vol. 3 at 669-86, 688-89. According to the district court, UVBA is likely to succeed on the merits of its claim that the Inspection Program violates the Fourth Amendment.[6] App. Vol. 3 at 672-80. But it held

---

[6] Because it held that the Inspection Program likely violated the Fourth Amendment, it did not rule on UVBA's claim that the Inspection Program

that the Inspection Program is severable from the rest of the E-Cigarette Act and thus refused to enjoin the entire E-Cigarette Act. App. Vol. 3 at 684-86.

UVBA filed its notice of appeal on April 21, 2025. App. Vol. 3 at 690-91. The State filed its notice of cross appeal on April 24, 2025. App. Vol. 3 at 693-94.

## Summary of the Argument

This Court should uphold the district court's order refusing to enjoin the Flavor Ban and reverse its order enjoining the Inspection Program. If this Court does not reverse the order enjoining the Inspection Program, it should uphold the district court's decision that the Inspection Program is severable from the rest of the E-Cigarette Act.

*The Flavor Ban*. This Court should not consider UVBA's appeal from the order refusing to enjoin the Flavor Ban. UVBA did not file a timely notice of appeal from that order denying injunctive relief. This Court thus lacks jurisdiction over it. But even if the Court considers UVBA's challenge to that order, the district court correctly held that the TCA does not expressly or impliedly preempt the Flavor Ban. Section 387p of the TCA, with its unique three-layered preservation, preemption, and savings provision, makes clear

---

violates the Utah Constitution's search and seizure provision. App. Vol. 3 at 680 n.61.

that Congress did not intend to preempt the Flavor Ban. The preemption clause applies only to requirements that relate to technical manufacturing standards, not sales restrictions. The Flavor ban is thus not a "tobacco product standard" subject to preemption under section 387p's preemption clause. 21 U.S.C. § 387p(a)(2)(A). And even if it is a "tobacco product standard," it is excepted from preemption because it falls under the savings clause as a requirement "relating to the sale" of tobacco products. 21 U.S.C. § 387p(a)(2)(B).

*The Inspection Program.* The district court erred by enjoining the Inspection Program and holding that it did not provide a constitutionally adequate substitute for a warrant. Instead of focusing solely on whether the Inspection Program set forth the frequency and certainty of inspections, the district court should have looked at the statute as a whole, including the scope of inspections, who may carry them out, when they may be conducted, and the notice given to retailers. Especially when looking at the Inspection Program as a whole, it is much more like statutes that both this Court and the Supreme Court have upheld as opposed to the ones that have been struck down and sufficiently limits the discretion of inspectors as to the time, purpose, and scope of the inspection.

*Severability.* If the Court does not reverse the district court's order enjoining the Inspection Program, it should uphold the court's decision that

13

the Inspection Program is severable. The E-Cigarette Act still furthers the purpose of preventing kids from using electronic cigarettes without the Inspection Program. Not only are there other ways to enforce the E-Cigarette Act, but many of its prohibitions, most notably, the Flavor Ban, operate independently of the Inspection Program. It is thus clear that the legislature would have still enacted the rest of the E-Cigarette Act without the Inspection Program.

## Argument

"A preliminary injunction is an extraordinary remedy" that constitutes "drastic relief." *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1249-50 (10th Cir. 2024). To obtain a preliminary injunction, a plaintiff must establish that (1) they are substantially likely to succeed on the merits; (2) they will suffer irreparable injury if the court denies the injunction; (3) their harm without the injunction outweighs the other party's harm with the injunction; and (4) the injunction is not adverse to the public interest. *Id.* at 1250. Because a preliminary injunction is an extraordinary remedy, "the right to relief must be clear and unequivocal." *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 752 (10th Cir. 2024) (internal quotation marks omitted).

This Court reviews a grant or denial of a preliminary injunction for abuse of discretion. *Id.* at 751. "A district court abuses its discretion when it commits an error of law or makes clearly erroneous factual findings." *Id.*

14

(internal quotation marks omitted). In reviewing whether a district court abused its discretion in granting or denying a preliminary injunction, this Court examines "the district court's legal determinations de novo, and its underlying factual findings for clear error." *Id.* at 751-52 (internal quotation marks omitted).

## I.    The district court did not abuse its discretion when it refused to enjoin the Flavor Ban.

The district court correctly held that UVBA is not likely to succeed on the merits of its claim that the Flavor Ban is preempted by the TCA and thus did not abuse its discretion by refusing to enjoin the Flavor Ban. But this Court shouldn't even review this issue because UVBA did not file a timely notice of appeal of the order refusing to enjoin the Flavor Ban. This Court thus lacks jurisdiction over UVBA's appeal from that order.

### A.    This Court lacks jurisdiction over the preemption issues because UVBA did not file a timely notice of appeal.

Orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions" are immediately appealable. 28 U.S.C. § 1292(a)(1); *New Mexico v. Trujillo*, 813 F.3d 1308, 1318 (10th Cir. 2016). A notice of appeal from such an order must be filed within 30 days of the order granting or refusing to enter the injunction. *See* Fed. R. App. P. 4(a)(1)(A); 28 U.S.C. § 2107(a). If the notice of appeal is not timely filed, this Court lacks jurisdiction and the appeal must be dismissed.

15

*United States v. Ceballos-Martinez*, 387 F.3d 1140, 1143 (10th Cir. 2004) ("The filing of a timely notice of appeal is an absolute prerequisite to our jurisdiction." (internal quotation marks omitted)); *Marshall v. English*, No. 21-3101, 2021 WL 5985331, at *1 (10th Cir. Aug. 24, 2021) ("[A]lthough an order denying a preliminary injunction is immediately appealable, . . . this Court can exercise jurisdiction only if a notice of appeal is timely filed." (cleaned up)).

The district court entered its order refusing to enjoin the Flavor Ban based on UVBA's preemption claims on February 13, 2025. App. V.3 at 625-46. But UVBA did not file its notice of appeal until April 21, 2025—67 days later. Because UVBA did not file its notice of appeal within the 30-day deadline, this Court lacks jurisdiction over it and should not consider it.

What's more, UVBA does not list the order denying its motion to enjoin the Flavor Ban in its notice of appeal. App. Vol. 3 at 691. Instead, it lists: (1) "the district court's Order Granting in Part Motion for Temporary Restraining Order and Preliminary Injunction" (the order giving its reasons for enjoining the Inspection Program and severing it from the Flavor Ban); (2) "the district court's Order Granting Preliminary Injunction" (a separate order enjoining the Inspection Program); and (3) "the district court's Docket Text Order" (dissolving the stipulated temporary restraining order), all entered on March 24, 2025. *Id.* UVBA also stated that it was appealing "any

16

and all underlying issues, rulings, decisions, and orders of the district court ancillary, subsidiary, or merged thereto." *Id.*

This tactic does not give the Court jurisdiction over UVBA's appeal of the order refusing to enjoin the Flavor Ban. That order was not "merged into" any of the later orders. *See* Fed. R. App. P. 3(c)(4) ("The notice of appeal encompasses all orders that, for purposes of appeal, merge into the designated judgment or appealable order."). Although "there has been little case law interpreting which orders 'merge into' a later order," *Wall Guy Inc. v. Fed. Deposit Ins. Corp.*, 95 F.4th 862, 877 (4th Cir. 2024), the merger rule "applies only where the earlier orders were non-appealable, interlocutory orders." *United States v. Rogers*, No. 20-13307, 2022 WL 3099423, at *3 (11th Cir. Aug. 4, 2022) (citing to the advisory committee's notes on the 2021 amendments to Rule 3 of the Federal Rules of Appellate Procedure). The order refusing to enjoin the Flavor Ban wasn't a non-appealable interlocutory order and there was no reason UVBA could not have appealed it. The order expressly denied UVBA's request to enjoin the Flavor Ban and resolved UVBA's motion on that issue. App. Vol. 3 at 646 ("Plaintiff's motion for preliminary injunction regarding the Flavor Sales Ban is DENIED."), 671 ("After a hearing, the court entered an order denying the preliminary injunction regarding the Act's Flavor Sales Ban provision.").

17

None of the March 24 orders modified the order enjoining the Flavor Ban either. Although appellate courts have jurisdiction to review orders that modify an existing injunction, they do not have jurisdiction to review orders that merely interpret or clarify an injunction. *S. Ute Indian Tribe v. Leavitt*, 564 F.3d 1198, 1209 (10th Cir. 2009). A modification "alters the legal relationship between the parties or substantially changes the terms and force of the injunction." *Pimentel & Sons Guitar Makers, Inc. v. Pimentel*, 477 F.3d 1151, 1154 (10th Cir. 2007) (internal quotation marks omitted). It must "change the command of the earlier injunction, relax its prohibitions, or release any respondent from its grip." *Id.* (internal quotation marks omitted). In contrast, "[a]n interpretation or clarification does not alter the status of the parties, but merely restates that relationship in new terms." *Id.* (internal quotation marks omitted).

The two separate orders enjoining the Inspection Program have nothing to do with the Flavor Ban. The order giving the reasons for enjoining the Inspection Program simply mentioned that the court had previously denied the preliminary injunction regarding the Flavor Ban. App. Vol. 3 at 671. And although the separate order enjoining the Inspection Program says that the State is "not enjoined from enforcing any other provision of the [E-Cigarette Act], including the Flavor . . . Ban," App. Vol. 3 at 689, this does nothing to modify the original order refusing to enjoin the Flavor Ban.

Finally, the March 24 docket text order dissolving the temporary restraining order doesn't modify the order refusing to enjoin the Flavor Ban either. That docket text order states that "[o]n December 30, 2024, the court entered the parties' agreed Temporary Restraining Order enjoining the enforcement of S.B. 61 until the court decided on Plaintiffs' Motion for Preliminary Injunction. The court has entered Order Granting Preliminary Injunction, which resolves Plaintiffs' Motion. Accordingly, Plaintiffs' Motion for Preliminary Injunction is no longer pending and the Temporary Restraining Order is hereby dissolved." App. Vol. 1 at 12. This doesn't modify the district court's earlier denial of UVBA's motion to enjoin the Flavor Ban; that issue was already fully decided when the district court entered its order denying the preliminary injunction. And even if it did modify the earlier order, this Court lacks jurisdiction over an order denying a temporary restraining order. *Monahan v. Talley*, 968 F.2d 1224, at *1 (10th Cir. 1992) (unpublished).

For these reasons, this Court should not consider UVBA's appeal of the order enjoining the Flavor Ban.

## B.    The TCA does not preempt the Flavor Ban.

Every appellate court that has considered whether a ban on the sale of flavored tobacco products is preempted by the TCA has come to the same conclusion: the ban is not preempted. *R.J. Reynolds Tobacco Co. v. City of*

*Edina*, 60 F.4th 1170, 1179 (8th Cir. 2023); *R.J. Reynolds Tobacco Co. v. Cnty. of Los Angeles*, 29 F.4th 542, 561 (9th Cir. 2022); *Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence*, 731 F.3d 71, 85 (1st Cir. 2013); *U.S. Smokeless Tobacco Mfg. Co. v. City of New York*, 708 F.3d 428, 436 (2d Cir. 2013). UVBA does not engage with the reasoning in any of these cases or explain why they are wrong. Nor could it. These earlier cases are all correct. This Court should adopt the same reasoning to hold that the Flavor Ban is not preempted by federal law.

Under the Supremacy Clause, "federal law preempts contrary state enactments." *Chamber of Com. v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010). Federal preemption of state law may be either express or implied. *Choate v. Champion Home Builders Co.*, 222 F.3d 788, 792 (10th Cir. 2000). The ultimate question in a preemption analysis is whether Congress intended to preempt state law. *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1324 (10th Cir. 2010). As the party claiming preemption, UVBA bears the burden of showing, with specificity, that Congress intended to preempt state law. *Day v. SkyWest Airlines*, 45 F.4th 1181, 1184 (10th Cir. 2022).

Whatever its form, the preemption analysis must begin "with the presumption that federal law does not override the historic police powers of the States, without the clear and manifest intent of Congress." *Bradshaw v. Am. Airlines, Inc.*, 123 F.4th 1168, 1173 (10th Cir. 2024) (internal quotation

20

marks omitted). Especially when considering the states' long history of regulating tobacco products as part of their police powers, the TCA does not expressly or impliedly preempt the Flavor Ban.

### 1. U.S. tobacco regulation and the TCA.

Historically, states have used their police powers to lead the way in regulating tobacco products, with the federal government playing only a limited role. The Supreme Court long ago endorsed this approach, holding that states could prohibit the sale of cigarettes under their inherent police powers to protect the health, safety, and welfare of their residents. *See Austin v. State of Tennessee*, 179 U.S. 343, 348-49 (1900).

Until Congress enacted the TCA in 2009, the FDA did not have the authority to regulate tobacco products. *Food and Drug Admin. v. Wages and White Lion Invs., L.L.C.*, 604 U.S. 542, 550-51 (2025). Although Congress enacted various statutes between 1965 and 2009, after a surgeon general's report detailing the negative health effects of smoking, these statutes largely focused on consumer education and reporting requirements, mostly regulating labeling and advertising. *See Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 148-50, 153-55 (2000); *Cnty. of Los Angeles*, 29 F.4th at 548 & n.1. Although these laws preempted state laws regulating labeling and advertising, they did not preempt states' "traditional power[s] to restrict or ban sales of tobacco products." *Cnty. of Los Angeles*, 29

F.4th at 548-49. Indeed, during this time, the states continued to enact laws regulating and even restricting the sale of tobacco products. *Id.* at 549.

Congress thus adopted the TCA against a backdrop of state and local laws that filled the void left from the FDA's inability to regulate tobacco products and Congress's decision to focus on labeling and advertising. The TCA authorized the FDA "to set national standards controlling the manufacture of tobacco products and the identity, public disclosure, and amount of ingredients used in such products." 21 U.S.C. § 387 notes (Purpose § (3)).

But Congress was careful to maintain a "balance of power between federal authority and state, local, and tribal authority." *Cnty. of Los Angeles*, 29 F.4th at 555. It thus included a "unique three-layered preservation provision" in Section 387p that "reserves regulation at the manufacturing stage exclusively to the federal government, but allows states and localities to continue to regulate sales and other consumer-related aspects of the industry in the absence of conflicting federal regulation." *Id.* at 550, 555.

Section 387p begins with an express "Preservation Clause" declaring that states retain their traditional regulatory authority and can therefore adopt more stringent regulations that go beyond the national regulatory floor, including prohibiting the sale of tobacco products. This Preservation Clause states:

22

> Except as provided in paragraph (2)(A) [the ensuing "preemption" section], nothing in this subchapter, or rules promulgated under this subchapter, shall be construed to limit the authority of . . . a State . . . to enact, adopt, promulgate, and enforce any law, rule, regulation, or other measure with respect to tobacco products that is in addition to, or more stringent than, requirements established under this subchapter, including a law, rule, regulation, or other measure relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products by individuals of any age, information reporting to the State, or measures relating to fire safety standards for tobacco products.

21 U.S.C. § 387p(a)(1).

Subsection (a)(2) of section 387p contains the "Preemption Clause." The Preemption Clause outlines eight limited exceptions to the broad preservation of state authority set forth in the Preservation Clause. It prohibits states from "establish[ing] or continu[ing] in effect with respect to a tobacco product any requirement which is different from, or in addition to, any requirement under the provisions of this subchapter relating to tobacco product standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products." 21 U.S.C. § 387p(a)(2)(A).

Finally, Section 387p includes a "Savings Clause" that is an "[e]xception" to the Preemption Clause. 21 U.S.C. § 387p(a)(2)(B). It states that the Preemption Clause "does not apply to requirements relating to the

sale, distribution, possession, information reporting to the State, exposure to, access to, the advertising and promotion of, or use of, tobacco products by individuals of any age, or relating to fire safety standards for tobacco products." *Id.*

### 2. The TCA does not expressly preempt the Flavor Ban.

Express preemption "occurs when the language of the federal statute reveals an express congressional intent to preempt state law." *US Airways*, 627 F.3d at 1324 (internal quotation marks omitted). In other words, a state law is preempted "when Congress defines explicitly the extent to which its enactments pre-empt state law." *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1129 (10th Cir. 2007) (cleaned up). To determine whether a state law is expressly preempted by a federal preemption clause, this Court applies "ordinary principles of statutory interpretation, looking initially to the plain language of the federal statute." *Chamber of Com.*, 594 F.3d at 765.

### a. Section 387p distinguishes between manufacturing and retail sales.

Read together, the plain language of section 387p's Preservation Clause, Preemption Clause, and Savings Clause shows that Congress maintained a "careful balance" between federal and state and local authority with states retaining their traditional powers to regulate retail sales, while still giving the FDA the authority to regulate manufacturing and to establish

national standards for tobacco products. *Cnty. of Los Angeles*, 29 F.4th at 555; *City of New York*, 708 F.3d at 434.

Section 387p "sandwiches limited production and marketing categories of preemption between clauses broadly preserving and saving local authority." *Cnty. of Los Angeles*, 29 F.4th at 555. Indeed, the Preservation and Savings Clauses use broad and nearly identical language to describe the state authority that is preserved or excepted from preemption. They preserve and except from preemption states' authority to regulate "the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products." 21 U.S.C. § 387p(a)(1), (a)(2)(B).[7] None of these areas relate to manufacturing, the contents of a tobacco product, or how a tobacco product is produced. Instead, they relate to regulation of tobacco products *after* they have entered the stream of commerce—sales and consumer-related aspects like use, possession, and exposure.

In contrast, the Preemption Clause uses different and more specific and technical language than the Preservation Clause and the Savings Clause. Instead of the broad language of those provisions that relates to sales, use,

---

[7] The Preservation Clause also includes the phrase "relating to or prohibiting the sale," as opposed to the Savings Clause's "relating to the sale." *Compare* 21 U.S.C. § 387p(a)(1) *with* (a)(2)(B); *see also infra* Part I.B.2.c (explaining the impact of including the term "prohibiting" in Preservation Clause but not the Savings Clause).

possession and exposure, the Preemption Clause preempts state laws that relate to manufacturing and marketing that regulate tobacco products *before* they enter the stream of commerce—any "requirement . . . relating to tobacco product standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products." 21 U.S.C. § 387p(a)(2)(A). These categories have nothing to do with sales or consumer-related activities.

UVBA challenges the conclusion that the Preemption Clause is limited to manufacturing by pointing to the terms "premarket review" and "modified risk tobacco products" that UVBA says encompass more than just manufacturing. Aplt. Br. at 21-22. But these terms reiterate that the Preemption Clause applies only to regulation *before* a tobacco product is introduced into the stream of commerce. They are concerned with how a tobacco product is produced or the ingredients it contains. The FDA's "premarket review" process requires the FDA to conduct a review of the "components, ingredients, additives, and properties" of the tobacco product, and "issue an order" to certify that the "product may be introduced or delivered for introduction into interstate commerce." 21 U.S.C. § 387j(b)(1)(B), (c)(1). Similarly, to qualify as a "modified risk tobacco product," details about a product's manufacturing and marketing process must be provided to the FDA. 21 U.S.C. § 387k(d) (requiring information on

26

"the formulation of the product" and "proposed advertising and labeling"). Like the premarket review process, this is a prerequisite to the tobacco product being "deliver[ed] for introduction into interstate commerce." 21 U.S.C. § 387k(a).

For the same reason, the inclusion of the term "good manufacturing standards" does not mean that the other terms in the Preemption Clause cannot relate to manufacturing too. *See* Aplt. Br. at 22 (arguing that construing the Preemption Clause to apply to marketing standards renders the term "good manufacturing standards" superfluous). The Preemption Clause applies to regulations that relate to the manufacturing process, not necessarily manufacturing itself. As for the terms "premarket review" and "modified risk tobacco products," they earn their designations based on how the products are manufactured or the ingredients the products contain, but they are not "good manufacturing standards." Construing the terms in the Preemption Clause as relating to manufacturing does not render that term superfluous.

Every appellate court that has examined this issue has come to the same conclusion—Section 387p "distinguishes between manufacturing and the retail sale of finished products" and "reserves regulation at the manufacturing stage exclusively to the federal government, but allows states and localities to continue to regulate sales and other consumer-related

aspects of the industry in the absence of conflicting federal regulation." *City of New York*, 708 F.3d at 434; *see also Cnty. of Los Angeles*, 29 F.4th at 555; *City of Edina*, 60 F.4th at 1175; *City of Providence*, 731 F.3d at 83 n.11. And they all hold that this "unique preemption structure gives the federal government exclusive power to set 'tobacco product standards,' while preserving state . . . authority to regulate or ban sales of those products altogether." *Cnty. of Los Angeles*, 29 F.4th at 552; *see also City of New York*, 708 F.3d at 433-34; *City of Providence*, 731 F.3d at 82; *City of Edina*, 60 F.4th at 1178.

### b. The Flavor Ban is not a "tobacco product standard."

The Preemption Clause prohibits states from "establish[ing] or continu[ing] in effect with respect to a tobacco product any requirement which is different from, or in addition to, any requirement . . . relating to *tobacco product standards*, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products." 21 U.S.C. § 387p(a)(2)(A) (emphasis added). Despite all the authority holding otherwise, and without engaging with its reasoning, UVBA contends that the Flavor Ban falls under the Preemption Clause because it is a "tobacco product standard." Aplt. Br. at 16-18. As discussed above, the terms in the Preemption Clause, including "tobacco product standards" relate

28

to how a product is manufactured. Because the Flavor Ban does not regulate how electronic cigarettes are manufactured or their ingredients, it is not a "tobacco product standard."

Although the term "tobacco product standard" is not defined in the TCA, section 387g is so titled. That section creates a "[s]pecial rule for cigarettes," which states that a cigarette "shall not contain as a constituent . . . or additive, an artificial or natural flavor (other than tobacco or menthol) or an herb or spice, . . . that is a characterizing flavor of the tobacco product or tobacco smoke." 21 U.S.C. § 387g(a)(1)(A). And it calls this "special rule" a "tobacco product standard[]." 21 U.S.C. § 387g(a)(2). Section 387g also lists the "[c]ontent[s]" of what a "tobacco product standard" should, "where appropriate," include. 21 U.S.C. § 387g(a)(4). Among other things, these contents include "provisions respecting the construction, components, ingredients, additives, constituents, . . . and properties of the tobacco product," "provisions for the testing . . . of the tobacco product," and "provisions for the measurement of the tobacco product characteristics of the tobacco product." *Id.* § 387g(a)(4)(B)(i), (ii), (iii).

UVBA relies on this language to argue that "flavors in tobacco products are paradigmatic tobacco product standards." Aplt. Br. at 16-17. But this argument ignores key differences between the Flavor Ban and the "special rule for cigarettes" and the required "contents" of a "tobacco product

standard." Unlike the "special rule for cigarettes," the Flavor Ban does not regulate the components or ingredients in electronic cigarettes. Instead, the Flavor Ban prohibits "electronic cigarette product[s]" "that ha[ve] a taste or smell that is distinguishable by an ordinary consumer" and includes those electronic cigarette products that are "labeled as, or ha[ve] a taste or smell of any fruit, chocolate, vanilla, honey, candy, cocoa, dessert, alcoholic beverage, herb, spice, or mint." Utah Code §§ 76-10-101(7), -113(2). Whether a product is barred by the Flavor Ban thus "depends on its characteristics as an end product, and not on whether it was manufactured in a particular way or with particular ingredients." *City of New York*, 708 F.3d at 435. As the Second Circuit explained when it rejected a similar argument, the Flavor Ban "does not care what goes into the tobacco product or how the flavor is produced, but only whether final tobacco products are ultimately characterized by—or marketed as having—a flavor." *Id.*[8]

UVBA points to section 387g(a)(4)(B)(i)'s use of the term "properties," arguing that because that term is included in the provision stating what a "tobacco product standard" should include, it must cover what is barred by

---

[8] UVBA also points to the Registry as evidence that the Flavor Ban is a manufacturing standard. Aplt. Br. at 23-24. But UVBA challenged the Flavor Ban in its motion for preliminary injunction, not the Registry. *See supra* Part I.B.3.

the Flavor Ban. Aplt. Br. at 17. But the term "properties" must be read in accordance with the other terms in that subsection—"construction, components, ingredients, additives, [and] constituents." 21 U.S.C. § 387g(a)(4)(B)(i); *In re McDaniel*, 973 F.3d 1083, 1097 (10th Cir. 2020) (explaining canon of *noscitur a sociis* as instructing that the Court should give "words grouped in a list a related meaning" (cleaned up)). Read with the other terms in section 387g(a)(4)(B)(i), the term "properties" refers not to a flavor or a smell that the user perceives, but to its ingredients or components.[9]

Next, UVBA cites FDA's rulemaking history to contend that "banning flavored tobacco products is the very essence of a tobacco product standard." Aplt. Br. at 17. It notes that the FDA has issued proposed rules adopting standards to prohibit menthol cigarettes and flavored electronic cigarette products and that these proposed regulations indicate that "both Congress and FDA view flavor regulation as a core, exclusively federal authority." Aplt. Br. at 17-18. At the outset, none of these regulations have been enacted, so

---

[9] UVBA also points to section 387g(a)(4)(C), which says that a "tobacco product standard" "shall, where appropriate, require the use and prescribe the form and content of labeling for the proper use of the tobacco product," as evidence that "tobacco product standards" is not limited to standards related to manufacturing. Not only does labeling occur before a tobacco product enters the stream of commerce, but it is also just one part of what a "tobacco product standard" should include. *See* 21 U.S.C. § 387g(a)(4).

31

the Flavor Ban is not "different from, or in addition to" them in violation of the Preemption Clause. *See* 21 U.S.C. § 387p(2)(A). More importantly, FDA's proposed rules don't give any insight into *Congress's* intent. And even if they did, an agency's interpretation of a statute is no longer entitled to any deference and carries no weight. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401-03 (2024) (overruling *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).

Finally, UVBA contends that even if the term "tobacco product standard" and the rest of the Preemption Clause is limited to regulations relating to manufacturing, the Flavor Ban is a *de facto* manufacturing standard that must be preempted because it "silently dictates the characteristics that manufacturers may include in their products." Aplt. Br. at 22-24. To be sure, the Supreme Court has held that certain sales bans that dictate production standards are preempted by federal law. *See Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 463-64 (2012); *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253-55 (2004). But the laws at issue in these cases were not subject to the same "unique" three-part preservation provision as the TCA that expressly preserves and exempts from preemption state sales bans. And unlike the laws in those cases, the Flavor Ban does not dictate how a tobacco product must be produced.

32

In *National Meat*, the Supreme Court examined whether a state law that prohibited slaughterhouses from selling meat from nonambulatory animals was preempted by a federal law that prohibited states from imposing "[r]equirements within the scope of [the Act] with respect to premises, facilities, and operation." 565 U.S. at 458, 463 (quoting 21 U.S.C. § 678). The Supreme Court held that the sales ban was preempted because it "functions as a command to slaughterhouses to structure their operations in the exact way the remainder of [the state law] mandates," namely, prohibiting the receipt and purchase of, barring butchering and processing of, and mandate to immediately euthanize nonambulatory animals. *Id.* at 464. And the Court reasoned that if the sales ban was not preempted, "any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved." *Id.*

Although the preemption statute at issue in *National Meat* had a savings clause, it was nothing like the three-part preservation sandwich in the TCA. Unlike the TCA's Savings Clause that expressly exempts from preemption "requirements relating to the sale" of tobacco products, 21 U.S.C. § 387p(a)(2)(A), the savings clause in *National Meat* says only that the act "shall not preclude any State . . . from making requirement[s] or taking other action, consistent with this [Act], with respect to any other matters regulated under this [Act]." *Id.* at 458 n.3 (quoting 21 U.S.C. § 678). Likewise, unlike

33

the statute at issue in *National Meat*, the Flavor Ban has nothing to do with

production. It is not based on how a tobacco product is produced or the

ingredients it contains. Instead, it concerns whether the *final product* has a

flavor or smell, a result that can be accomplished regardless of how an

electronic cigarette product is produced.

In *Engine Manufacturers*, the Supreme Court held that a state law that

required fleet operators to purchase vehicles meeting certain emission

standards was preempted by the Clean Air Act's prohibition on adopting or

enforcing "any standard relating to the control of emissions from new motor

vehicles." 541 U.S. at 252 (quoting 42 U.S.C. § 7543(a)). The Court rejected

an argument that the term "standard" in the Clean Air Act was limited to

manufacturing. But in doing so, it relied on other provisions of the Clean Air

Act, holding that there was no such distinction in the text or structure of the

Clean Air Act. *Id.* at 255.

Again, the TCA is different than the Clean Air Act. Like the

preemption statute in *National Meat*, the Clean Air Act lacks anything like

section 387p that preserves and excepts sales requirements from preemption.

And, as discussed above, unlike the Clean Air Act, the plain language and

structure and history of the TCA dictate a difference between manufacturing

and sales requirements. Finally, while UVBA cites *Engine Manufacturers* to

say that allowing the Flavor Ban to stand would "undo Congress's carefully

34

calibrated regulatory scheme," Aplt. Br. at 23 (quoting *Engine Mfrs.*, 541 U.S. at 255), the "scheme" that Congress created with the TCA was that states control retail sales and other processes *after* a tobacco product enters the stream of commerce, whereas the FDA controls manufacturing and production *before* it does so.

For all these reasons, the district court correctly held that the Flavor Ban is not a "tobacco product standard."

### c. Even if the Flavor Ban is a "tobacco product standard," it is not preempted because it is exempted from preemption by the Savings Clause.

The district court correctly held that even if the Flavor Ban is a "tobacco product standard," it is not preempted because it falls under the Savings Clause. The Savings Clause is an "[e]xception" to the Preemption Clause and states that the Preemption Clause "does not apply to requirements relating to the sale, distribution, . . . access to, . . . or use of, tobacco products by individuals of any age." 21 U.S.C. § 387p(a)(2)(B). So even if the Court holds that the Flavor Ban is a "tobacco product standard" under the Preemption Clause, the Preemption Clause "does not apply" because the Flavor Ban is a "requirement[] relating to the sale" or "access to . . . tobacco products by individuals of any age." *See id.* In addition to holding that similar flavor bans are not "tobacco product standards," every appellate

court to examine this issue has held, in the alternative, that those bans

would fall under the Savings Clause. *City of Edina*, 60 F.4th at 1175-77;

*Cnty. of Los Angeles*, 29 F.4th at 558-61; *City of Providence*, 731 F.3d at 82-

83; *City of New York*, 708 F.3d at 435-36.

UVBA argues that the Savings Clause does not apply for two reasons.

First, it contends that the Savings Clause is limited to preserving "states'

traditional authority to impose neutral sales regulations, such as age

restrictions, licensing regimes, or limits on sales locations" and does not

"authorize states to enact categorical prohibitions tied to product

characteristics." Aplt. Br. at 18. But UVBA provides no support for this

argument and nothing in the plain language of the Savings Clause (or the

rest of section 387p) supports it. *See City of Edina*, 60 F.4th at 1177 (noting

that the company "identifie[d] no basis in the text of the TCA to distinguish

between a 'blanket' prohibition and some prohibition relating to sale, like

restrictions on sale to a certain age group or time, place, and manner

restrictions"). The plain language of the Savings Clause says the opposite—

that it covers "requirements relating to the sale" of tobacco products. 21

U.S.C. § 387p(a)(2)(B).

Second, UVBA compares the text of the Preservation Clause, which

expressly preserves (subject to the Preemption Clause) states' authority to

enact laws "relating to *or prohibiting* the sale . . . of tobacco products by

individuals of any age," with the text of the Savings Clause, which excepts

from the Preemption Clause "requirements relating to the sale . . . of, tobacco

products by individuals of any age." 21 U.S.C. § 387p(a)(1), (a)(2)(B)

(emphasis added). According to UVBA, because the Preservation Clause uses

the term "prohibiting the sale," but the Savings Clause does not, a law

prohibiting the sale of a tobacco product cannot fall under the Savings

Clause. Aplt. Br. at 19-20, 24-25. But this argument ignores the fact that the

Preemption Clause also omits this language.[10]

Under UVBA's argument, the Flavor Ban, as a sales prohibition, would

also not fall under the Preemption Clause, meaning there would be no need

to examine whether it is excepted by the Savings Clause. Unlike the

Preservation Clause, both the Preemption Clause and the Savings Clause use

the term "requirement" and do not explicitly refer to prohibitions. The

Preemption Clause preempts "any requirement . . . relating to tobacco

product standards." 21 U.S.C. § 387p(a)(2)(A). And the Savings Clause

excepts from preemption "requirements relating to the sale . . . of, tobacco

products." *Id.* § 387p(a)(2)(B). To fall under the Preemption Clause, the

---

[10] Not only does the Preemption Clause omit the language "prohibiting the sale," it omits the term "sale." 21 U.S.C. § 387p(a)(2)(A). This is further evidence that Congress intended for the Preemption Clause to apply solely to manufacturing and marketing.

Flavor Ban must be a "requirement" (a point that UVBA admits). Aplt. Br. at 19. Because the Flavor Ban is a sales prohibition, the term "requirement" must then include prohibitions. And because the term "requirement" must have the same meaning in the Preemption Clause and the Savings Clause, the Savings Clause must also except sales prohibitions from preemption. *See Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning."). If the term "requirement" did not include prohibitions, then the Flavor Ban would not be preempted under the Preemption Clause. So under UVBA's logic (that a "requirement" must specifically mention "prohibiting the sale"), the Flavor Ban would not fall under the Preemption Clause either because the Preemption Clause also does not use the phrase "prohibiting the sale." *See Cnty. of Los Angeles*, 29 F.4th at 558-60; *City of Edina*, 60 F4th at 1177 (rejecting the same argument).[11] The difference in language in the Preservation Clause and the Savings Clause thus does not show that the Savings Clause does not except the Flavor Ban from preemption.

---

[11] UVBA points out that the district court mistakenly said that the Preemption Clause uses the phrase "relating to the sale." Aplt. Br. at 24-25. This is true. *See* App. Vol. 3 at 639. But that mistake does not affect this or the district court's analysis.

### 3. Federal law does not impliedly preempt the Flavor Ban.

UVBA contends that the Flavor Ban is impliedly preempted because it conflicts with federal law by standing "as an obstacle to Congress' objectives in enacting the TCA." Aplt. Br. at 25-28. Such conflict preemption (a type of implied preemption) "occurs when it is impossible for a private party to comply with both state and federal requirements or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Emerson*, 503 F.3d at 1129 (internal quotation marks omitted). It "requires that the state or local action be a material impediment to the federal action, or thwart the federal policy in a material way." *Choate*, 222 F.3d at 796 (cleaned up). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Tarrant Reg'l Water Dist. v. Hermann*, 656 F.3d 1222, 1242 (10th Cir. 2011) (internal quotation marks omitted). There is a "presumption against implied conflict preemption." *Id.* And an implied preemption analysis should not become a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives" as this would "undercut the principle that it is Congress rather than the courts that pre-empts state law." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (internal quotation marks omitted).

39

UVBA makes two arguments why the Flavor Ban is impliedly preempted. First, UVBA contends that the Flavor Ban "stands as an obstacle to Congress' objectives in enacting the TCA" because Congress did so "to authorize the FDA to set national standards controlling the manufacture of tobacco products and the amount of ingredients used in such products." Aplt. Br. at 26 (cleaned up) (quoting 21 U.S.C. § 387 note (Purpose § (3))). Like its express preemption arguments, this one has been debunked by every court to consider it. *City of Edina*, 60 F.4th at 1178-79 (explaining that a similar flavor ban "does not destroy Congress's regulatory scheme"); *Cf. Cnty. of Los Angeles*, 29 F.4th at 561 (rejecting different argument on implied preemption). As discussed above, the Flavor Ban does not impact this purpose because it does not concern "the manufacture of tobacco products" or "the amount of ingredients used in such products." *See infra* Parts I.B.2.a, b. And although the presence of a Savings Clause does not foreclose a finding of implied preemption, *Choate*, 222 F.3d at 794, holding that the Flavor Ban is impliedly preempted by the TCA would ignore the Preservation Clause and the Savings Clause that expressly preserve and except from preemption state laws prohibiting the sale of tobacco products.

Second, UVBA argues that because the TCA gives the FDA exclusive authority and discretion over the TCA's enforcement provisions, Congress intended to preempt the Flavor Ban. *See* Aplt. Br. at 26 ("Congress reinforced

40

its intent to nationalize tobacco product standards by reserving exclusive enforcement authority of TCA provisions to the federal government."). But this isn't an argument that the Flavor Ban is preempted. It's an argument that the Registry and the ban on selling electronic cigarettes that are not premarket authorized or pending electronic cigarette products are preempted.

UVBA didn't make this argument at the district court. Instead, it argued only that the Flavor Ban was preempted and didn't mention anything about the Registry, premarket authorization, or TCA's enforcement provisions.[12] App. Vol. 3 at 496-98 (portion of UVBA's motion for preliminary injunction arguing that the TCA impliedly preempts the Flavor Ban); *see also* App. Vo. 4 at 796-97 (acknowledging that only the Flavor Ban and Inspection Program were at issue in the preliminary injunction motion). Because UVBA does not ask for plain error review, this argument is waived and this Court should not consider it. *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1306 (10th Cir. 2017) ("[A]n appellant waives an argument if she fails to raise it in the

---

[12] Indeed, long after this appeal was initiated, UVBA amended its complaint to add allegations supporting a claim that the state enforcement provision conflicts with federal law. *Compare* App. Vol. 1 at 73-75 (preemption cause of action in original complaint), *with* Supp. App. at 152-57 (preemption cause of action in amended complaint, filed on October 29, 2025, that adds paragraphs 163, 165-66, and 168-70).

41

district court and has failed to argue for plain error and its application on appeal." (internal quotation marks omitted)); *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013) ("Arguments that were not raised below are waived for purposes of appeal." (internal quotation marks omitted)).

Even if the Court considers this argument, it's wrong. UVBA cites two cases that purportedly conclude that similar state laws are preempted. Aplt. Br. at 28 (citing *Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Dep't of Revenue*, 781 F.Supp.3d 724 (S.D. Iowa 2025),[13] and *Vapor Tech. Ass'n v. Marshall*, No. 03-cv-2025-901284.00 (Ala. Cir. Ct. Aug. 15, 2025)[14]). At least two other cases have held otherwise, explaining that similar premarket authorization requirements were not impliedly preempted because doing so would ignore section 387p's unique three-part structure. *See Vapor Tech. Ass'n v. Wooten*, No. 4:25-cv-76, 2025 WL 1787420 (E.D.N.C. June 27, 2025), and *Wisconsinites for Alternatives to Smoking and Tobacco, Inc. v. Casey*, No. 25-cv-552, 2025 WL 2582099 (W.D. Wis. Sept. 5. 2025). Like in

---

[13] The statute at issue in *Iowans for Alternatives* did not include a ban on flavored tobacco products. 781 F.Supp.3d at 728. And that case even distinguishes between such a flavor ban and a ban on products that have not satisfied premarket review requirements. *Id.* at 740-41.

[14] The State is unable to locate the Alabama state court case. It does not appear to be available "in a publicly accessible electronic database" and was not attached to UVBA's brief. *See* 10th Cir. R. 32.1(b).

42

these cases, the E-Cigarette Act does not bar sales of electronic cigarettes solely based on their premarket authorization status. Instead, like in *Wooten* and *Casey*, it prohibits the sale of electronic cigarette products that are not listed on the Registry, Utah Code § 59-14-810(7)(a), or electronic cigarette products that, in addition to not being premarket authorized or pending electronic cigarette product, exceed the permitted nicotine level, Utah Code §§ 76-10-101(16), -113(2). So even if the Court considers this new challenge to different parts of the E-Cigarette Act, those portions of the E-Cigarette Act are not impliedly preempted either.

### C.     UVBA cannot satisfy the remaining preliminary injunction elements.

Because the district court held that UVBA was not likely to succeed on its preemption claim, it did not analyze the remaining preliminary injunction elements—irreparable injury, balance of harms, and public interest. If this Court determines that UVBA is likely to succeed on the merits of its preemption claim, it should remand to the district court to decide these elements in the first instance. *Equal Emp. Opportunity Comm'n v. CollegeAmerica Denver, Inc.*, 89 F.3d 1171, 1175 (10th Cir. 2017) ("the better practice on issues raised below but not ruled on by the district court is to leave the matter to the district court in the first instance" (cleaned up)).

43

But even if this Court considers the other elements, UVBA has not satisfied its burden to prove them. Much of UVBA's arguments on these issues are either unsupported or rely on declarations that contain hearsay that the State challenged at the district court, App. Vol. 3 at 598, or material that is not part of the record because it was submitted *after* the district court decided this issue.[15] *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1225 (10th Cir. 2023) ("We do not generally review documents that were not before the district court.").

UVBA appears to rely on the district court's irreparable harm analysis from its order enjoining the Inspection Program. Aplt. Br. at 34. But the district court based its irreparable harm decision on the merits—the threat of being subject to an unconstitutional search. App. Vol. 3 at 682-83. This analysis is not relevant to the Flavor Ban. UVBA also contends that its members would be forced to go out of business if they could not sell flavored electronic cigarette products. Aplt. Br. at 35. But the evidence they cite for this assertion is a declaration describing a survey of tobacco retailers that is rife with hearsay. Aplt. Br. at 35 (citing App. Vol. 3 at 562-66); App. Vol. 3 at

---

[15] UVBA cites to evidence it used to support a Motion for Injunction Pending Appeal that it filed in the district court. App. Vol. 4 at 696-767. Not only is this evidence not part of the record, UVBA withdrew that motion. Supp. App. at 97-98.

598-99 (challenging the declaration as hearsay).[16] Even assuming UVBA's assertion is true, the loss of exclusivity or destruction of a business does not always constitute irreparable harm. *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262-63 (10th Cir. 2004); *Phibro Biodigester v. Murphy-Brown, LLC*, No. 22-4117, 2024 WL 4541530, at *6 (10th Cir. Oct. 22, 2024).

UVBA can't satisfy the other two elements either. The last two elements—balance of harms and public interest—merge when the government is a party. *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020). UVBA contends that it satisfies these elements because "[a]s a matter of law, protecting constitutional freedoms is in the public interest." Aplt. Br. at 36. But this rule applies only when a statute violates *individual* constitutional rights. *Aposhian*, 958 F.3d at 989-91; *Leachco*, 103 F.3d at 754-55. UVBA argues that the Flavor Ban is unconstitutional because it is preempted by the TCA, not because it violates an individual right. Here, the State's strong interest in reducing the number of kids who use electronic cigarettes

---

[16] Without citation, UVBA also says that some retail tobacco specialty businesses have closed since the Flavor Ban went into effect. Aplt. Br. at 35. The only evidence that could support this assertion is UVBA's withdrawn motion for injunction pending appeal that is not properly part of the record on appeal.

outweighs any purported harm that UVBA may suffer because of the Flavor Ban.[17]

## II. The district court abused its discretion by enjoining the Inspection Program and holding UVBA was likely to succeed on its claim that it violates the Fourth Amendment.

The Inspection Program allows a "local health department" to "examine the books, papers, and records of a retailer" in Utah to determine whether a retailer is complying with the Registry. Utah Code § 26A-1-131(1)(a). The local health department may conduct this inspection "at any time during ordinary business hours" and may "inspect the premises and all desks, safes, vaults, and other fixtures and furniture contained in or upon the premises for the purpose of ascertaining whether an electronic cigarette product is held or possessed in violation of" the Registry. *Id.* § 26A-1-131(1)(b). If a retailer is found to possess products not on the Registry, the local health department must make an "[u]nannounced follow-up examination[]" within 30 days of the violation. *Id.* § 26A-1-131(1)(c). The local health department must "publish the results of all examinations at least annually and shall make the results available to the public on request." *Id.* § 26A-1-131(1)(d).

---

[17] UVBA says an injunction will not prejudice the State because, according to UVBA, not all local health departments have been enforcing the Flavor Ban. Aplt. Br. at 38. But UVBA again relies on its withdrawn motion for injunction pending appeal that is not properly part of the record.

Warrantless administrative searches conducted pursuant to statute, like the Inspection Program, are constitutionally permissible under the Fourth Amendment if the business or industry to be inspected is "closely regulated" and the inspection satisfies the three criteria set forth in *New York v. Burger*, 482 U.S. 691 (1987). *Johnson v. Smith*, 104 F.4th 153, 159 (10th Cir. 2024). To satisfy the *Burger* criteria, (a) "there must be a significant governmental interest that informs the regulatory scheme pursuant to which the inspection is made;" (b) "the warrantless inspections must be necessary to further the regulatory scheme;" and (c) "the statute's inspection program, in terms of certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant." *Id.* (cleaned up).

UVBA conceded that tobacco retailers are a closely regulated business and that the Inspection Program satisfies the first two *Burger* criteria. App. Vol. 3 at 673, 678, Vol. 4 at 791-92. The only issue for the district court to decide was thus whether the Inspection Program satisfies the third *Burger* criterion—whether "the statute's inspection program, in terms of the certainty and regularity of its application, . . . provide[s] a constitutionally adequate substitute for a warrant." *Johnson*, 104 F.4th at 159 (quoting *Burger*, 482 U.S. at 700). To do so, "the law 'must advise the owner of the commercial premises that the search is being made pursuant to the law and

47

has a properly defined scope, and it must limit the discretion of the inspecting officers.'" *Id.* at 174 n.7 (quoting *Burger*, 482 U.S. at 703).

The district court held that the Inspection Program likely failed the third *Burger* criterion. According to the district court, the Inspection Program did not provide a constitutionally adequate substitute for a warrant because it did not limit inspectors' discretion as to which retailers to inspect or how often to inspect them. App. Vol. 3 at 678-80 (concluding that the "Inspection Program seemingly leaves it in inspectors' hands entirely as to whether any inspections occur, which RTSBs will be inspected, and how frequently any particular RTSB might be inspected").

The district court erred by focusing only on the frequency and certainty of inspections and by holding that the Inspection Program did not provide enough certainty in this regard to satisfy the Fourth Amendment. To determine whether a law provides a constitutionally adequate substitute for a warrant, the court must look at the statute "as a whole." *Burger*, 482 U.S. at 711 n.21; *see also Marshall v. Barlow's Inc.*, 436 U.S. 307, 321 (1978) (explaining that the "reasonableness of a warrantless search . . . will depend upon the specific enforcement needs and privacy guarantees of each statute"). Although "the number of searches that may be conducted of a particular business during any given period . . . or the absence thereof, are a factor in an analysis of the adequacy of a particular statute, they are not determinative of

48

the result so long as the statute, as a whole, places adequate limits upon the discretion of the inspecting officers." *Burger*, 482 U.S. at 711 n.21.

When viewed as a whole, the Inspection Program provides an adequate substitute for a warrant and places adequate limits on the discretion of inspecting officers. It is nearly identical to three similar programs that were upheld by either the Supreme Court or this Court.

In *Burger*, the Supreme Court upheld a statute that allowed warrantless searches of vehicle junkyards. Specifically, the statute allowed an agent of the commissioner of the state department of motor vehicles or a police officer to examine certain records and "any vehicles or parts of vehicles . . . on the premises." 482 U.S. at 694 n.1 (quoting the relevant New York statute). The statute did not limit or require the number of inspections in a certain period.[18] The Supreme Court held that the statute gave junkyard operators adequate notice because they would know "that the inspections . . . do not constitute discretionary acts by a government official but are conducted pursuant to statute." *Id.* at 711. According to the Court, the

_____

[18] Contrary to what the district court said, the statute at issue in *Burger* did not dictate the frequency of inspections. App. Vol. 3 at 674. Despite a statement in the opinion that the "statute informs the operator of a vehicle dismantling business that inspections will be made on a regular basis," *Burger*, 482 U.S. at 711, the statute at issue in *Burger* said no such thing. *See id.* at 694 n.1 (reciting text of relevant statute).

49

statute adequately set forth the scope of the inspection and put operators "on notice as to how to comply with the statute" and "who is authorized to conduct an inspection." *Id.* And it put "appropriate restraints upon the discretion of the inspecting officers" because the "time, place, and scope of the inspection [was] limited" to only during business hours. *Id.* (internal quotation marks omitted). Finally, the Court expressly disclaimed any requirement that the statute limit the number of searches during a particular period. *Id.* at 711 n.21.

In *United States v. Biswell*, the Supreme Court upheld a statute that allowed warrantless searches of "any firearms or ammunition dealer for the purpose of inspecting or examining (1) any records or documents required to be kept and (2) any firearms or ammunition kept or stored by such dealer at such premises." 406 U.S. 311, 311-12 (1972) (cleaned up). The Court upheld the statute despite the lack of any provisions dictating how often an officer could or must inspect a dealer. According to the Court, "the possibilities of abuse and the threat to privacy [were] not of impressive dimensions" in part because, by "choos[ing] to engage in this pervasively regulated business and to accept a federal license, [a dealer] does so with the knowledge that his business, records, firearms, and ammunition will be subject to effective inspection." *Id.* at 316-17. The Court also explained that the "flexibility as to time, scope, and frequency" of the inspection were necessary. *Id.* at 316.

50

Finally, in *S&S Pawn Shop Inc. v. City of Del City*, this Court upheld a statute that authorized warrantless searches of pawnshops. 947 F.2d 432 (10th Cir. 1991). The statute allowed the administrator of consumer affairs, his duly authorized representative, or law enforcement officials to inspect pawnshops' books and records and "have free access to the office, place of business, files, safes and vaults of such licensee." *Id.* at 435 n.3. This Court rejected the argument that "the statute fails to notify pawnbrokers of the frequency of inspections" because "the Supreme Court has not required great specificity in [that] regard." *Id.* at 438. It explained that the statute provided sufficient limits on the discretion of the inspecting officers because it limited inspections to "a reasonable time," because "only pawnshops [we]re subject to such a search," and because the scope of the inspection was limited to "the pawnshop itself and those records that pertain to the business regulated by" the pawnshop act. *Id.* at 439. This Court also blessed the statute because it "provide[d] notice to individuals licensed as pawn brokers that they [would] be subject to warrantless inspections" and that those inspections would be conducted "for the purpose of discovering violations of the Oklahoma Pawnshop Act or of securing information required by the Act." *Id.* at 438 (cleaned up).[19]

---

[19] This Court remanded to the district court to resolve an as applied challenge to the statute because it appeared from the record that the

Like *Burger*, *Biswell*, and *S&S Pawn*, the Inspection Program satisfies the third *Burger* criterion. If anything, the Inspection Program is more limited than the statutes at issue in those cases. Unlike those statutes, the Inspection Program *requires* unannounced follow-up inspections within 30 days of a failed inspection. Utah Code § 26A-1-131(1)(c). And it requires that the results of the inspections be published and made available to the public. *Id.* § 26A-1-131(1)(d). It also limits who may conduct an inspection. While the statutes at issue in *Burger*, *Biswell*, and *S&S Pawn* allowed law enforcement to conduct the inspections, only "local health departments" may do so under the Inspection Program. *Id.* § 26A-1-131(1)(a). Furthermore, like the statute in *Burger*, the Inspection Program limits inspections not just to a "reasonable time," that was permissible in *S&S Pawn*, but to "ordinary business hours." *Id.* § 26A-1-131(1)(b). And like the statutes at issue in those cases, the Inspection Program gives notice that by selling tobacco products in the state, retailers are subject to warrantless inspections and are notified of the purpose and scope of such inspections. Like in *Burger*, *Biswell*, and *S&S*

---

inspections at issue in the case resulted not based on a routine administrative search, but rather because of "direct criminal suspicion." *S & S Pawn*, 947 F.2d at 440-41. There is no such as applied challenge in this case. UVBA makes only a pre-enforcement facial challenge to the Inspection Program.

*Pawn*, the lack of certainty as to the exact time and number of inspections does not mean that the Inspection Program fails the third *Burger* criterion.

To be sure, despite *Burger*'s insistence that the frequency of the searches is not determinative, both the Supreme Court and this Court have discussed that factor in striking down statutes that allow warrantless administrative searches. But in each of those cases, the lack of certainty of inspections was just one factor in the courts' analyses. Those cases are also otherwise distinguishable.

In *Donovan v. Dewey*, a case that pre-dates *Burger*, the Supreme Court upheld a statute that allowed federal mine regulators to conduct warrantless mine inspections. 452 U.S. 594, 596 (1981). It required underground mines to be inspected at least four times a year and surface mines to be inspected at least twice a year. *Id.* Although the Court relied on the fact that the statute "require[d] inspection of *all* mines and specifically define[d] the frequency of inspection," that was not the Court's only reason for holding that the statute provided a constitutionally adequate substitute for a warrant. *Id.* at 603-04. The Court also relied on the fact that, like the Inspection Program, the act required "followup inspections of mines where violations of the Act ha[d] previously been discovered" and that "the standards with which a mine operator is required to comply are all specifically set forth in the Act" or the Code of Federal Regulations. *Id.* at 604. Further, the court explained that

53

inspectors did not have discretion over what violations to search for, meaning that like retailers under the Inspection Program, "the operator of a mine is not left to wonder about the purposes of the inspector or the limits of his task." *Id.* at 604 (internal quotation marks omitted).

In *V-1 Oil Co. v. Wyoming Department of Environmental Quality*, this Court struck down a statute that allowed for warrantless searches of any property, except private residences, on which a pollution source is located or being constructed. 902 F.2d 1482, 1484 (10th Cir. 1990). Although this Court mentioned that the statute provided "no assurance of regularity of inspections" and left "inspectors free to inspect any business as often or seldom as he or she pleases," that was not the sole reason for striking down the statute. *Id.* at 1487 (internal quotation marks omitted). This Court also explained that, unlike the Inspection Program, the statute applied "to every business in Wyoming" and provided "no notice whatsoever to the owner of any particular business that his or her property will be subject to warrantless inspections." *Id.* Thus, considering the entire statute, this Court determined that it was not a constitutionally adequate substitute for a warrant. *Id.*

Most recently, in *City of Los Angeles v. Patel*, the Supreme Court struck down a statute that allowed warrantless searches of hotel records. 576 U.S. 409 (2015). The crux of the Supreme Court's holding was that hotels were not closely regulated businesses and that the exception for closely regulated

54

businesses did not apply. *Id.* at 424. But, with almost no analysis, the Court also stated that even if hotels were closely regulated, the statute failed "sufficiently to constrain police officers' discretion as to which hotels to search and under what circumstances." *Id.* at 427. Unlike the Inspection Program which authorizes local health departments to conduct warrantless searches, the law in *Patel* allowed Los Angeles police officers to do so. 576 U.S. at 413. And unlike the Inspection Program that limits searches to ordinary business hours, the only limitation on the hotel searches was that "whenever possible, the inspections shall be conducted at a time and in a manner that minimizes any interference with the operation of the business." *Id.* (cleaned up). There was also no follow-up inspection requirement.[20]

Although the Inspection Program does not have a defined frequency of initial inspections, like the statute in *Dewey* and unlike the one in *Patel*, the Inspection Program requires follow-up visits in a defined time period. Utah Code § 26A-1-131(1)(c). And unlike the statute in *V-I* (and similar to those in *Burger* and *S&S Pawn*), the Inspection Program does not apply broadly to all

---

[20] The district court also relied on this Court's decision in *Johnson v. Smith*, 104 F.4th 153 (10th Cir. 2024). App. Vol. 3 at 680. But in that case, the Court "assume[d] that the third criterion had been satisfied" and discussed it only in a footnote. *Johnson*, 104 F.4th at 174 n.7. Its analysis is thus dicta and not binding. *See Tokoph v. United States*, 774 F.3d 1300, 1303 (10th Cir. 2014).

businesses. It is limited to tobacco retailers, who know that they are subject to these restrictions. Accordingly, when looking at the Inspection Program as a whole, as *Burger* requires, the Inspection Program is an adequate substitute for a warrant. The district court erred by relying solely on the frequency and certainty of the inspections and not looking at the Inspection Program as a whole.

Because UVBA is not likely to succeed on the merits of its claim that the Inspection Program violates the Fourth Amendment, this Court should reverse the district court's order enjoining it.[21]

## III.   The district court correctly held that the Inspection Program is severable.

If this Court reverses the district court's order enjoining the Inspection Program, it need not reach this issue. But if this Court upholds the district court's order enjoining the Inspection Program, it should also uphold the district court's decision that the Inspection Program is severable, meaning the Flavor Ban and other portions of the E-Cigarette Act may remain in place.

---

[21] The district court also determined that UVBA satisfied the irreparable injury, balance of harms, and public interest elements. But its decision on these issues was based entirely on the fact that the Inspection Program likely violates the Fourth Amendment. App. Vol. 3 at 680-84.

The severability of a state statute is a matter of state law. *Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1250 (10th Cir. 2000). In Utah, "the general rule is that statutes, where possible, are to be construed as to sustain their constitutionality." *Vega v. Jordan Valley Med. Ctr., LP*, 2019 UT 35, ¶ 17, 449 P.3d 31 (cleaned up). So "if a portion of the statute might be saved by severing the part that is unconstitutional, such should be done." *Id.* (internal quotation marks omitted).

To determine whether a portion of a statute is severable, the court must "examine legislative intent and ask whether the legislature would have intended to enact the statute with the stricken provision severed." *Id.* Contrary to what UVBA says, this is the rule regardless of whether the statute includes a severability clause. *See* Aplt. Br. at 29-30. If "there is no severability provision in the statute, or, more generally, if the legislature's intent is not expressly stated" the court must "turn to the statute itself and examine the remaining constitutional portion of the statute in relation to the stricken portion. If the remainder of the statute is operable and still furthers the intended legislative purpose, the statute will be allowed to stand." *Vega*, 2019 UT 35, ¶ 24 (internal quotation marks omitted); *In re Gestational Agreement*, 2019 UT 40, ¶ 52, 449 P.3d 69 ("In other words, we look at

57

whether the remaining portions of the act can stand alone and serve a legitimate legislative purpose." (internal quotation marks omitted)).[22]

The district court correctly held that the Inspection Program is severable because it is likely that the legislature would have enacted the E-Cigarette Act in the absence of the Inspection Program. As the district court explained, the E-Cigarette Act still furthers the purpose of reducing youth use of electronic cigarette products without the Inspection Program and provides "a comprehensive program for regulating electronic cigarettes and punishing retailers that sell banned products" that is operable without the Inspection Program. App. Vol. 3 at 685-86. The structure of the E-Cigarette Act and its various parts illustrate this fact.

The primary purpose of the E-Cigarette Act—reducing youth electronic cigarette use—is still furthered without the Inspection Program. The E-

---

[22] UVBA says that because severability provisions in Utah law are common, the fact that the legislature did not include one in the E-Cigarette Act shows that the legislature did not intend for the Inspection Program to be severable. Aplt. Br. at 30. Not only does this disregard Utah law that says that the lack of a severability clause is not determinative, but it also disregards the principle that the legislature's failure to use a term in one part of the code where it has used it in another is not evidence of the legislature's intent. *See Jensen v. Intermountain Healthcare, Inc.*, 2018 UT 27, ¶ 26, 424 P.3d 885. Rather, all it shows is that the legislature "knowns how to speak more explicitly." *Craig v. Provo City*, 2016 UT 40, ¶ 38, 339 P.3d 423 (internal quotation marks omitted). And because the legislature could always speak more clearly, that "typically gets [the court] nowhere." *Id.*

Cigarette Act sought to accomplish this purpose by implementing the Flavor Ban, creating the Registry, imposing a nicotine limit for electronic cigarettes, and prohibiting the sale of electronic cigarette products that are not premarket authorized or pending premarket authorization. These provisions are still operable without the Inspection Program. Although the Inspection Program helps to enforce the Registry requirement, it is not the only enforcement mechanism for the E-Cigarette Act. Utah Code section 26B-7-516 allows local health departments to inspect tobacco retailers to determine if there has been a violation of state law, which includes violations of the Flavor Ban, nicotine, limit, and Registry. Similarly, as the district court ruled, nothing prohibits local health departments or law enforcement from obtaining an ex parte warrant or conducting undercover operations. App. Vol. 3 at 686. And simply having the Flavor Ban and associated penalties creates a deterrent effect. *Smith v. Doe*, 538 U.S. 84, 102 (2003) ("Any number of governmental programs might deter crime without imposing punishment."); *Shaw v. Patton*, 823 F.3d 556, 571 (2016) ("Deterrence is not unique to punishment, for any civil regulation likely has some deterrent effect.").

The structure of the E-Cigarette Act drives home the point that the legislature would have enacted the E-Cigarette Act without the Inspection Program. The Inspection Program allows warrantless administrative searches "for the purpose of determining compliance with Section 59-14-810"

and appears in the Local Health Authorities title of the Utah Code. Utah Code § 26A-1-131(a). Section 59-14-810 is the Registry statute. The Registry is separate from the Flavor Ban and the ban on premarket authorized or pending electronic cigarette products. Those bans appear in the criminal code and impose criminal penalties. Utah Code § 76-10-113(2)-(4). The Registry, which appears in the tax code, requires manufacturers to certify that they will comply with premarket authorization requirements and submit a form certifying the nicotine content and any flavors contained in the product. *Id.* § 59-14-810(1), (3). Although the Registry statute makes it unlawful to sell products not listed on the Registry, it imposes civil penalties for doing so and does not reference the criminal sales bans. *Id.* § 59-14-810(7), (8). Because these parts of the E-Cigarette Act are completely separate, even if the Inspection Program was necessary to enforce the Registry's requirements, it could still operate independently of the Flavor Ban and the ban on the sale of electronic cigarettes that are not premarket authorized or pending electronic cigarette products. Because these provisions operate independently of the Inspection Program, it is necessarily severable.

UVBA's arguments that the Inspection Program is not severable are unavailing.

1.      According to UVBA, "the legislature saw an effective enforcement mechanism as central to the Flavor Ban reducing youth's access to electronic

cigarette products." Aplt. Br. at 31. It says that the district court "overlooked

the legislature's consideration of time and cost efficiencies when including the

Inspection Program versus alternative methods" and that costly enforcement

mechanisms are "burdens the legislature likely weighed when designing the

Act's scheme." Aplt. Br. at 32 (citing Utah Code §§ 59-14-810(12), 26A-1-

131(1)(f)). This argument is unsupported, ignores the structure, purpose, and

deterrent effects discussed above, and overstates the purported importance of

the Inspection Program. There was no discussion of the Inspection Program

during the legislative hearings or debates on the E-Cigarette Act. The only

time it was mentioned was a single sentence in passing noting an

amendment that included "an enforcement mechanism." SB 61, 2024 Gen.

Sess. Day 29 (Feb. 13, 2024), at 45:47.[23] In light of the overwhelming support

for the E-Cigarette Act, especially the Flavor Ban, this argument does not

demonstrate that the legislature would not have enacted the E-Cigarette Act

without the Inspection Program.[24]

---

[23] Available at https://le.utah.gov/av/floorArchive.jsp?markerID=125828

[24] UVBA also contends that the fact that the legislature considered amendments to the E-Cigarette Act in its 2025 general session that did not include a severability clause is evidence that the legislature did not intend for the Inspection Program to be severable. Aplt. Br. at 30 (discussing S.B. 186, Tobacco and Electronic Cigarette Amendments, 66th Gen. Leg. Sess. (Utah 2025)). As discussed above, the absence of a severability provision is not material. *See Vega*, 2019 UT 35, ¶ 24. But UVBA also fails to mention that this bill proposed *eliminating* the Inspection Program's warrantless searches.

2.    Next, UVBA contends that the State conceded that the Inspection Program could not be severed by arguing, as part of the Fourth Amendment analysis, that the Inspection Program was necessary to enforce the E-Cigarette Act. Aplt. Br. at 32-33. But arguing that the Inspection Program was necessary to enforce the E-Cigarette Act as part of the Fourth Amendment analysis (the second factor of the *Burger* test which is that "the warrantless inspections must be necessary to further the regulatory scheme," *Burger*, 482 U.S. at 702 (cleaned up)), is not the same inquiry as whether the legislature intended for the Inspection Program to be severable. The severability inquiry asks whether "the remainder of the statute is operable and still furthers the intended legislative purpose." *Vega*, 2019 UT 35, ¶ 17 (internal quotation marks omitted). The Fourth Amendment analysis says nothing about whether the legislature would have enacted the remainder of the E-Cigarette Act without the Inspection Program or whether the remainder of the E-Cigarette Act—most notably the Flavor Ban—would be

---

S.B. 186, lines 45-54. What's more S.B. 186 passed in the Senate but was amended in the House in the closing minutes of the legislative session, with no time for the Senate to vote on the House amendments. *See* S.B. 186 Status, *available at* https://le.utah.gov/~2025/bills/static/SB0186.html (showing amended bill passing the House and being transmitted to the Senate at 11:48 pm). It is not evidence that the legislature did not intend for the Inspection Program to be severable.

operable without the Inspection Program or would still serve the purpose of reducing youth access to and use of electronic cigarettes.

3.    Finally, UVBA wrongly contends that the State forfeited its severability argument by addressing it in a footnote in its opposition to UVBA's motion for a temporary restraining order and preliminary injunction and in its supplemental reply brief on the Fourth Amendment issue and by not discussing it at the hearing. Aplt. Br. at 33. But this Court has made clear that "[t]he forfeiture rule . . . doesn't apply when the district court explicitly considers and resolves an issue of law on the merits because appellate courts can reach issues that were passed upon by the lower court." *VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1169 (10th Cir. 2021) (cleaned up); *Estrada v. Smart*, 107 F.4th 1254, 1263 (10th Cir. 2024) ("We set aside our general rules on forfeiture and waiver when an issue has been 'passed upon,' meaning the district court explicitly has considered and resolved an issue of law on the merits." (cleaned up)). Because the district court reached the severability issue, the State could not have forfeited it.

What's more UVBA's severability argument in its preliminary injunction motion was hardly robust. UVBA gave no reason why the Inspection Program was not severable. Other than reciting the standard for severability, UVBA simply stated "[i]nasmuch as there is no severability provision found in the relevant statutes and the warrantless search

63

provisions violate Plaintiffs' constitutional rights, the remaining provisions of the Electronic Cigarette Amendments will be rendered inoperable upon a determination that the warrantless search provisions are unconstitutional and must be enjoined." App. Vol. 3 at 499-500. The State provided a detailed response, explaining that the remaining portions of the E-Cigarette Act still serve the primary purpose of reducing youth electronic cigarette use. App. Vol. 3 at 611-12 n.59. Considering the paucity of UVBA's argument, the State's response, albeit in a footnote, was sufficient.

## Conclusion

For the reasons expressed herein, the Court should uphold the district court's order refusing to enjoin the Flavor Ban, should reverse the district court's order enjoining the Inspection Program, and if it does not reverse the order enjoining the Inspection Program, should affirm the district court's order holding that it is severable from the Flavor Ban.

DATED this 24th day of November, 2025

/s/ *Sarah Goldberg*
Sarah Goldberg
Assistant Solicitor General

*Attorneys for Appellees/Cross-Appellants*

64

## Certificate of Compliance

I certify that:

1.     All required privacy redactions have been made.

2.     This brief complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(B) because it contains 15,005 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B).

3.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 10th Cir. R. 32(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 13-point Century Schoolbook font.

DATED this 24th day of November, 2025

/s/ *Sarah Goldberg*
Sarah Goldberg
Assistant Solicitor General

*Attorneys for Appellees/Cross-Appellants*

# Addendum 1

**Enrolled Copy**                                                                                                               **S.B. 61**

## ELECTRONIC CIGARETTE AMENDMENTS

### 2024 GENERAL SESSION

### STATE OF UTAH

**Chief Sponsor: Jen Plumb**

House Sponsor: Brady Brammer

═══════════════════════════════════════════════════════════════════════

**LONG TITLE**

**General Description:**

This bill modifies provisions related to electronic cigarettes.

**Highlighted Provisions:**

This bill:

‣ prohibits the sale of electronic cigarette products that have not received market authorization or are pending market authorization from the federal Food and Drug Administration;

‣ codifies a nicotine limit for electronic cigarette products;

‣ prohibits the sale of flavored electronic cigarette products; and

‣ creates a registry for electronic cigarette products.

**Money Appropriated in this Bill:**

None

**Other Special Clauses:**

This bill provides a special effective date.

**Utah Code Sections Affected:**

AMENDS:

**10-8-41.6**, as last amended by Laws of Utah 2023, Chapter 327

**17-50-333**, as last amended by Laws of Utah 2023, Chapter 327

**26B-7-505**, as renumbered and amended by Laws of Utah 2023, Chapter 308

**59-14-807**, as last amended by Laws of Utah 2023, Chapters 98, 300, 329, and 531 and last amended by Coordination Clause, Laws of Utah 2023, Chapter 531

**76-10-101**, as last amended by Laws of Utah 2023, Chapter 330

**76-10-113**, as enacted by Laws of Utah 2020, Chapter 302

ENACTS:

**26A-1-131**, Utah Code Annotated 1953

**59-14-810**, Utah Code Annotated 1953

*Be it enacted by the Legislature of the state of Utah:*

Section 1.  Section **10-8-41.6** is amended to read:

**10-8-41.6 . Regulation of retail tobacco specialty business.**

(1)  As used in this section:

(a)  "Community location" means:

(i)  a public or private kindergarten, elementary, middle, junior high, or high school;

(ii)  a licensed child-care facility or preschool;

(iii)  a trade or technical school;

(iv)  a church;

(v)  a public library;

(vi)  a public playground;

(vii)  a public park;

(viii)  a youth center or other space used primarily for youth oriented activities;

(ix)  a public recreational facility;

(x)  a public arcade; or

(xi)  for a new license issued on or after July 1, 2018, a homeless shelter.

(b)  "Department" means the Department of Health and Human Services created in Section 26B-1-201.

(c)  "Electronic cigarette product" means the same as that term is defined in Section 76-10-101.

[(d)  "Flavored electronic cigarette product" means the same as that term is defined in Section 76-10-101.]

[(e)] (d)  "Licensee" means a person licensed under this section to conduct business as a retail tobacco specialty business.

[(f)] (e)  "Local health department" means the same as that term is defined in Section 26A-1-102.

[(g)] (f)  "Nicotine product" means the same as that term is defined in Section 76-10-101.

[(h)] (g)  "Retail tobacco specialty business" means a commercial establishment in which:

(i)  sales of tobacco products, electronic cigarette products, and nicotine products account for more than 35% of the total quarterly gross receipts for the establishment;

- 2 -

(ii) 20% or more of the public retail floor space is allocated to the offer, display, or storage of tobacco products, electronic cigarette products, or nicotine products;

(iii) 20% or more of the total shelf space is allocated to the offer, display, or storage of tobacco products, electronic cigarette products, or nicotine products;

(iv) the commercial establishment:

(A) holds itself out as a retail tobacco specialty business; and

(B) causes a reasonable person to believe the commercial establishment is a retail tobacco specialty business; or

[(v) any flavored electronic cigarette product is sold; or]

[(vi)] (v) the retail space features a self-service display for tobacco products, electronic cigarette products, or nicotine products.

[(i)] (h) "Self-service display" means the same as that term is defined in Section 76-10-105.1.

[(j)] (i) "Tobacco product" means:

(i) a tobacco product as defined in Section 76-10-101; or

(ii) tobacco paraphernalia as defined in Section 76-10-101.

(2) The regulation of a retail tobacco specialty business is an exercise of the police powers of the state by the state or by delegation of the state's police powers to other governmental entities.

(3) (a) A person may not operate a retail tobacco specialty business in a municipality unless the person obtains a license from the municipality in which the retail tobacco specialty business is located.

(b) A municipality may only issue a retail tobacco specialty business license to a person if the person complies with the provisions of Subsections (4) and (5).

(4) (a) Except as provided in Subsection (7), a municipality may not issue a license for a person to conduct business as a retail tobacco specialty business if the retail tobacco specialty business is located within:

(i) 1,000 feet of a community location;

(ii) 600 feet of another retail tobacco specialty business; or

(iii) 600 feet from property used or zoned for:

(A) agriculture use; or

(B) residential use.

(b) For purposes of Subsection (4)(a), the proximity requirements shall be measured in a straight line from the nearest entrance of the retail tobacco specialty business to the

Appellate Case: 25-4046     Document: 39     Date Filed: 11/24/2025     Page: 80

nearest property boundary of a location described in Subsections (4)(a)(i) through (iii), without regard to intervening structures or zoning districts.

(5) A municipality may not issue or renew a license for a person to conduct business as a retail tobacco specialty business until the person provides the municipality with proof that the retail tobacco specialty business has:

(a) a valid permit for a retail tobacco specialty business issued under Title 26B, Chapter 7, Part 5, Regulation of Smoking, Tobacco Products, and Nicotine Products, by the local health department having jurisdiction over the area in which the retail tobacco specialty business is located; and

(b) (i) for a retailer that sells a tobacco product, a valid license issued by the State Tax Commission in accordance with Section 59-14-201 or 59-14-301 to sell a tobacco product; and

(ii) for a retailer that sells an electronic cigarette product or a nicotine product, a valid license issued by the State Tax Commission in accordance with Section 59-14-803 to sell an electronic cigarette product or a nicotine product.

(6) (a) Nothing in this section:

(i) requires a municipality to issue a retail tobacco specialty business license; or

(ii) prohibits a municipality from adopting more restrictive requirements on a person seeking a license or renewal of a license to conduct business as a retail tobacco specialty business.

(b) A municipality may suspend or revoke a retail tobacco specialty business license issued under this section:

(i) if a licensee engages in a pattern of unlawful activity under Title 76, Chapter 10, Part 16, Pattern of Unlawful Activity Act;

(ii) if a licensee violates federal law or federal regulations restricting the sale and distribution of tobacco products or electronic cigarette products to protect children and adolescents;

(iii) upon the recommendation of the department or a local health department under Title 26B, Chapter 7, Part 5, Regulation of Smoking, Tobacco Products, and Nicotine Products; or

(iv) under any other provision of state law or local ordinance.

(7) (a) A retail tobacco specialty business is exempt from Subsection (4) if:

(i) on or before December 31, 2018, the retail tobacco specialty business was issued a license to conduct business as a retail tobacco specialty business;

(ii) the retail tobacco specialty business is operating in a municipality in accordance with all applicable laws except for the requirement in Subsection (4); and

(iii) beginning July 1, 2022, the retail tobacco specialty business is not located within 1,000 feet of a public or private kindergarten, elementary, middle, junior high, or high school.

(b) A retail tobacco specialty business may maintain an exemption under Subsection (7)(a) if:

(i) the license described in Subsection (7)(a)(i) is renewed continuously without lapse or permanent revocation;

(ii) the retail tobacco specialty business does not close for business or otherwise suspend the sale of tobacco products, electronic cigarette products, or nicotine products for more than 60 consecutive days;

(iii) the retail tobacco specialty business does not substantially change the business premises or business operation; and

(iv) the retail tobacco specialty business maintains the right to operate under the terms of other applicable laws, including:

(A) Section 26B-7-503;

(B) zoning ordinances;

(C) building codes; and

(D) the requirements of the license described in Subsection (7)(a)(i).

(c) A retail tobacco specialty business that does not qualify for an exemption under Subsection (7)(a) is exempt from Subsection (4) if:

(i) on or before December 31, 2018, the retail tobacco specialty business was issued a general tobacco retailer permit or a retail tobacco specialty business permit under Title 26B, Chapter 7, Part 5, Regulation of Smoking, Tobacco Products, and Nicotine Products, by the local health department having jurisdiction over the area in which the retail tobacco specialty business is located;

(ii) the retail tobacco specialty business is operating in the municipality in accordance with all applicable laws except for the requirement in Subsection (4); and

(iii) beginning July 1, 2022, the retail tobacco specialty business is not located within 1,000 feet of a public or private kindergarten, elementary, middle, junior high, or high school.

(d) Except as provided in Subsection (7)(e), a retail tobacco specialty business may maintain an exemption under Subsection (7)(c) if:

- 5 -

(i) on or before December 31, 2020, the retail tobacco specialty business receives a retail tobacco specialty business permit from the local health department having jurisdiction over the area in which the retail tobacco specialty business is located;

(ii) the permit described in Subsection (7)(d)(i) is renewed continuously without lapse or permanent revocation;

(iii) the retail tobacco specialty business does not close for business or otherwise suspend the sale of tobacco products, electronic cigarette products, or nicotine products for more than 60 consecutive days;

(iv) the retail tobacco specialty business does not substantially change the business premises or business operation as the business existed when the retail tobacco specialty business received a permit under Subsection (7)(d)(i); and

(v) the retail tobacco specialty business maintains the right to operate under the terms of other applicable laws, including:

(A) Section 26B-7-503;

(B) zoning ordinances;

(C) building codes; and

(D) the requirements of the retail tobacco permit described in Subsection (7)(d)(i).

(e) A retail tobacco specialty business described in Subsection (7)(a) or (b) that is located within 1,000 feet of a public or private kindergarten, elementary, middle, junior high, or high school before July 1, 2022, is exempt from Subsection (4)(a)(iii)(B) if the retail tobacco specialty business:

(i) relocates, before July 1, 2022, to a property that is used or zoned for commercial use and located within a group of architecturally unified commercial establishments built on a site that is planned, developed, owned, and managed as an operating unit; and

(ii) continues to meet the requirements described in Subsection (7)(b) that are not directly related to the relocation described in this Subsection (7)(e).

Section 2. Section **17-50-333** is amended to read:

**17-50-333 . Regulation of retail tobacco specialty business.**

(1) As used in this section:

(a) "Community location" means:

(i) a public or private kindergarten, elementary, middle, junior high, or high school;

(ii) a licensed child-care facility or preschool;

(iii) a trade or technical school;

(iv)  a church;

(v)  a public library;

(vi)  a public playground;

(vii)  a public park;

(viii)  a youth center or other space used primarily for youth oriented activities;

(ix)  a public recreational facility;

(x)  a public arcade; or

(xi)  for a new license issued on or after July 1, 2018, a homeless shelter.

(b)  "Department" means the Department of Health and Human Services created in Section 26B-1-201.

(c)  "Electronic cigarette product" means the same as that term is defined in Section 76-10-101.

[(d)  "Flavored electronic cigarette product" means the same as that term is defined in Section 76-10-101.]

[(e)] (d)  "Licensee" means a person licensed under this section to conduct business as a retail tobacco specialty business.

[(f)] (e)  "Local health department" means the same as that term is defined in Section 26A-1-102.

[(g)] (f)  "Nicotine product" means the same as that term is defined in Section 76-10-101.

[(h)] (g)  "Retail tobacco specialty business" means a commercial establishment in which:

(i)  sales of tobacco products, electronic cigarette products, and nicotine products account for more than 35% of the total quarterly gross receipts for the establishment;

(ii)  20% or more of the public retail floor space is allocated to the offer, display, or storage of tobacco products, electronic cigarette products, or nicotine products;

(iii)  20% or more of the total shelf space is allocated to the offer, display, or storage of tobacco products, electronic cigarette products, or nicotine products;

(iv)  the commercial establishment:

(A)  holds itself out as a retail tobacco specialty business; and

(B)  causes a reasonable person to believe the commercial establishment is a retail tobacco specialty business; or

[(v)  any flavored electronic cigarette product is sold; or]

[(vi)] (v)  the retail space features a self-service display for tobacco products, electronic cigarette products, or nicotine products.

[(i)] (h) "Self-service display" means the same as that term is defined in Section 76-10-105.1.

[(j)] (i) "Tobacco product" means:

(i) the same as that term is defined in Section 76-10-101; or

(ii) tobacco paraphernalia as defined in Section 76-10-101.

(2) The regulation of a retail tobacco specialty business is an exercise of the police powers of the state by the state or by the delegation of the state's police power to other governmental entities.

(3) (a) A person may not operate a retail tobacco specialty business in a county unless the person obtains a license from the county in which the retail tobacco specialty business is located.

(b) A county may only issue a retail tobacco specialty business license to a person if the person complies with the provisions of Subsections (4) and (5).

(4) (a) Except as provided in Subsection (7), a county may not issue a license for a person to conduct business as a retail tobacco specialty business if the retail tobacco specialty business is located within:

(i) 1,000 feet of a community location;

(ii) 600 feet of another retail tobacco specialty business; or

(iii) 600 feet from property used or zoned for:

(A) agriculture use; or

(B) residential use.

(b) For purposes of Subsection (4)(a), the proximity requirements shall be measured in a straight line from the nearest entrance of the retail tobacco specialty business to the nearest property boundary of a location described in Subsections (4)(a)(i) through (iii), without regard to intervening structures or zoning districts.

(5) A county may not issue or renew a license for a person to conduct business as a retail tobacco specialty business until the person provides the county with proof that the retail tobacco specialty business has:

(a) a valid permit for a retail tobacco specialty business issued under Title 26B, Chapter 7, Part 5, Regulation of Smoking, Tobacco Products, and Nicotine Products, by the local health department having jurisdiction over the area in which the retail tobacco specialty business is located; and

(b) (i) for a retailer that sells a tobacco product, a valid license issued by the State Tax Commission in accordance with Section 59-14-201 or 59-14-301 to sell a

tobacco product; or

    (ii)  for a retailer that sells an electronic cigarette product or a nicotine product, a valid license issued by the State Tax Commission in accordance with Section 59-14-803 to sell an electronic cigarette product or a nicotine product.

(6)  (a)  Nothing in this section:

    (i)  requires a county to issue a retail tobacco specialty business license; or

    (ii)  prohibits a county from adopting more restrictive requirements on a person seeking a license or renewal of a license to conduct business as a retail tobacco specialty business.

  (b)  A county may suspend or revoke a retail tobacco specialty business license issued under this section:

    (i)  if a licensee engages in a pattern of unlawful activity under Title 76, Chapter 10, Part 16, Pattern of Unlawful Activity Act;

    (ii)  if a licensee violates federal law or federal regulations restricting the sale and distribution of tobacco products or electronic cigarette products to protect children and adolescents;

    (iii)  upon the recommendation of the department or a local health department under Title 26B, Chapter 7, Part 5, Regulation of Smoking, Tobacco Products, and Nicotine Products; or

    (iv)  under any other provision of state law or local ordinance.

(7)  (a)  Except as provided in Subsection (7)(e), a retail tobacco specialty business is exempt from Subsection (4) if:

    (i)  on or before December 31, 2018, the retail tobacco specialty business was issued a license to conduct business as a retail tobacco specialty business;

    (ii)  the retail tobacco specialty business is operating in a county in accordance with all applicable laws except for the requirement in Subsection (4); and

    (iii)  beginning July 1, 2022, the retail tobacco specialty business is not located within 1,000 feet of a public or private kindergarten, elementary, middle, junior high, or high school.

  (b)  A retail tobacco specialty business may maintain an exemption under Subsection (7)(a) if:

    (i)  the license described in Subsection (7)(a)(i) is renewed continuously without lapse or permanent revocation;

    (ii)  the retail tobacco specialty business does not close for business or otherwise

suspend the sale of tobacco products, electronic cigarette products, or nicotine products for more than 60 consecutive days;

(iii) the retail tobacco specialty business does not substantially change the business premises or business operation; and

(iv) the retail tobacco specialty business maintains the right to operate under the terms of other applicable laws, including:

(A) Title 26, Chapter 38, Utah Indoor Clean Air Act;

(B) zoning ordinances;

(C) building codes; and

(D) the requirements of the license described in Subsection (7)(a)(i).

(c) A retail tobacco specialty business that does not qualify for an exemption under Subsection (7)(a) is exempt from Subsection (4) if:

(i) on or before December 31, 2018, the retail tobacco specialty business was issued a general tobacco retailer permit or a retail tobacco specialty business permit under Title 26, Chapter 62, Tobacco, Electronic Cigarette, and Nicotine Product Retail Permit, by the local health department having jurisdiction over the area in which the retail tobacco specialty business is located;

(ii) the retail tobacco specialty business is operating in the county in accordance with all applicable laws except for the requirement in Subsection (4); and

(iii) beginning July 1, 2022, the retail tobacco specialty business is not located within 1,000 feet of a public or private kindergarten, elementary, middle, junior high, or high school.

(d) A retail tobacco specialty business may maintain an exemption under Subsection (7)(c) if:

(i) on or before December 31, 2020, the retail tobacco specialty business receives a retail tobacco specialty business permit from the local health department having jurisdiction over the area in which the retail tobacco specialty business is located;

(ii) the permit described in Subsection (7)(d)(i) is renewed continuously without lapse or permanent revocation;

(iii) the retail tobacco specialty business does not close for business or otherwise suspend the sale of tobacco products, electronic cigarette products, or nicotine products for more than 60 consecutive days;

(iv) the retail tobacco specialty business does not substantially change the business premises or business operation as the business existed when the retail tobacco

specialty business received a permit under Subsection (7)(d)(i); and

(v) the retail tobacco specialty business maintains the right to operate under the terms of other applicable laws, including:

(A) Title 26, Chapter 38, Utah Indoor Clean Air Act;

(B) zoning ordinances;

(C) building codes; and

(D) the requirements of the retail tobacco permit described in Subsection (7)(d)(i).

(e) A retail tobacco specialty business described in Subsection (7)(a) or (b) that is located within 1,000 feet of a public or private kindergarten, elementary, middle, junior high, or high school before July 1, 2022, is exempt from Subsection (4)(a)(iii)(B) if the retail tobacco specialty business:

(i) relocates, before July 1, 2022, to a property that is used or zoned for commercial use and located within a group of architecturally unified commercial establishments built on a site that is planned, developed, owned, and managed as an operating unit; and

(ii) continues to meet the requirements described in Subsection (7)(b) that are not directly related to the relocation described in this Subsection (7)(e).

Section 3.  Section **26A-1-131** is enacted to read:

**26A-1-131 . Electronic cigarette registry enforcement.**

(1) (a) A local health department may examine the books, papers, and records of a retailer in this state, for the purpose of determining compliance with Section 59-14-810.

(b) A local health department may make the inspections and examinations at any time during ordinary business hours, and may inspect the premises and all desks, safes, vaults, and other fixtures and furniture contained in or upon the premises for the purpose of ascertaining whether an electronic cigarette product is held or possessed in violation of Section 59-14-810.

(c) Unannounced follow-up examinations of all retailers are required within 30 days after any violation of Section 59-14-810.

(d) A local health department shall publish the results of all examinations at least annually and shall make the results available to the public on request.

(e) Any electronic cigarette product offered for sale in violation of Section 59-14-810 is declared to be a contraband good and shall be immediately embargoed by a local health department.

(f) An electronic cigarette product described in Subsection (1)(e) may be embargoed

without a warrant by:

(i) a local health department; or

(ii) a law enforcement agency of this state if directed by a local health department

with jurisdiction over where the product is found.

(g) The cost of embargoing shall be borne by the retailer.

(h) In an action brought under this section, a local health department may recover

reasonable expenses incurred in investigating and preparing the case and attorney

fees.

(i) A retailer shall remove any embargoed electronic cigarette product from the retailer's

active inventory and work with the wholesaler or distributor to return or dispose the

electronic cigarette product.

(2) (a) A local health department shall disclose to the attorney general any information

received under this section which is requested by the attorney general for purposes of

determining compliance with and enforcing the provisions of this section or Section

59-14-810.

(b) A local health department and the attorney general shall share with each other

information received under this section and Section 59-14-810 or corresponding laws

of other states.

(c) A local health department shall provide any necessary information to the State Tax

Commission regarding violations of Section 59-14-810.

(3) A monetary penalty assessed to a retailer by a local health department under this section

shall be doubled if the retailer fails to provide documentation establishing a clear chain

of custody back to the manufacturer.

Section 4.  Section **26B-7-505** is amended to read:

**26B-7-505 . Electronic cigarette products -- Labeling -- Requirements to sell --**

**Advertising -- Labeling of nicotine products containing nicotine.**

(1) The department shall, in consultation with a local health department and with input from

members of the public, establish by rule made in accordance with Title 63G, Chapter 3,

Utah Administrative Rulemaking Act, the requirements to sell an electronic cigarette

substance that is not a manufacturer sealed electronic cigarette substance regarding:

(a) labeling;

(b) nicotine content;

(c) packaging; and

(d) product quality.

(2) On or before January 1, 2021, the department shall, in consultation with a local health department and with input from members of the public, establish by rule made in accordance with Title 63G, Chapter 3, Utah Administrative Rulemaking Act, the requirements to sell a manufacturer sealed electronic cigarette product regarding:

(a) labeling;

(b) nicotine content;

(c) packaging; and

(d) product quality.

(3) (a) A person may not sell an electronic cigarette substance unless the electronic cigarette substance complies with the requirements established by the department under Subsection (1).

(b) Beginning on July 1, 2021, a person may not sell a manufacturer sealed electronic cigarette product unless the manufacturer sealed electronic cigarette product complies with the requirements established by the department under Subsection (2).

(c) Notwithstanding Subsections (3)(a) and (3)(b), beginning on January 1, 2025, a person may not sell an electronic cigarette product that is not a premarket authorized or pending electronic cigarette product as that term is defined in Section 76-10-101.

(4) (a) A local health department may not enact a rule or regulation regarding electronic cigarette substance labeling, nicotine content, packaging, or product quality that is not identical to the requirements established by the department under Subsections (1) and (2).

(b) Except as provided in Subsection (4)(c), a local health department may enact a rule or regulation regarding electronic cigarette substance manufacturing.

(c) A local health department may not enact a rule or regulation regarding a manufacturer sealed electronic cigarette product.

(5) A person may not advertise an electronic cigarette product as a tobacco cessation device.

(6) (a) Any nicotine product shall contain the statement described in Subsection [(7)] (6)(b) if the nicotine product:

[(a)] (i) [(i)] (A) is not a tobacco product as defined in 21 U.S.C. Sec. 321 and related federal regulations; or

[(ii)] (B) is not otherwise required under federal or state law to contain a nicotine warning; and

[(b)] (ii) contains nicotine.

- 13 -

[(7)] (b)  A statement shall appear on the exterior packaging of a nicotine product described in Subsection (6)(a) as follows:

"This product contains nicotine."

Section 5.  Section **59-14-807** is amended to read:

**59-14-807 . Electronic Cigarette Substance and Nicotine Product Proceeds Restricted Account.**

(1)  There is created within the General Fund a restricted account known as the "Electronic Cigarette Substance and Nicotine Product Proceeds Restricted Account."

(2)  The Electronic Cigarette Substance and Nicotine Product Proceeds Restricted Account consists of:

(a)  revenue collected from the tax imposed by Section 59-14-804;

(b)  fees and penalties collected under Section 59-14-810;

[(b)] (c)  all money received by the attorney general or the Department of Commerce as a result of any judgment, settlement, or compromise of claims pertaining to alleged violations of law related to the manufacture, marketing, distribution, or sale of electronic cigarette products, as defined in Section 76-10-101:

(i)  if the total amount of the judgment, settlement, or compromise received by the state exceeds $1,000,000; and

(ii)  after reimbursement to the attorney general and the Department of Commerce for expenses related to the matters described in Subsection [(2)(b)] (2)(c); and

[(c)] (d)  amounts appropriated by the Legislature.

(3)  (a)  For each fiscal year and subject to appropriation by the Legislature, the Division of Finance shall distribute from the Electronic Cigarette Substance and Nicotine Product Proceeds Restricted Account:

(i)  $2,000,000, which shall be allocated to the local health departments by the Department of Health and Human Services using the formula created in accordance with Section 26A-1-116;

(ii)  $2,000,000 to the Department of Health and Human Services for statewide cessation programs and prevention education;

(iii)  $1,180,000 to the Department of Public Safety for law enforcement officers aimed at disrupting organizations and networks that provide tobacco products, electronic cigarette products, nicotine products, and other illegal controlled substances to minors;

(iv)  $3,000,000, which shall be allocated to the local health departments by the

Department of Health and Human Services using the formula created in accordance with Section 26A-1-116;

(v) $5,084,200 to the State Board of Education for school-based prevention programs; [and]

(vi) $2,000,000 to the Department of Health and Human Services for alcohol, tobacco, and other drug prevention, reduction, cessation, and control programs that promote unified messages and make use of media outlets, including radio, newspaper, billboards, and television[.] ; and

(vii) of the money deposited under Section 59-14-810:

(A) to the commission, in an amount equal to the amount necessary to create and maintain the registry described in Section 59-14-810;

(B) to the Department of Health and Human Services, in an amount necessary for completing duties described in Section 59-14-810; and

(C) to the Department of Health and Human Services, the remainder to be divided among the local health departments for inspection and enforcement described in Sections 26A-1-131 and 59-14-810.

(b) If the amount in the Electronic Cigarette Substance and Nicotine Product Proceeds Restricted Account is insufficient to cover the distributions described in Subsection (3)(a), the distribution amounts shall be adjusted proportionately.

(4) (a) The local health departments shall use the money received in accordance with Subsection (3)(a) for enforcing:

(i) the regulation provisions described in Section 26B-7-505;

(ii) the labeling requirement described in Section 26B-7-505; and

(iii) the penalty provisions described in Section 26B-7-518.

(b) The Department of Health and Human Services shall use the money received in accordance with Subsection (3)(a)(ii) for the Youth Electronic Cigarette, Marijuana, and Other Drug Prevention Program created in Section 26B-1-428.

(c) The local health departments shall use the money received in accordance with Subsection (3)(a)(iv) to issue grants under the Electronic Cigarette, Marijuana, and Other Drug Prevention Grant Program created in Section 26A-1-129.

(d) The State Board of Education shall use the money received in accordance with Subsection (3)(a)(v) to distribute to local education agencies to pay for:

(i) (A) stipends for positive behaviors specialists as described in Subsection 53G-10-407(4)(a)(i);

(B)  the cost of administering the positive behaviors plan as described in Subsection 53G-10-407(4)(a)(ii); and

(C)  the cost of implementing an Underage Drinking and Substance Abuse Prevention Program in grade 4 or 5, as described in Subsection 53G-10-406 (3)(b); or

(ii)  a comprehensive prevention plan, as that term is defined in Section 53F-2-525.

(5)  (a)  The fund shall earn interest.

(b)  All interest earned on fund money shall be deposited into the fund.

(6)  Subject to legislative appropriations, funds remaining in the Electronic Cigarette Substance and Nicotine Product Proceeds Restricted Account after the distribution described in Subsection (3) may only be used for:

(a)  funding commission personnel to enforce compliance with the tax collection requirements of this part; and

(b)  programs and activities related to the prevention and cessation of electronic cigarette, nicotine products, marijuana, and other drug use.

Section 6.  Section **59-14-810** is enacted to read:

**59-14-810 . Electronic cigarette product registry.**

(1)  Beginning on August 1, 2024, every manufacturer of an electronic cigarette product that is sold in this state, whether directly or through a distributor, wholesaler, retailer, or similar intermediary or intermediaries, shall certify under penalty of perjury on a form and in the manner prescribed by the commission, that:

(a)  the manufacturer agrees to comply with this section; and

(b)  the electronic cigarette product is a premarket authorized or pending electronic cigarette product as defined in Section 76-10-101 and will not be illegal to be sold in the state as of January 1, 2025.

(2)  When submitting the certification a manufacturer shall submit a form that separately lists each electronic cigarette product that is sold in this state.

(3)  (a)  Each certification form shall include:

(i)  the name of the electronic cigarette product, nicotine content level by percentage, and any flavors contained in the product;

(ii)  (A)  a copy of the order granting a premarket tobacco product application of the electronic cigarette product by the United States Food and Drug Administration under 21 U.S.C. Sec. 387j(c)(1)(A)(i); or

(B)  evidence that the premarket tobacco product application for the electronic

Appellate Case: 25-4046    Document: 39    Date Filed: 11/24/2025    Page: 93

cigarette product or nicotine product was submitted to the United States Food and Drug Administration before September 9, 2020, and a final authorization or order has not yet taken effect;

(iii)  a nonrefundable $1,000 fee for an electronic cigarette product that is being added to the registry in the first instance; and

(iv)  information described in Subsection (10) if applicable.

(b)  The commission shall make the materials submitted under Subsection (3)(a) available to the Department of Health and Human Services for review and approval.

(c)  A manufacturer required to submit a certification form under this section shall notify the commission and the Department of Health and Human Services in a manner prescribed by the commission within 30 days of any material change making the certification form no longer accurate, including:

(i)  the issuance or denial of a marketing authorization or other order by the United States Food and Drug Administration under 21 U.S.C. Sec. 387j; or

(ii)  any other order or action by the United States Food and Drug Administration or any court that affects the ability of the electronic cigarette product to be introduced or delivered into interstate commerce for commercial distribution in the United States.

(d)  On or before January 31 of each year and in a manner prescribed by the commission, a manufacturer shall:

(i)  recertify that the information contained in the certification is correct and accurate;

(ii)  correct or amend information if necessary; and

(iii)  pay a $250 nonrefundable fee for each electronic cigarette product on the registry that is manufactured by the manufacturer.

(e)  A manufacturer may amend a certification, including to add additional electronic cigarette products to the registry, if all requirements of this section are met.

(f)  The commission shall:

(i)  provide an electronic notification to a manufacturer that has not submitted a recertification under Subsection (3)(d); and

(ii)  remove a manufacturer or an electronic cigarette product that is not recertified from the registry by March 15.

(4)  (a)  The Department of Health and Human Services shall review materials described in Subsection (3)(a) and notify the commission regarding whether an electronic cigarette product should be included in the registry.

(b) On or before October 1, 2024, the commission shall make publicly available on the commission's website a registry that lists each electronic cigarette product manufacturer and each electronic cigarette product for which certification forms have been approved by the Department of Health and Human Services.

(c) An electronic cigarette product may not be listed on the registry unless the Department of Health and Human Services determines the requirements of Subsection (3)(a) are met.

(5) (a) If the Department of Health and Human Services obtains information that an electronic cigarette product should not be listed in the registry, the Department of Health and Human Services shall provide the manufacturer notice and an opportunity to cure deficiencies before notifying the commission to remove the manufacturer or products from the registry.

(b) Except as provided in Subsection (5)(c), the Department of Health and Human Services shall comply with Title 63G, Chapter 4, Administrative Procedures Act, before notifying the commission to remove an electronic cigarette product or manufacturer from the registry.

(c) Subsection (5)(b) does not apply to a manufacturer failing:

(i) to decertify an electronic cigarette product;

(ii) to provide fees and documentation described in Subsection (3)(a) or (3)(d); or

(iii) to comply with Subsection (10).

(6) (a) If a product is removed from the registry, each retailer, distributor, and wholesaler shall have 30 days from the day on which the product is removed from the registry to remove the product from any inventory and return the product to the manufacturer for disposal.

(b) After the period described in Subsection (6)(a), any electronic cigarette product of a manufacturer identified in the notice of removal are contraband and are subject to penalties under Subsection (8) and seizure, forfeiture, and destruction under Section 26A-1-131.

(7) (a) Beginning on January 1, 2025, a person may not sell or offer for retail sale an electronic cigarette product in this state that is not included in the registry.

(b) A manufacturer may not sell, either directly or through a distributor, wholesaler, retailer, or similar intermediary or intermediaries, an electronic cigarette product in this state that is not included in the registry.

(8) (a) A wholesaler, distributor, or retailer who sells or offers for retail sale an

Appellate Case: 25-4046   Document: 39   Date Filed: 11/24/2025   Page: 95

electronic cigarette product in this state that is not included in the registry shall be subject to a civil penalty of:

    (i) $1,000 for each product offered for sale in violation of this section; and

    (ii) $100 per day until the offending product is removed from the market or until the offending product is properly listed on the registry.

(b) The commission shall suspend the person's license issued under Section 59-14-803 for a violation of Subsection (8)(a) as follows:

    (i) for a second violation within a 12-month period, at least 14 days;

    (ii) for a third violation within a 12-month period, at least 60 days; or

    (iii) for a fourth violation within a 12-month period, at least one year.

(c) A manufacturer whose electronic cigarette products are not listed in the registry and are sold in this state, whether directly or through a distributor, wholesaler, retailer, or similar intermediary or intermediaries, is subject to a civil penalty of:

    (i) $1,000 for each product offered for retail sale in violation of this section; and

    (ii) $100 per day until the offending product is removed from the market or until the offending product is properly listed on the registry.

(d) A manufacturer that falsely represents any information required by a certification form described in this section shall be guilty of a class C misdemeanor for each false representation.

(e) A repeated violation of this section shall constitute a deceptive act or practice as provided in Sections 13-11-4 and 13-11a-3 and shall be subject to any remedies or penalties available for a violation of those sections.

(9) (a) To assist in ensuring compliance and enforcement of this section and Section 26A-1-131, the commission shall disclose to the following entities, upon request, any information obtained under this section:

    (i) the Department of Health and Human Services;

    (ii) a local health department; or

    (iii) the attorney general.

(b) The commission and attorney general shall share with each other information received under this section, or corresponding laws of other states.

(10) (a) (i) The commission may not list a nonresident manufacturer of an electronic cigarette product in the registry unless:

    (A) the nonresident manufacturer has registered to do business in the state as a foreign corporation or business entity; or

(B) the nonresident manufacturer appoints and maintains without interruption the services of an agent in this state to receive any service of process on behalf of the manufacturer.

(b) The nonresident manufacturer shall provide the name, address, and telephone number of the agent to the commission.

(c) (i) A nonresident manufacturer shall provide notice to the commission 30 days before the termination of the authority of an agent and shall further provide proof to the satisfaction of the commission of the appointment of a new agent no less than five calendar days prior to the termination of an existing agent appointment.

(ii) In the event an agent terminates an agency appointment, the manufacturer shall notify the commission of the termination within five calendar days and shall include proof to the satisfaction of the commission of the appointment of a new agent.

(11) Before May 31 of each year, the commission and the Department of Health and Human Services shall provide a report to the Revenue and Taxation Interim Committee and the Health and Human Services Interim Committee regarding:

(a) the status of the registry;

(b) manufacturers and products included in the registry;

(c) revenue and expenditures related to administration of this section; and

(d) enforcement activities undertaken under this section and Section 26A-1-131.

(12) All fees and penalties collected under this section shall be used for administration and enforcement of this section and Section 26A-1-131.

(13) The commission, in consultation with the Department of Health and Human Services, may make rules in accordance with Title 63G, Chapter 3, Utah Administrative Rulemaking Act, to implement this section.

Section 7. Section **76-10-101** is amended to read:

**76-10-101 . Definitions.**

As used in this part:

(1) (a) "Alternative nicotine product" means a product, other than a cigarette, a counterfeit cigarette, an electronic cigarette product, a nontherapeutic nicotine product, or a tobacco product, that:

(i) contains nicotine;

(ii) is intended for human consumption;

(iii) is not purchased with a prescription from a licensed physician; and

(iv)  is not approved by the United States Food and Drug Administration as nicotine replacement therapy.

(b)  "Alternative nicotine product" includes:

(i)  pure nicotine;

(ii)  snortable nicotine;

(iii)  dissolvable salts, orbs, pellets, sticks, or strips; and

(iv)  nicotine-laced food and beverage.

(c)  "Alternative nicotine product" does not include a fruit, a vegetable, or a tea that contains naturally occurring nicotine.

(2)  "Cigar" means a product that contains nicotine, is intended to be burned under ordinary conditions of use, and consists of any roll of tobacco wrapped in leaf tobacco, or in any substance containing tobacco, other than any roll of tobacco that is a cigarette.

(3)  "Cigarette" means a product that contains nicotine, is intended to be heated or burned under ordinary conditions of use, and consists of:

(a)  any roll of tobacco wrapped in paper or in any substance not containing tobacco; or

(b)  any roll of tobacco wrapped in any substance containing tobacco which, because of its appearance, the type of tobacco used in the filler, or its packaging and labeling, is likely to be offered to, or purchased by, consumers as a cigarette described in Subsection (3)(a).

(4)  (a)  "Electronic cigarette" means:

(i)  any electronic oral device:

(A)  that provides an aerosol or a vapor of nicotine or other substance; and

(B)  which simulates smoking through the use or inhalation of the device;

(ii)  a component of the device described in Subsection (4)(a)(i); or

(iii)  an accessory sold in the same package as the device described in Subsection (4)(a)(i).

(b)  "Electronic cigarette" includes an oral device that is:

(i)  composed of a heating element, battery, or electronic circuit; and

(ii)  marketed, manufactured, distributed, or sold as:

(A)  an e-cigarette;

(B)  an e-cigar;

(C)  an e-pipe; or

(D)  any other product name or descriptor, if the function of the product meets the definition of Subsection (4)(a).

(c) "Electronic cigarette" does not mean a medical cannabis device, as that term is
defined in Section 26B-4-201.

(5) "Electronic cigarette product" means an electronic cigarette, an electronic cigarette
substance, or a prefilled electronic cigarette.

(6) "Electronic cigarette substance" means any substance, including liquid containing
nicotine, used or intended for use in an electronic cigarette.

(7) (a) "Flavored electronic cigarette product" means an electronic cigarette product that
has a taste or smell that is distinguishable by an ordinary consumer either before or
during use or consumption of the electronic cigarette product.

(b) "Flavored electronic cigarette product" includes an electronic cigarette product that is
labeled as, or has a taste or smell of any fruit, chocolate, vanilla, honey, candy,
cocoa, dessert, alcoholic beverage, herb,[ or] spice, or mint.

(c) "Flavored electronic cigarette product" does not include an electronic cigarette
product that[:]  has a taste or smell of only tobacco or menthol.
[(i)  has a taste or smell of only tobacco, mint, or menthol; or]
[(ii)  has been approved by an order granting a premarket tobacco product application
of the electronic cigarette product by the United States Food and Drug
Administration under 21 U.S.C. Sec. 387j(c)(1)(A)(i).]

(8) "Nicotine" means a poisonous, nitrogen containing chemical that is made synthetically
or derived from tobacco or other plants.

(9) "Nicotine product" means an alternative nicotine product or a nontherapeutic nicotine
product.

(10) (a) "Nontherapeutic nicotine device" means a device that:
(i)  has a pressurized canister that is used to administer nicotine to the user through
inhalation or intranasally;
(ii)  is not purchased with a prescription from a licensed physician; and
(iii)  is not approved by the United States Food and Drug Administration as nicotine
replacement therapy.

(b) "Nontherapeutic nicotine device" includes a nontherapeutic nicotine inhaler or a
nontherapeutic nicotine nasal spray.

(11) "Nontherapeutic nicotine device substance" means a substance that:
(a) contains nicotine;
(b) is sold in a cartridge for use in a nontherapeutic nicotine device;
(c) is not purchased with a prescription from a licensed physician; and

(d) is not approved by the United States Food and Drug Administration as nicotine replacement therapy.

(12) "Nontherapeutic nicotine product" means a nontherapeutic nicotine device, a nontherapeutic nicotine device substance, or a prefilled nontherapeutic nicotine device.

(13) "Place of business" includes:

(a) a shop;

(b) a store;

(c) a factory;

(d) a public garage;

(e) an office;

(f) a theater;

(g) a recreation hall;

(h) a dance hall;

(i) a poolroom;

(j) a cafe;

(k) a cafeteria;

(l) a cabaret;

(m) a restaurant;

(n) a hotel;

(o) a lodging house;

(p) a streetcar;

(q) a bus;

(r) an interurban or railway passenger coach;

(s) a waiting room; and

(t) any other place of business.

(14) "Prefilled electronic cigarette" means an electronic cigarette that is sold prefilled with an electronic cigarette substance.

(15) "Prefilled nontherapeutic nicotine device" means a nontherapeutic nicotine device that is sold prefilled with a nontherapeutic nicotine device substance.

(16) "Premarket authorized or pending electronic cigarette product" means an electronic cigarette product that:

(a) (i) has been approved by an order granting a premarket tobacco product application of the electronic cigarette product by the United States Food and Drug Administration under 21 U.S.C. Sec. 387j(c)(1)(A)(i); or

Appellate Case: 25-4046    Document: 39    Date Filed: 11/24/2025    Page: 100

(ii)  (A)  was marketed in the United States on or before August 8, 2016;

(B)  the manufacturer submitted a premarket tobacco product application for the electronic cigarette product to the United States Food and Drug Administration under 21 U.S.C. Sec. 387j on or before September 9, 2020; and

(C)  has an application described in Subsection (16)(b)(ii) that either remains under review by the United States Food and Drug Administration or a final decision on the application has not taken effect; and

(b)  does not exceed:

(i)  4.0% nicotine by weight per container; or

(ii)  a nicotine concentration of 40 milligrams per milliliter.

[(16)] (17)  "Retail tobacco specialty business" means the same as that term is defined in Section 26B-7-501.

[(17)] (18)  "Smoking" means the possession of any lighted cigar, cigarette, pipe, or other lighted smoking equipment.

[(18)] (19)  (a)  "Tobacco paraphernalia" means equipment, product, or material of any kind that is used, intended for use, or designed for use to package, repackage, store, contain, conceal, ingest, inhale, or otherwise introduce a tobacco product, an electronic cigarette substance, or a nontherapeutic nicotine device substance into the human body.

(b)  "Tobacco paraphernalia" includes:

(i)  metal, wooden, acrylic, glass, stone, plastic, or ceramic pipes with or without screens, permanent screens, hashish heads, or punctured metal bowls;

(ii)  water pipes;

(iii)  carburetion tubes and devices;

(iv)  smoking and carburetion masks;

(v)  roach clips, meaning objects used to hold burning material, such as a cigarette, that has become too small or too short to be held in the hand;

(vi)  chamber pipes;

(vii)  carburetor pipes;

(viii)  electric pipes;

(ix)  air-driven pipes;

(x)  chillums;

(xi)  bongs; and

(xii)  ice pipes or chillers.

(c) "Tobacco paraphernalia" does not include matches or lighters.

[(19)] (20) "Tobacco product" means:

(a) a cigar;

(b) a cigarette; or

(c) tobacco in any form, including:

(i) chewing tobacco; and

(ii) any substitute for tobacco, including flavoring or additives to tobacco.

[(20)] (21) "Tobacco retailer" means:

(a) a general tobacco retailer, as that term is defined in Section 26B-7-501; or

(b) a retail tobacco specialty business.

Section 8. Section **76-10-113** is amended to read:

**76-10-113 . Prohibition on distribution of flavored electronic cigarette products -- Prohibition of electronic cigarette products without federal authorization.**

(1) [It] Subject to Subsection (2), it is unlawful for a tobacco retailer that is not a retail tobacco specialty business to give, distribute, sell, offer for sale, or furnish a flavored electronic cigarette product to any person.

(2) Notwithstanding Subsection (1), and beginning on January 1, 2025, it is unlawful for a person to give, distribute, sell, offer for sale, or furnish to any person a flavored electronic cigarette product.

(3) Beginning on January 1, 2025, it is unlawful for a person to give, distribute, sell, offer for sale, or furnish to any person an electronic cigarette product that is not a premarket authorized or pending electronic cigarette product.

[(2)] (4) An individual who violates this section is guilty of:

(a) a class C misdemeanor for the first offense; and

(b) a class B misdemeanor for any subsequent offense.

Section 9. **Effective date.**

This bill takes effect on July 1, 2024.

# Addendum 2

United States Code Annotated
  Title 21. Food and Drugs (Refs & Annos)
    Chapter 9. Federal Food, Drug, and Cosmetic Act (Refs & Annos)
      Subchapter IX. Tobacco Products (Refs & Annos)

21 U.S.C.A. § 387p

§ 387p. Preservation of State and local authority

Currentness

**(a) In general**

**(1) Preservation**

Except as provided in paragraph (2)(A), nothing in this subchapter, or rules promulgated under this subchapter, shall be construed to limit the authority of a Federal agency (including the Armed Forces), a State or political subdivision of a State, or the government of an Indian tribe to enact, adopt, promulgate, and enforce any law, rule, regulation, or other measure with respect to tobacco products that is in addition to, or more stringent than, requirements established under this subchapter, including a law, rule, regulation, or other measure relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products by individuals of any age, information reporting to the State, or measures relating to fire safety standards for tobacco products. No provision of this subchapter shall limit or otherwise affect any State, tribal, or local taxation of tobacco products.

**(2) Preemption of certain State and local requirements**

**(A) In general**

No State or political subdivision of a State may establish or continue in effect with respect to a tobacco product any requirement which is different from, or in addition to, any requirement under the provisions of this subchapter relating to tobacco product standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products.

**(B) Exception**

Subparagraph (A) does not apply to requirements relating to the sale, distribution, possession, information reporting to the State, exposure to, access to, the advertising and promotion of, or use of, tobacco products by individuals of any age, or relating to fire safety standards for tobacco products. Information disclosed to a State under subparagraph (A) that is exempt from disclosure under section 552(b)(4) of Title 5 shall be treated as a trade secret and confidential information by the State.

**(b) Rule of construction regarding product liability**

---

No provision of this subchapter relating to a tobacco product shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State.

## CREDIT(S)

(June 25, 1938, c. 675, § 916, as added Pub.L. 111-31, Div. A, Title I, § 101(b)(3), June 22, 2009, 123 Stat. 1823.)

Notes of Decisions (15)

21 U.S.C.A. § 387p, 21 USCA § 387p
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.