NO. 25-4046 & 25-4047

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

UTAH VAPOR BUSINESS ASSOCIATION, INC., et al.

Plaintiffs-Appellants/Cross Appellees,

v.

STATE OF UTAH, et al.

Defendant-Appellees/Cross Appellants.

APPEAL FROM THE UNITED STATES DISTRICT

COURT FOR THE DISTRICT OF UTAH, HONORABLE DAVID BARLOW

CASE NO. 2:24-CV-00950-DBB-JCB

## APPELLANTS'/CROSS-APPELLEES' REPLY AND RESPONSE BRIEF

Oral Argument Is Not Requested

Deno G. Himonas (05483)
W. Bradford Barber (18601)
**WILSON SONSINI GOODRICH & ROSATI**
95 South State Street, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 401 8510
dhimonas@wsgr.com
bbarber@wsgr.com

Trinity Jordan (15875)
Jordan E. Westgate (16098)
**DENTONS DURHAM JONES PINEGAR, P.C.**
111 South Main Street, Suite 2400
Salt Lake City, Utah 84111
Telephone: (801) 415-.3000
trinity.jordan@dentons.com
jordan.westgate@dentons.com

Walter A. Romney (07975)
Katherine E. Pepin (16925)
**CLYDE SNOW & SESSIONS**
201 South Main Street, Suite 2200
Salt Lake City, Utah 84111
Telephone: (801) 322-3516
war@clydesnow.com
kep@clydesnow.com

Benjamin R. Dyer (13691)
**DYER LAW GROUP PLLC**
261 East 300 South, Suite 200
Salt Lake City, Utah 84111
Telephone: (801) 363-5000
ben@dyerlawgroup.com

*Counsel for Plaintiffs-Appellants/Cross Appellees*

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................3

I.     The State's Jurisdictional Objection Fails. ...................................................3

II.    The Tobacco Control Act Preempts Utah's Flavor Ban. ...............................7

     A.    The Flavor Ban is expressly preempted by federal law. .......................7

          1.    Section 387p does not draw the "manufacturing vs. sales" distinction the State asserts. .......................................................7

          2.    The State's position that the Flavor Ban is not a tobacco product standard cannot be reconciled with the TCA or Supreme Court precedent. ..........................................................12

     B.    Utah's Flavor Ban and Registry are impliedly preempted by federal law. ....................................................................................16

          1.    This Court can reach each of Appellants' arguments that federal law impliedly preempts the Act. ..................................16

          2.    This Court should not adopt the reasoning in Wooten and Wisconsinites as those cases rest on an erroneous interpretation of Section 337(a). ................................................19

     C.    The remaining preliminary injunction factors favor Appellants.........23

          1.    Enforcement of the preempted Flavor Ban inflicts irreparable harm on UVBA members as a matter of law..........24

          2.    Appellants' loss of business goodwill separately supports injunctive relief. ..............................................................27

III.   The District Court Correctly Enjoined the Inspection Program Because Appellants Are Likely to Succeed on Their Fourth Amendment Claim. ......29

     A.    *Burger*'s third criteria requires statutory safeguards that Utah's Inspection Program lacks. ..............................................................31

SL_8737201.1
4920-1781-7995, v. 1 / 326230.001000

B.      The district court correctly applied controlling principles and case law to conclude that the Inspection Program is likely unconstitutional. ...................................................................34

C.      Alternatively, the Inspection Program's sweeping scope reinforces its constitutional deficiency under *Burger*'s third prong. ..........................................................................................37

D.      The State does not contest the remaining preliminary injunction factors, which are satisfied if this Court affirms the district court's Fourth Amendment ruling. ...................................39

IV.   The District Court Erred in Holding the Inspection Program Severable from the Remainder of the Act. ....................................................39

CONCLUSION ..................................................................................44

SL_8737201.1
4920-1781-7995, v. 1 / 326230.001000

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ........................................................................24

*Anixter v. Home-Stake Prod. Co.*,
77 F.3d 1215 (10th Cir. 1996) ........................................................................19

*Aposhian v. Barr*,
958 F.3d 969 (10th Cir. 2020) ...................................................................24, 25

*Arizona v. Gant*,
556 U.S. 332 (2009)........................................................................................29

*Baca v. Cosper*,
128 F.4th 1319 (10th Cir. 2025) ....................................................................18

*Big Cats of Serenity Springs, Inc. v. Rhodes*,
843 F.3d 853 (10th Cir. 2016) ........................................................................29

*Bionic Auto Parts & Sales, Inc. v. Fahner*,
721 F.2d 1072 (7th Cir. 1983) ........................................................................32

*Bradshaw v. Am. Airlines, Inc.*,
123 F.4th 1168 (10th Cir. 2024) ......................................................................7

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001)........................................................................................21

*Butler v. Bd. of Cnty. Comm'rs for San Miguel Cnty.*,
920 F.3d 651 (10th Cir. 2019) ........................................................................16

*Chem-Trol, Inc. v. Christensen*,
No. 09- 2024-EFM, 2009 WL 331625 (D. Kan. Feb. 10, 2009)...................27

*City of Los Angeles v. Patel*,
576 U.S. 409 (2015)...................................................................................32, 35

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
356 F.3d 1256 (10th Cir. 2004) ......................................................................27

iv

*Donovan v. Dewey*,
     452 U.S. 594 (1981)............................................................31, 34, 35, 36

*First W. Cap. Mgmt. Co. v. Malamed*,
     874 F.3d 1136 (10th Cir. 2017) ...........................................................18, 19

*Garland v. Cargill*,
     602 U.S. 406 (2024)...............................................................................25

*Heideman v. S. Salt Lake City*,
     348 F.3d 1182 (10th Cir. 2003) ...........................................................28

*Iowans for Alts. to Smoking & Tobacco, Inc. v. Iowa Dep't of
     Revenue*,
     781 F. Supp. 3d 724 (S.D. Iowa 2025)...............................................19, 20, 21,
                                                               22, 23

*Iowans for Alts. v. Mosiman*,
     No. 25-2087 (8th Cir. Jan. 15, 2026)............................................................23

*Johnson v. Smith*,
     104 F.4th 153 (10th Cir. 2024) ...........................................................30

*Kamen v. Kemper Fin. Servs., Inc.*,
     500 U.S. 90 (1991), *cert. denied*,
     146 S.Ct. 354 (U.S. Nov. 10, 2025) .....................................................18

*Leachco, Inc. v. Consumer Product Safety Commission*,
     103 F.4th 748 (10th Cir. 2024),
     *cert. denied*, 145 S. Ct. 1047 (2025)..................................................26

*Lorillard Tobacco Co. v. Reilly*,
     533 U.S. 525 (2001)..............................................................................7

*Marshall v. Barlow's, Inc.*,
     436 U.S. 307 (1978)..........................................................................38, 39

*Mullins v. City of New York*,
     626 F.3d 47 (2d Cir. 2010) ...............................................................29

*Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence*,
     731 F.3d 71 (1st Cir. 2013)................................................................15

v

*National Meat Association v. Harris*,
565 U.S. 452 (2012)..................................................................14

*New York v. Burger*,
482 U.S. 691 (1987)......................................................30, 31, 32, 33, 34,
35, 36, 37, 38, 43

*Neways Inc. v. Mower*,
543 F. Supp. 2d 1277 (D. Utah 2008) ........................................27

*NOVA Distro, Inc. v. Miyares*,
No. 3:25-CV-857 (DJN),
2025 WL 3680321 (E.D. Va. Dec. 18, 2025)................................20

*Otero Sav. & Loan Ass'n v. Fed. Rsrv. Bank*,
665 F.2d 275 (10th Cir. 1981) ....................................................27

*R.J. Reynolds Tobacco Co. v. City of Edina*,
60 F.4th 1170 (8th Cir. 2023) .....................................................15

*R.J. Reynolds Tobacco Co. v. Cnty. of Los Angeles*,
29 F.4th 542 (9th Cir. 2022) .......................................................15

*Rocky Patel Premium Cigars, Inc. v. Bonta*,
No. 8:25-CV-02244-MRA(PDX),
2025 WL 3903972 (C.D. Cal. Dec. 23, 2025)..............................20

*S & S Pawn Shop Inc. v. City of Del City*,
947 F.2d 432 (10th Cir. 1991) ...............................................32, 34

*Salazar ex rel. Salazar v. D.C.*,
671 F.3d 1258 (D.C. Cir. 2012).....................................................6

*Schulenberg v. BNSF Ry. Co.*,
911 F.3d 1276 (10th Cir. 2018) ..................................................17

*Thornton v. Tyson Foods, Inc.*,
28 F.4th 1016 (10th Cir. 2022) .....................................................8

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River
Power, Inc.*,
805 F.2d 351 (10th Cir. 1986) ....................................................27

SL_8737201.1
4920-1781-7995, v. 1 / 326230.001000

*U.S. Smokeless Tobacco Mfg. Co. v. City of New York*,
    708 F.3d 428 (2d Cir. 2013) ................................................................15

*United States v. Biswell*,
    406 U.S. 311 (1972)..................................................................34, 37

*United States v. Texas*,
    794 F. Supp. 3d 427 (W.D. Tex. 2025) ....................................24, 25

*United Steelworkers of Am. v. Or. Steel Mills, Inc.*,
    322 F.3d 1222 (10th Cir. 2003) ...........................................................18

*V-1 Oil Co. v. Wyo. Dep't of Env't Quality*,
    902 F.2d 1482 (10th Cir. 1990) ..............................................32, 34, 35

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ................................................24, 25, 26

*Valle del Sol v. Whiting*,
    No. CV 10-1061-PHX-SRB,
    2012 WL 8021265 (D. Ariz. Sep. 5, 2012),
    *aff'd*, 732 F.3d 1006 (9th Cir. 2013) .........................................25

*Vapor Tech. Ass'n v. Wooten*,
    No. 4:25-CV-00076-M-RJ,
    2025 WL 1787420 (E.D.N.C. June 27, 2025) ...........19, 20, 21, 23

*Vega v. Jordan Valley Med. Ctr., LP*,
    2019 UT 35, 449 P.3d 31..........................................................40, 41

*Wisconsinites for Alts. to Smoking & Tobacco, Inc. v. Casey*,
    No. 25-CV-552-WMC,
    2025 WL 2582099 (W.D. Wis. Sep. 5, 2025) ...........19, 20, 21, 23

**STATUTES**

21 U.S.C. § 387a ...............................................................................7

21 U.S.C. § 387c(a)..........................................................................10

21 U.S.C. § 387g.......................................................................9, 12, 13

21 U.S.C. § 387j(b) ...........................................................................9

vii

21 U.S.C. § 387k(g) ................................................................................9

21 U.S.C. § 387p .............................................................7, 8, 9, 10, 11, 17

21 U.S.C. § 678 ...............................................................................14

28 U.S.C. § 1292(a)(1) .........................................................................1, 3

21 U.S.C. § 337(a) ..............................................................17, 18, 19, 20, 21, 22, 23

UTAH CODE ANN. § 26A-1-131 ............................... 33, 36, 37, 38, 41, 42

UTAH CODE ANN. § 26B-7-505 ...............................................................22

UTAH CODE ANN. § 59-14-810 ............................ 22, 27, 33, 37, 41, 42

UTAH CODE ANN. § 76-9-1101 ..............................................................22

UTAH CODE ANN. § 76-9-1114 .................................................................7

UTAH CODE ANN. § 76-10-101(7)(b) ......................................................10

UTAH CODE ANN. § 76-10-113 ..............................................7, 22, 27, 42

## RULES

10th Cir. R. 32.1(B) ...........................................................................20

Fed. R. App. P. 4(a)(1) ......................................................................1, 3

Fed. R. App. P. 3(c)(4) ..........................................................................5

SL_8737201.1
4920-1781-7995, v. 1 / 326230.001000

## **INTRODUCTION**

The State's response provides no basis to affirm the district court's refusal to enjoin the Flavor Ban[1] or its decision to sever the Inspection Program from the Act. As a threshold matter, this Court has jurisdiction because Appellants timely filed their notice of appeal within 30 days of the district court's March 24, 2025 order resolving the motion for a preliminary injunction—the order that triggered Appellants' right to appeal under 28 U.S.C. § 1292(a)(1) and Rule 4(a)(1) of the Federal Rules of Appellate Procedure.

On the merits, Utah's Flavor Ban is preempted by federal law. The Tobacco Control Act draws no "manufacturing versus sales" distinction of the kind the State advances; instead, it expressly reserves exclusive federal authority over tobacco product standards while preserving state authority over sales and access requirements—like who, where, when, and how someone can buy—that don't turn on *what* a product is made of, like additives, ingredients, and the like. Because how something tastes is caused by what goes into it while it is being made, it makes sense that Congress specifically identified flavor prohibitions as tobacco product standards. Nothing in the statute permits states to impose product standards of their own—that is, limits on *how* something is made—through sales bans. Utah's attempt

---

[1] Defined terms in this brief carry the same meaning as those in Appellants' Principal Brief.

1

to recharacterize its Flavor Ban as a mere sales regulation disregards the TCA's text, structure, and Supreme Court precedent rejecting end-runs around express preemption. Utah's scheme is also impliedly preempted because it stands as an obstacle to Congress's intent of achieving nationally uniform tobacco product standards. For example, it conditions lawful market participation on federal PMTA compliance and authorizes state enforcement of federal regulatory determinations, intruding on enforcement authority Congress reserved exclusively to the federal government.

Additionally, the State is incorrect that a remand is required for consideration of the remaining preliminary-injunction factors as they relate to the Flavor Ban. This Court is well positioned to address irreparable harm, balance of equities, and the public interest in the first instance either as a matter of law or on the record before it.

Contrary to the arguments raised in the State's cross-appeal, the district court correctly concluded that the Inspection Program likely violates the Fourth Amendment. The court properly applied the controlling framework governing warrantless administrative searches and correctly determined that the Inspection Program fails to provide a constitutionally adequate substitute for a warrant. The district court did err, however, in holding that the Inspection Program was severable from the remainder of the Act. The Inspection Program is integral to the statutory

SL_8737201.1
4920-1781-7995, v. 1 / 326230.001000

scheme, and the Legislature would not have enacted the Act without it.

For these reasons, the Court should reverse the district court's partial denial of Appellants' motion for a temporary restraining order and preliminary injunction as to the Flavor Ban, affirm the grant of injunctive relief as to the Inspection Program, and hold that the Inspection Program is not severable from the Act.

## ARGUMENT

### I.    The State's Jurisdictional Objection Fails.

Pursuant to Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure ("**FRAP**" or "**Rule**"), Appellants timely noticed their appeal on April 21, 2025—within 30 days of the March 24, 2025 orders granting a preliminary injunction as to the Inspection Program, refusing to enjoin the remainder of the Act (including from the Flavor Ban), and dissolving the stipulated temporary restraining order that had preserved the status quo "until the court decided on Plaintiffs' Motion for Preliminary Injunction." Docket Text Order, ECF No. 57 (D. Utah Mar. 24, 2025); *see also* A3:669–87.

Contrary to the State's argument, this appeal properly raises issues addressed in the district court's February 13, 2025 order, which rejected certain arguments as to the Flavor Ban. *See* A3:625–46. This is so because the district court did not "refus[e]" to grant an injunction, within the meaning of 28 U.S.C. § 1292(a)(1), until March 24, 2025. Until March 24, 2025, the question of whether the Flavor Ban

SL_8737201.1
4920-1781-7995, v. 1 / 326230.001000

would be enjoined remained unresolved because only some, but not all grounds for striking down that portion of the statute had been decided.

The district court expressly managed the preliminary injunction proceedings as a single, unified motion. On February 13, 2025, the court (1) rejected certain of Appellants' arguments as to the Flavor Ban and, in a contemporaneous docket text order, (2) ordered supplemental briefing and took the Inspection Program issues under advisement while leaving the stipulated TRO in place. *See* A3:625–50. Because Appellants had argued that the Inspection Program was unconstitutional and not severable, the Court's February 13 order left unresolved the alternative argument that the Flavor Ban should be struck down with the Inspection Program. *See* A3:499-500.

On March 24, the court entered written orders granting a preliminary injunction as to the Inspection Program, concluding the Inspection Program is severable from the Flavor Ban and other provisions of the Act, and separately dissolving the TRO, stating that entry of the preliminary injunction "resolves Plaintiffs' Motion." ECF No. 57 (noting that "Plaintiffs' Motion for Preliminary Injunction is no longer pending and the Temporary Restraining Order is hereby dissolved"), *see also* A3:669–87. Although the court had earlier concluded it disagreed with some arguments for striking down the Flavor Ban, in its own words, it did not "decide[]" the motion until March 24. Docket Text Order, ECF No. 57 (D.

4

Utah Mar. 24, 2025). That is why, on March 24, the court ordered: "Defendants are not enjoined from enforcing any other provision of the Electronic Cigarette Amendments, including the Flavor Sales Ban." A3:689. In sum, on March 24, 2025, the district court entered an order "refusing" to grant an injunction of the Flavor Sales Ban, from which an appeal lies.[2]

The State cites no case that, like this one, features an appeal from a single motion for preliminary injunction where independent bases for granting the injunction were ruled on at different times. That is telling. It would be a needless waste of resources for a party awaiting decision on alternative grounds to have to prosecute an appeal when its alternative arguments have not yet been reached. Such partial determinations do not "refuse" an injunction—they simply alert the parties to grounds on which the requested injunction will not be granted. If other grounds remain, the injunction has not been "refus[ed]" yet.

---

[2] Treating March 24 as the operative date for purposes of appeal is consistent with Rule 3(c)(4), which provides that "[t]he notice of appeal encompasses all orders that, for purposes of appeal, merge into the designated judgment or appealable order. It is not necessary to designate those orders in the notice of appeal." Because it addressed only some, but not all grounds for enjoining the Flavor Ban, the February 13 ruling can easily be seen as merging into the March 24 appealable orders. Appellants' April 21 notice designated the March 24 orders, but also expressly stated that it encompassed "all underlying issues, rulings, decisions, and orders . . . ancillary, subsidiary, or merged thereto[,]" which includes the February 13 ruling. A3:691.

Unsurprisingly, courts have rejected the State's offered approach and concluded that, for example, "when a district court rejects only one of multiple grounds for dissolving an injunction, the court has not 'in terms' refused to dissolve that injunction . . . ." *Salazar ex rel. Salazar v. D.C.*, 671 F.3d 1258, 1263 n.5 (D.C. Cir. 2012). In *Salazar*, where an "order did nothing more than reject the first of two reasons . . . offered in support of dissolution" of an injunction, "leaving argument on and resolution of the second rationale pending," the court concluded that dissolution of the injunction had not yet been "refused." *Id.* at 1263. The Court emphasized that "[t]he implications of this argument are sweeping: in a more complicated case, it would permit a party to present five, or ten, or a hundred arguments for vacating an injunction, and then appeal each time the court decided any one of them. This would certainly leave the barrier against piecemeal appeals with as many holes as Swiss cheese." *Id.*

In sum, this Court has jurisdiction. Plaintiffs' April 21, 2025 notice of appeal was timely and encompasses review of the district court's February 13, 2025 and March 24, 2025 rulings.

SL_8737201.1
4920-1781-7995, v. 1 / 326230.001000

## II.   The Tobacco Control Act Preempts Utah's Flavor Ban.

The TCA, which vests the FDA with authority to regulate tobacco products, *see* 21 U.S.C. § 387a, expressly and impliedly preempts the Flavor Ban,[3] and the Flavor Ban thus violates the Supremacy Clause of the United States Constitution. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001).

### A.   The Flavor Ban is expressly preempted by federal law.

#### 1.   *Section 387p does not draw the "manufacturing vs. sales" distinction the State asserts.*

As a threshold matter, the State invites this Court to err by "presum[ing] that federal law does not override 'the historic police powers of the States[.]'" Appellees'/Cross-Appellants' Principal & Response Br. ("**Appellee's Br.**"), at 20 (quoting *Bradshaw v. Am. Airlines, Inc.*, 123 F.4th 1168, 1173 (10th Cir. 2024) (citing U.S. Const. art. VI, cl. 2)). But importantly, *Bradshaw* was not an express preemption case. *See Bradshaw*, 123 F.4th at 1173 ("Neither in the district court nor on appeal have the Airlines sought express preemption under the ADA."); *id.* ("The Aviation Act does not expressly preempt state regulation of air safety, so any preemption would need to be implied."). That matters because, "in more recent years, the Supreme Court has declined to apply such a presumption in express-

---

[3] The Flavor Ban was originally codified at Utah Code Annotated section 76-10-113 (2024). Though Utah Code Annotated section 76-10-113 was amended and renumbered as section 76-9-1114, effective May 7, 2025, appellants cite the pre-recodification (2024) version of the statute.

7

preemption cases," and the Tenth Circuit "[has] done the same." *Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1023 (10th Cir. 2022). Instead, this Court "do[es] not invoke any presumption against preemption and focus[es] instead on the plain language of the . . . preemption provision," "which necessarily contains the best evidence of Congress' pre[]emptive intent." *Id.* (citations omitted).

Here, the State's express preemption argument turns on the premise that 21 U.S.C. § 387p(a)(2)(A) (the Preemption Clause) applies only to manufacturing or other pre-stream-of-commerce regulation. That premise cannot be reconciled with the text or structure of Section 387p. Read as Congress wrote it, the statute draws a line not between "manufacturing" and "sales," but between state regulation of "tobacco product standards" and state regulation of sales and access to tobacco products. The State's interpretation collapses that distinction and rewrites the statute.

Section 387p begins with a Preservation Clause that contains an important carveout. While Subsection (a)(1) preserves state authority to enact laws "with respect to tobacco products" that are more stringent than federal law, such as measures "relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products," that preservation is expressly qualified: it applies "[e]xcept as provided in paragraph (2)(A)." 21 U.S.C. § 387p(a)(1). Congress thus made clear that state authority over

8

SL_8737201.1
4920-1781-7995, v. 1 / 326230.001000

sales and access is preserved only so long as it does not intrude into the domain withdrawn by the Preemption Clause.

That withdrawal is set out in subsection (a)(2)(A). There, Congress barred states from establishing "any requirement" that is "different from, or in addition to," federal requirements "relating to tobacco product standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products." *Id.* § 387p(a)(2)(A). Critically, nothing in this language limits preemption to manufacturing. Congress did not say "manufacturing requirements," nor did it cabin preemption to how products are made. Instead, it enumerated a set of regulatory subjects that are exclusively for the federal domain— several of which extend beyond production and manufacturing.

"Tobacco product standards" is the most obvious example. Elsewhere in the TCA, *see id.* § 387g(a)(1)(A), Congress expressly labeled a flavor prohibition a tobacco product standard, confirming that this category reaches product characteristics, not merely production methods. The same is true of "premarket review," which governs whether a product may be marketed at all and requires the FDA to evaluate public-health consequences of marketing a finished product. *Id.* § 387j(b). "Modified risk tobacco products" similarly turn on claims and representations made about a product, which may arise without any change in manufacturing. *Id.* § 387k(g). "Labeling" and "misbranding" likewise regulate how

9

a product is presented and sold, not how it is produced. *Id.* § 387c(a). These categories operate at different points in a product's lifecycle, many of them after manufacturing is complete.[4]

The State's manufacturing-only reading also violates basic principles of statutory construction. Congress separately listed "good manufacturing standards." *Id.* § 387p(a)(2)(A). If "tobacco product standards" already meant manufacturing alone, that separate reference would be unnecessary. Reading all of the enumerated categories as manufacturing collapses distinct statutory terms (e.g., tobacco product standards and good manufacturing standards) into one, rendering portions of subsection (a)(2)(A) redundant. Courts decline to construe statutes in a way that strips words of independent meaning.

The Savings Clause in subsection (a)(2)(B) reinforces this structure rather than undermining it. That clause restores state authority over "requirements relating to the sale, distribution, possession, [and] access to" tobacco products—but only as an exception to the Preemption Clause. *Id.* § 387p(a)(2)(B). The Savings Clause

---

[4] The Preemption Clause's inclusion of "labeling" is particularly noteworthy given that Utah's statute, in fact, includes express labeling requirements. Utah's statutory definition of "flavored electronic cigarette product" expressly includes any product "that **is labeled as**, *or* has a taste or smell of any fruit, chocolate, vanilla, honey, candy, cocoa, dessert, alcoholic beverage, herb, spice, or mint." UTAH CODE ANN. § 76-10-101(7)(b) (2024) (emphasis added). By making "label[ed] as" flavor descriptors a trigger for the prohibition, the statute regulates labeling content directly and therefore falls squarely within the TCA's labeling-preemption bar.

10

cannot be read to permit States to do exactly what the Preemption Clause says they cannot—that would render the Preemption Clause meaningless. Instead, the Savings Clause is best understood as making clear that States have authority to regulate the who, when, and where of sales and access, so long as they do not intrude on the federally occupied fields (e.g., tobacco product standards) identified in subsection (a)(2)(A). Read together, the Preservation Clause, Preemption Clause, and Savings Clause form a coherent scheme: states may regulate sales and access, but they may not do so in a way that imposes or enforces tobacco product standards reserved to the federal government.

The State's approach flips that structure on its head. By recasting the Preemption Clause as manufacturing-only, the State effectively allows states to regulate federally defined product standards so long as they do so through a sales ban. Nothing in the text supports that maneuver. Congress withdrew state authority over tobacco product standards categorically, not merely when states regulate manufacturing directly. A state cannot evade that withdrawal by relabeling a product-standard rule as a sales restriction.

In short, Section 387p does not draw the line the State urges. The statute distinguishes between regulation of tobacco product standards—which Congress placed under exclusive federal control—and regulation of sales and access—which states may continue to govern. The State's manufacturing-versus-sales dichotomy

SL_8737201.1
4920-1781-7995, v. 1 / 326230.001000

ignores that textual and structural design and should be rejected by this Court. To hold otherwise would allow states to enact any number of sales and access regulations (and each state to impose its own, unique ones) that would, in practical effect, dictate the manufacturing process.

> 2. *The State's position that the Flavor Ban is not a tobacco product standard cannot be reconciled with the TCA or Supreme Court precedent.*

The State's effort to recharacterize the Flavor Ban as a mere sales regulation cannot be reconciled with the text Congress enacted—or with the district court's own acknowledgment of that text. As the district court conceded, "the textual argument for a sales ban being a 'tobacco product standard' is not without support." A3:634. That concession understates the force of the statute. The TCA itself identifies a flavor prohibition as the paradigmatic example of a tobacco product standard.

Although the TCA does not supply a standalone definition of "tobacco product standards," it does something more telling: it provides an express illustration of what Congress believed that term encompassed. In the "special rule for cigarettes," Congress prohibited cigarettes from containing, "as a constituent . . . or additive, an artificial or natural flavor (other than tobacco or menthol)." 21 U.S.C. § 387g(a)(1)(A). Congress then expressly labeled that prohibition a "tobacco product standard." *Id.* § 387g(a)(2). That choice of language forecloses the State's attempt to exclude flavor-based rules from the category of product standards. When

12

Congress applies a term of art to a concrete example, the statute must be interpreted consistently.

The statutory structure of the TCA reinforces the point. Tobacco product standards may include provisions respecting a product's "components, ingredients, additives, constituents, . . . and properties." *Id.* § 387g(a)(4)(B)(i). Flavor fits squarely within that framework. Flavoring substances are additives, and the resulting taste or smell is a property of the product. Nothing in the statute limits "properties" to invisible or purely chemical attributes, and the State identifies no persuasive textual basis for that narrower construction.[5] To the contrary, the very concern Congress addressed in the special rule for cigarettes was the sensory experience of the product—its characterizing flavor.

The State's attempt to draw a sharp line between manufacturing and the "end" or "final" product creates a distinction without a difference. The special rule for cigarettes illustrates why. That rule functions simultaneously as a manufacturing restriction and a sales prohibition: cigarettes may not be manufactured with certain additives, and cigarettes containing those additives thus may not be sold. Utah's

---

[5] The State argues that all of the terms in Section 387g(a)(4)(B)(i) should be read together to give them a related meaning. Appellees' Br. at 31. However, the State's argument then uses two other words from the list "ingredients" and "components" to define "properties." The term properties would be superfluous if it simply included those two terms. Moreover, there is nothing in the statutory text to indicate that ingredients or components do not encompass flavored smells and tastes.

13

Flavor Ban operates in the same way. The end product cannot meaningfully be separated from the manufacturing process, because it is during that process that additives and properties are introduced to give an e-cigarette its distinguishable taste or smell. Ingredients dictate characteristics; characteristics define the product. A law that conditions market access on the absence of a particular characteristic necessarily dictates what ingredients manufacturers may include in their products.

Accepting the State's theory would permit states to nullify any and all federal tobacco product standards simply by phrasing them as sales bans. That would write the express preemption provision completely out of the statute. Supreme Court precedent squarely rejects this kind of attempted end-run.

In *National Meat Association v. Harris*, the Court held that a state could not evade federal preemption by imposing a sales prohibition that effectively dictated how products must be produced. 565 U.S. 452, 463–64 (2012). The district court attempted to distinguish *Harris* on the ground that the Federal Meat Inspection Act ("**FMIA**") lacked preservation and savings provisions comparable to the TCA. *See* A3:642. That distinction is overstated. While the FMIA does not contain a preservation clause, it does contain a savings clause. *See Harris*, 565 U.S. at 458 n.3 (The FMIA "shall not preclude any State . . . from making requirement[s] or taking other action, consistent with this [Act], with respect to any other matters regulated under this [Act]." (quoting 21 U.S.C. § 678)). The presence of a savings clause did

14

not prevent the Supreme Court from recognizing that a sales ban functioning as a product-standard mandate was preempted.

The State now acknowledges that the district court overstated the statutory differences in this respect, but it nonetheless seeks to minimize *Harris* by arguing that the TCA's savings clause is different. Appellees' Br. at 32-35. That effort fails. To interpret a savings clause to authorize states to impose requirements Congress reserved to federal control would allow states to accomplish, through semantics, exactly what the statute attempts to forbid them from doing. Allowing states to condition market access on compliance with a state's preferred product standards, as the State seeks to do here, would nullify the TCA's express preemption provision.

In short, the Flavor Ban falls squarely within the category Congress identified and regulated as a tobacco product standard. The State's contrary characterization depends on disregarding Congress' own example, narrowing statutory language without textual support, and embracing a manufacturing-sales distinction rejected by the U.S. Supreme Court. The TCA does not permit states to override federal tobacco product standards by recasting them as sales restrictions, and the Flavor Ban is therefore expressly preempted.[6]

---

[6] As previously noted, this Court is not bound by the decisions on which the State relies. *See R.J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170 (8th Cir. 2023); *R.J. Reynolds Tobacco Co. v. Cnty. of Los Angeles*, 29 F.4th 542 (9th Cir. 2022); *Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence*, 731 F.3d 71 (1st Cir. 2013); *U.S. Smokeless Tobacco Mfg. Co. v. City of New York*, 708 F.3d 428 (2d Cir.

**B.     Utah's Flavor Ban and Registry are impliedly preempted by federal law.**

*1.    This Court can reach each of Appellants' arguments that federal law impliedly preempts the Act.*

As a threshold matter, the State does not, and cannot, refute that Appellants properly raised the issue of whether the Flavor Ban is impliedly preempted by federal law. Appellants thus have not abandoned, altered, or newly asserted an implied preemption claim for the first time on appeal. The issue is appropriately presented for the Court's review.

Appellants acknowledge that their Principal Brief on appeal cites to additional statutory authority and subsequently decided cases that illuminate the correct interpretation of the same federal scheme it challenged below. But despite these new citations, the State has not shown waiver, nor has it given any reason this Court cannot consider the full statutory picture.

First, this Court may consider new authority on appeal that supports a position properly advanced in the district court. *Butler v. Bd. of Cnty. Comm'rs for San*

---

2013). Each was decided by a different court of appeals and therefore carries no precedential weight in this Court. Contrary to the State's assertion, Appellants did not merely disagree with those outcomes; their principal brief explained why those courts' statutory interpretation—and the holdings that flowed from it—misconstrues the scope of federal preemption and is inconsistent with the text, structure, and purpose of the governing federal statutes.

16

*Miguel Cnty.*, 920 F.3d 651, 661 n.5 (10th Cir. 2019); *see also Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1286 n.4 (10th Cir. 2018) (same). That principle applies with full force here. Appellants consistently argued that Utah's scheme is impliedly preempted because it conflicts with Congress' design for uniform federal regulation of tobacco product standards, including in the motion for preliminary injunction (A3:496-98) and at the hearing on that motion (A4:799-800). While Appellants did not invoke Section 337(a) of the FDCA below, it is part of the same statutory framework and provides context for understanding Congress' intent in enacting Section 387p. Section 337(a) is additional statutory authority confirming that Congress reserved enforcement discretion exclusively to the federal government—a point directly relevant to the implied preemption analysis already before the Court, because it speaks to Congress's intent for national uniformity.[7]

Second, even apart from the ability to consider new authority, this Court has an independent obligation to apply the correct interpretation of governing law. When

---

[7] The State correctly observes that Appellants have amended their operative complaint below. However, those amendments simply supply more detail about the legal reasons Utah's law is impliedly preempted—detail that is consistent with the arguments that are presently advanced before this Court. Notably, the district court recently denied the State's motion to dismiss the amended complaint, observing that the motion "addressed the preemption issues that are pending before the Tenth Circuit," and noting that "[w]hatever the Tenth Circuit decides, the parties' arguments and this court's decision on the pending motions will be either affected or determined by the Tenth Circuit's decision." Docket Text Order, ECF No. 104 (D. Utah Dec. 10, 2025). Accordingly, the most efficient path is for this Court to reach and resolve Appellants' arguments on implied preemption.

17

an issue is properly before the Court, "the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Baca v. Cosper*, 128 F.4th 1319, 1328 n.5 (10th Cir. 2025) (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)), *cert. denied*, 146 S.Ct. 354 (U.S. Nov. 10, 2025). The scope of federal preemption under the TCA and FDCA is squarely presented in this appeal. In resolving that question, the Court is not confined to the district court's reasoning or the precise statutory provisions cited below. If Section 337(a) bears on the meaning and operation of Congress' preemption scheme—and it does—this Court should consider it to reach the correct statutory interpretation.

Third, even if the State were correct that Appellants' reliance on Section 337(a) presents a new issue, there is no jurisdictional bar and the Court may consider it. This is so even where plain error review has not been requested, and even where an appellant "relied on an entirely different statutory argument" below. *United Steelworkers of Am. v. Or. Steel Mills, Inc.*, 322 F.3d 1222, 1227 (10th Cir. 2003). The Tenth Circuit retains discretion to address issues raised for the first time on appeal, particularly where, as here, the issue is purely legal and requires no additional factual development. *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1145 (10th Cir. 2017) (noting this court has discretion "to determine an issue raised for the first time on appeal if it is a pure matter of law and its proper resolution is

18

certain") (citation omitted)); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1229 (10th Cir. 1996). Appellants acknowledge this discretion is used "sparingly," but it is particularly appropriate where, as here, the issue is a pure matter of law, "both parties had full opportunity to argue—and did argue—this issue on appeal," and declining to address it would risk "entrench[ing] an erroneous result based on forfeiture." *First W. Cap. Mgmt. Co.*, 874 F.3d at 1145. Whether Congress reserved exclusive enforcement authority to the federal government under Section 337(a), and how that reservation informs the implied preemption inquiry in this case, are questions of statutory interpretation that can be resolved as a matter of law on the existing record. Declining to address them would risk perpetuating an incorrect understanding of the federal scheme.

In short, Appellants have consistently challenged Utah's law as preempted by federal statute. Invoking Section 337(a) for the first time on appeal neither changes that claim nor circumvents preservation rules; it simply ensures that the Court has the full statutory context necessary to decide the question correctly.

> 2. *This Court should not adopt the reasoning in* Wooten *and* Wisconsinites *as those cases rest on an erroneous interpretation of Section 337(a).*

The disagreement between *Iowans for Alternatives to Smoking & Tobacco*[8]

---

[8] *Iowans for Alts. to Smoking & Tobacco, Inc. v. Iowa Dep't of Revenue*, 781 F. Supp. 3d 724 (S.D. Iowa 2025) ("***Iowans***"). In their Principal Brief, Appellants also referenced *Vapor Technology Association v. Marshall*, No. 03-CV-2025-901284.00

19

and the decisions in *Wooten*[9] and *Wisconsinites*[10] stems from the latter courts applying a flawed legal interpretation of Section 337(a) and obstacle preemption.[11] That is, while the courts applied the same federal statutes—the FDCA and the TCA—they reached opposite results based on materially different understandings of when state law crosses the line from permissible sales regulation into impermissible enforcement of federal law.

---

(Ala. Cir. Ct. Aug. 15, 2025). Appellants understand that the court in the Alabama case, after entering a TRO, declined to enter a preliminary injunction, but left the TRO in place. An appeal to the Alabama Supreme Court is currently pending. *See Vapor Tech. Ass'n v. Spencer*, No. 03-CV-2025-901284.00 (Ala. Cir. Ct. Aug. 11, 2025), Dkt. 55, 139. Pursuant to this Court's minute entry dated January 23, 2026, Dkt. 45, Appellants have not attached copies of the foregoing orders to this brief. If requested, counsel will provide copies to the Court. On December 10, 2025, the Alabama Supreme Court denied a motion to stay the lower court's TRO pending appeal. *Vapor Tech. Ass'n v. Spencer*, No. SC-2025-0833 (Ala. Dec. 10, 2025). The Alabama appellate docket is publicly available at: https://publicportal.alappeals.gov/portal/court/68f021c4-6a44-4735-9a76-5360b2e8af13/case/8ddf1901-d9b9-474e-8bd7-ab2774b118e9.

[9] *Vapor Tech. Ass'n v. Wooten*, No. 4:25-CV-00076-M-RJ, 2025 WL 1787420 (E.D.N.C. June 27, 2025).

[10] *Wisconsinites for Alts. to Smoking & Tobacco, Inc. v. Casey*, No. 25-CV-552-WMC, 2025 WL 2582099 (W.D. Wis. Sep. 5, 2025).

[11] Two other federal district courts have recently weighed in as well. One court agreed with *Iowans* that 337(a) has preemptive force and struck down provisions of a Virginia law that "authorize[d] state enforcement mechanisms that condition lawful sale or impose penalties based on FDA premarket authorization determinations," but left in place other provisions of the state law that did not require the state to enforce federal requirements. *NOVA Distro, Inc. v. Miyares*, No. 3:25-CV-857 (DJN), 2025 WL 3680321, at *15-21 (E.D. Va. Dec. 18, 2025). Another court followed the *Wooten* and *Wisconsinites* decisions in finding no preemption. *Rocky Patel Premium Cigars, Inc. v. Bonta*, No. 8:25-CV-02244-MRA(PDX), 2025 WL 3903972, at *7 (C.D. Cal. Dec. 23, 2025).

20

The *Iowans* court correctly applied Section 337(a) and *Buckman*[12] by focusing on function rather than form. It held that when state law makes compliance with the federal PMTA regime a precondition of lawful market participation, and attaches state penalties to federal regulatory status, the state is enforcing the FDCA "by and in the name of" itself, in direct conflict with Congress' decision to vest exclusive enforcement authority in the federal government. *Iowans*, 781 F. Supp. 3d at 740. That conclusion turned on the basic rule that states may not substitute their judgment for FDA's enforcement discretion, nor can they operationalize federal requirements through state penalties.

By contrast, *Wooten* and *Wisconsinites* adopted an unduly narrow conception of enforcement under Section 337(a), reasoning that a state avoids preemption so long as it characterizes its law as regulating sales rather than federal compliance. *See* 2025 WL 1787420, at *5; 2025 WL 2582099, at *7–8. That approach elevates form over substance and permits exactly the type of enforcement *Buckman* forbids: state laws that exist only by virtue of federal requirements and that leverage state penalties to compel compliance with federal regulatory judgments.

Utah's statute squarely presents the legal conflict identified in *Iowans*. The Act conditions lawful sale on federal PMTA status; requires manufacturers to monitor and report FDA actions; mandates removal of products from the state market

---

[12] *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001).

21

when FDA issues denials or other orders; and imposes civil, licensing, and contraband consequences that flow directly from federal regulatory determinations. UTAH CODE ANN. §§ 26B-7-505; 59-14-810; 76-10-113 (2024). The State tries to distance Utah's statute from the one struck down in *Iowans*, but the Utah law contains the same core provision: a requirement that conditions market access on compliance with the federal PMTA process. While the Utah statute contains additional provisions banning flavors and nicotine levels,[13] its PMTA-compliance requirement, just like Iowa's, cannot be squared with Section 337(a). Utah has not simply regulated the retail sale of products. It has embedded federal premarket authorization into state law and authorized Utah state officials to enforce it.

Section 337(a) does not permit states to condition market access on federal regulatory compliance or impose state penalties that turn on federal enforcement

---

[13] Appellants acknowledge, as the State pointed out in its brief, that flavored e-cigarette products, even if premarket authorized, are not exempt from the Flavor Ban—but that simply highlights the problem with the Flavor Ban; it stands as an obstacle to the enforcement of federal tobacco product standards. The same problem is created by the Act's definition of "premarket authorized or pending" e-cigarettes: these are defined as electronic cigarette products that have "been approved by an [FDA] order granting a premarket tobacco product application" (or certain pending applications) **and** "do[ ] not exceed . . . 4.0% nicotine by weight per container" or "a nicotine concentration of 40 milligrams per milliliter." UTAH CODE ANN. § 76-9-1101(16)(a), (b) (2024). Thus, Utah's law not only mandates Utah enforce federal standards (by requiring a pending or approved PMTA), but it also purports to impose Utah's own premarket authorization requirement (a nicotine limit). Both are direct obstacles to achieving Congress's intent of a nationally uniform premarket authorization process.

22

decisions. The *Iowans* court correctly recognized that principle and applied it faithfully. To the extent *Wooten* and *Wisconsinites* reached contrary outcomes, they did so by minimizing § 337(a)'s exclusivity and allowing state enforcement to proceed so long as it is framed as a sales restriction.[14]

This Court should adopt the rule articulated in *Iowans*: when a state statute makes federal PMTA compliance the operative legal standard for market access and displaces FDA's enforcement discretion through automatic state consequences, it stands as an obstacle to Congress' objectives and is impliedly preempted. Under that rule, Utah's statute cannot stand.

### C. The remaining preliminary injunction factors favor Appellants.

The district court denied injunctive relief after concluding that Appellants had not shown a likelihood of success on the merits of their preemption claims and therefore did not address the remaining injunction factors. *See* A3:646. The State now contends that, if this Court disagrees with that merits determination, the case should be remanded for the district court to consider in the first instance irreparable injury, balance of hardships, and the public interest. *See* Appellee's Br. at 43. While

---

[14] *Iowans*, *Wooten*, and *Wisconsinites* are all currently on appeal. Oral argument before the Eighth Circuit in *Iowans* was held January 15, 2026. Oral Argument, *Iowans for Alts. v. Mosiman*, No. 25-2087 (8th Cir. Jan. 15, 2026), https://www.ca8.uscourts.gov/case-number-0, search "25-2087," and click "MP3" to access an audio recording of the oral argument.

this Court could so remand, this Court can and should resolve those issues in Appellants' favor on this appeal.

When a state statute is preempted by federal law, its enforcement is unconstitutional and constitutes irreparable harm as a matter of law. Independently, the record before this Court establishes irreparable injury through ongoing losses to UVBA's members' businesses, goodwill, and customer relationships, permitting appellate resolution without remand.

> 1. *Enforcement of the preempted Flavor Ban inflicts irreparable harm on UVBA members as a matter of law.*

Courts have held that the enforcement—or credible threat of enforcement—of a state law that is preempted by federal law constitutes per se irreparable harm. The Supremacy Clause confers a federal right to be free from enforcement of state laws that conflict with or are displaced by federal law, and the deprivation of that right "unquestionably constitutes irreparable injury." *United States v. Texas*, 794 F. Supp. 3d 427, 452 (W.D. Tex. 2025) (citation omitted). Where a plaintiff demonstrates a likelihood of success on a Supremacy Clause claim, courts do not require additional proof of downstream economic loss as the unconstitutional enforcement itself satisfies the irreparable harm requirement. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029–30 (9th Cir. 2013); *see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057–58 (9th Cir. 2009).

The State's reliance on *Aposhian v. Barr* does not alter that conclusion.

24

*Aposhian* did not involve a preemption or Supremacy Clause challenge, and the Court resolved the irreparable harm inquiry on the threshold ground that the plaintiff had failed to raise any constitutional claim at all in the principal brief. 958 F.3d 969, 989–90 (10th Cir. 2020), *abrogated on other grounds by Garland v. Cargill*, 602 U.S. 406 (2024). Having determined that no constitutional violation was alleged, the Court necessarily concluded that irreparable harm was lacking on that basis. *Aposhian*, 958 F.3d at 989–90.

The Court's subsequent discussion of irreparable harm—introduced expressly as an "even if" hypothetical—addressed a generalized separation-of-powers theory that was not before it and was unnecessary to the disposition. *Id.* at 990. As a result, that discussion is dicta. More importantly, nothing in *Aposhian* purports to address the irreparable harm that flows from the ongoing enforcement of a law that is invalid under the Supremacy Clause. Unlike separation-of-powers disputes, preemption claims arise from federalism principles and the Constitution's allocation of authority between the federal government and the states. Where a state enforces a state law displaced by federal law, the injury stems from the deprivation of federal rights and the imposition of an unlawful regulatory regime—an injury courts have recognized as irreparable. *Texas*, 794 F. Supp. 3d at 452; *Valle del Sol v. Whiting*, No. CV 10-1061-PHX-SRB, 2012 WL 8021265, at *6 (D. Ariz. Sep. 5, 2012), *aff'd*, 732 F.3d 1006 (9th Cir. 2013). Accordingly, *Aposhian* provides no guidance—let alone

25

controlling authority—on irreparable harm in cases involving preemption and unlawful state enforcement under the Supremacy Clause.

Nor does *Leachco, Inc. v. Consumer Product Safety Commission* support the State's position. 103 F.4th 748 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 1047 (2025). *Leachco* concerned constitutional challenges rooted in separation-of-powers principles—specifically, the allocation of authority among the three branches of the federal government. *Id.* at 753. It did not involve federalism, preemption, or the division of regulatory authority between the states and the federal government. As a result, *Leachco* addressed a fundamentally different constitutional context and does not speak to the irreparable harm that arises when a state enforces a statute that federal law has displaced.

That distinction matters. Separation-of-powers cases evaluate whether one branch has encroached on another's authority within the federal government, whereas preemption cases vindicate the Supremacy Clause's express command that federal law "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. When a state enforces a preempted statute, the harm is not abstract or institutional; it is immediate, coercive, and concrete. That deprivation of federal rights is itself irreparable. *Valle del Sol*, 732 F.3d at 1029.

Here, Utah's Flavor Ban places UVBA members squarely in that position. Absent injunctive relief, they must either comply with a law they are likely to show

26

is preempted by federal statute or risk civil penalties, license consequences, and potential criminal liability. *See* UTAH CODE ANN. §§ 59-14-810(6), (8) (2024); 76-10-113 (2024). Compliance is not a neutral alternative. As the record demonstrates, flavored e-cigarette products constitute the economic backbone of retail tobacco specialty businesses ("**RTSBs**"). *See* A2:375–77; A2:383.

### 2. *Appellants' loss of business goodwill separately supports injunctive relief.*

Courts in the Tenth Circuit have found that irreparable harm is present where the plaintiff establishes that it would be difficult to calculate damages from harm to goodwill, diminished competitive positions in the marketplace, or loss of employees' unique services. *See, e.g.*, *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004); *Neways Inc. v. Mower*, 543 F. Supp. 2d 1277, 1289 (D. Utah 2008). The Tenth Circuit has also acknowledged that loss of business and goodwill constitutes irreparable harm susceptible to injunction. *See Otero Sav. & Loan Ass'n v. Fed. Rsrv. Bank*, 665 F.2d 275, 278 (10th Cir. 1981) (reasoning that service disruption would involve consequences such as "severe confusion of processes and loss of good will and customer confidence in these institutions" (citation omitted)); *see also Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) (holding that "[a] threat to trade or business viability may constitute irreparable harm"); *Chem-Trol, Inc. v. Christensen*, No. 09- 2024-EFM, 2009 WL 331625, at *5 (D. Kan. Feb. 10,

2009) ("Loss of customers, especially long term customers in which goodwill has been developed through the years, creates irreparable harm.").

Appellants' fears of irreparable harm posed by the Flavor Ban are not hyperbole or merely hypothetical. Indeed, since the district court dissolved the Stipulated Temporary Restraining Order that enjoined enforcement of the Flavor Ban, Appellants have suffered immediate and substantial irreparable harm. The Flavor Ban has substantially limited the number and variety of products that Plaintiffs and other RTSBs can legally sell to customers. The now-banned products made up approximately 89 percent of Plaintiffs' business—and, therefore, Plaintiffs' profits—pre-Flavor Ban. *See* A2:376–77. Moreover, flavored e-cigarette products, which were only available for sale from RTSBs pre-Flavor Ban, were the primary reason why Plaintiffs' customers made the additional effort to go to an RTSB versus a nearby convenience store. *See* A2:385. Once customers abandon specialty retailers because they can no longer obtain flavored products, as is occurring here, those relationships and that goodwill cannot be readily restored—even if the law is later invalidated.[15]

---

[15] The State argues that the record evidence is "rife with hearsay," but it presents no law that hearsay cannot be considered on a preliminary injunction. To the contrary, the law is clear that, given the expedited nature of the proceedings, a district court is free to consider it and give it appropriate weight. *See, e.g.*, *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) ("The Federal Rules of Evidence do not apply to preliminary injunction hearings."); *see also Procedure on an Application for a Preliminary Injunction*, 11A WRIGHT & MILLER'S FEDERAL PRACTICE &

This Court should conclude that Appellants will suffer irreparable harm in the absence of an injunction as to the Flavor Ban.

### III. The District Court Correctly Enjoined the Inspection Program Because Appellants Are Likely to Succeed on Their Fourth Amendment Claim.

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 865 (10th Cir. 2016) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). "It is well established that the Fourth Amendment applies not only to private homes and individuals, but also to commercial premises" *Big Cats of Serenity Springs*, 843 F.3d at 865. Under the Fourth Amendment, warrantless administrative inspections of commercial premises are generally unreasonable, but a narrow exception may apply when the business is part of a closely regulated industry and

---

PROCEDURE CIVIL § 2949 (3d ed. 2025) ("Hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction since to hold otherwise would be at odds with the summary nature of the remedy and would undermine the ability of courts to provide timely provisional relief.") (citing *Mullins v. City of New York*, 626 F.3d 47 (2d Cir. 2010)). In any event, the district court never sustained the State's objections to this evidence. And it certainly takes no guesswork to conclude that, when a product that makes up 89% of Plaintiffs' business is removed, grave consequences will follow.

29

certain additional criteria are met. *See New York v. Burger*, 482 U.S. 691, 699–703 (1987). In such settings, warrantless inspections may be reasonable if the government satisfies a two-step inquiry. *See Johnson v. Smith*, 104 F.4th 153, 159 (10th Cir. 2024).

First, the State must establish that the regulated business is, in fact, a "closely regulated" industry. *See id.* Second, even if the industry is closely regulated, a warrantless inspection program is valid only if the three *Burger* criteria are satisfied: (1) "[t]here must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be necessary to further the regulatory scheme"; and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant." *Id.*

Only when all three criteria are met is a warrantless inspection of a closely regulated business permissible. If any element is missing—such as when the inspection program lacks meaningful constraints or is primarily designed to uncover criminal activity—the inspection scheme is unconstitutional. *Burger*, 482 U.S.. at 711–13 (invalidating warrantless searches that were pretextual and tantamount to general criminal searches).

Appellants acknowledge, for purposes of this appeal, that RTSBs may be treated as part of a closely regulated industry and that the State asserts both a

SL_8737201.1

4920-1781-7995, v. 1 / 326230.001000

substantial governmental interest in reducing youth e-cigarette use and a need for warrantless inspections to further that regulatory scheme governing e-cigarette products—the first two prongs of the *Burger* analysis. *See id.* at 702. The dispositive issue, however, is that Utah's Inspection Program fails the most critical *Burger* requirement: it does not provide a constitutionally adequate substitute for a warrant. *See id.*

### A.    *Burger*'s third criteria requires statutory safeguards that Utah's Inspection Program lacks.

To satisfy *Burger*'s third prong, a warrantless inspection scheme must provide "a constitutionally adequate substitute for a warrant" by ensuring that inspections occur with sufficient certainty and regularity and by imposing meaningful constraints on official discretion. *Id.* at 703 (citation omitted). Thus, the law must be "carefully limited in time, place, and scope," and it must "limit the discretion of the inspecting officers." *Id.* (citation omitted). An adequate substitute for a warrant requires that the statute establish the frequency or regularity of inspections such that business owners have a "real expectation that [their] property will from time to time be inspected by government officials." *Id.* at 723 n.10 (quoting *Donovan v. Dewey*, 452 U.S. 594, 599 (1981)). If inspections may occur "so random[ly], infrequent[ly], or unpredictable[ly]" that owners lack such an expectation, a warrant is required. *Id.* (citation omitted).

The district court aptly noted that these principles have been reinforced by

31

subsequent authority. An inspection program must provide "certainty and regularity of its application." *City of Los Angeles v. Patel*, 576 U.S. 409, 426 (2015) (quoting *Burger*, 482 U.S. at 702–03). The Tenth Circuit similarly requires that, to serve as a warrant substitute, a statute "must also establish the regularity with which inspections will occur." *S & S Pawn Shop Inc. v. City of Del City*, 947 F.2d 432, 438 (10th Cir. 1991). Although *Burger* does not demand a fixed number of inspections within a given period, the absence of defined frequency is permissible only "so long as the statute, as a whole, places adequate limits upon the discretion of the inspecting officers." *Id.* at 438–39 (quoting *Burger*, 482 U.S. at 711 n.21).

Inspection schemes that leave officials "free to inspect any business as often or seldom as he or she pleases" fail this requirement because they do not meaningfully guide who may be inspected, when, or how often. *V-1 Oil Co. v. Wyo. Dep't of Env't Quality*, 902 F.2d 1482, 1487 (10th Cir. 1990). As other courts have explained, to satisfy the certainty-and-regularity requirement, an inspection program must "define clearly what is to be searched, who can be searched, and the frequency of such searches." *Id.* (quoting *Bionic Auto Parts & Sales, Inc. v. Fahner*, 721 F.2d 1072, 1078 (7th Cir. 1983).

Taken together, these principles require that a warrantless inspection program for a closely regulated industry provide (1) notice to owners of the scope and purpose of inspections; (2) meaningful, statutory limits on the time, place, and scope of

32

inspections; and (3) sufficient regularity and predictability to prevent arbitrary or standardless searches. Only when these safeguards are present does a statutory inspection scheme serve as a constitutionally adequate substitute for a warrant under *Burger*'s third prong.

These foundational principles underscore a central defect in Utah's Inspection Program: the statute supplies little-to-no criteria governing when, whether, or how an RTSB will be inspected. The statutory text reads:

> (1)(a) A local health department may examine the books, papers, and records of a retailer in this state, for the purpose of determining compliance with Section 59-14-810.
>
> (b) A local health department *may* make the inspections and examinations at any time during ordinary business hours, and may inspect the premises and all desks, safes, vaults, and other fixtures and furniture contained in or upon the premises for the purpose of ascertaining whether an electronic cigarette product is held or possessed in violation of Section 59-14-810.

UTAH CODE ANN. § 26A-1-131(1)(a)–(b) (emphasis added).

This text contains no limitations on frequency, no standards for selecting among hundreds of retailers, no triggers governing when inspections may occur, and no procedural constraints ensuring that inspections will be conducted consistently rather than arbitrarily. The statute thus delegates inspection authority and discretion without supplying the "certainty," "regularity," or "properly defined scope" that *Burger* requires.

SL_8737201.1
4920-1781-7995, v. 1 / 326230.001000

**B.    The district court correctly applied controlling principles and case law to conclude that the Inspection Program is likely unconstitutional.**

The State asserts that the district court's analysis focused too heavily on the frequency and certainty of inspections without considering the statute as a whole. Appellees' Br. at 49. That is inaccurate. The district court expressly recognized that the "absence of a fixed number of inspections" is "not determinative" and instead focused its reasoning on the absence of any structural safeguards that might provide the functional regularity required under *Burger* and *Dewey*. A3:676 (quoting *S & S Pawn Shop*, 947 F. 2d at 438–39).

For example, in *Dewey*, the Federal Mine Safety and Health Act expressly required the inspection of "*all* mines." 452 U.S. at 604. It then laid out the frequency with which those mines would be inspected—twice per year for surface mines and at least four times annually for all underground mines. *Id.* The Supreme Court concluded that under those and other clearly defined statutory terms, "the owner of such a facility cannot help but be aware that he 'will be subject to effective inspection.'" *Id.* at 603 (quoting *United States v. Biswell*, 406 U.S. 311, 316 (1972)).

This Court has struck down inspection statutes that, unlike *Dewey*, do not place business owners on notice that their premises are subject to warrantless inspections. In *V-1 Oil Co. v. Wyoming Department of Environmental Quality*, the court held that a statute fails *Burger*'s third prong when it provides "no 'assurance

34

of regularity' of inspections" and leaves inspectors "free to inspect any business as often or seldom as he or she pleases." 902 F.2d at 1487 (quoting *Dewey*, 452 U.S. at 599).

Similarly, in *Patel*, a California statute permitting inspections of hotel records did not meet *Burger*'s certainty and regularity mandate, because "it fail[ed] sufficiently to constrain police officers' discretion as to which hotels to search and under what circumstances." *Patel*, 576 U.S. at 427. Contrary to the State's contention, the Supreme Court's holding did not turn on the fact that the statute authorized law enforcement to conduct the inspections, but rather the lack of restraint as to their discretion.

As noted by the district court, the Inspection Program more clearly resembles statutes that have been deemed invalid under *Burger*. The Act authorizes inspections but does not require them; it permits inspections "at any time during ordinary business hours" but provides no indication of cadence; and it places no constraints on whether, when, or how any particular retailer will be selected for inspection. *See* A3:673, 678–80.

The State's reliance on the Inspection Program's post-inspection provisions does not cure the constitutional defect at issue, because those provisions are triggered only after an initial warrantless inspection has already occurred. The State emphasizes that the statute requires unannounced follow-up inspections within 30

35

days of a failed inspection and mandates public reporting of inspection results. *See* Appellees' Br. at 52 (citing UTAH CODE ANN. § 26A-1-131(1)(c)–(d)). But by their plain terms, those requirements apply only if an inspection has already taken place and revealed noncompliance. They do nothing to define when, how often, or under what neutral criteria a retailer will be selected for the initial inspection in the first instance. As a result, they are constitutionally irrelevant to the question presented here: whether the statute provides advance notice, certainty, and regularity sufficient to substitute for a warrant at the point of first entry.

*Burger* and its progeny focus on whether the inspection scheme, ex ante, meaningfully constrains official discretion by informing regulated parties that inspections will occur with predictable frequency or pursuant to objective standards. A statute cannot satisfy that requirement by pointing to procedural structure that activates only after the government has already exercised unfettered discretion to inspect. Post-hoc regularity is not a substitute for pre-inspection limits. Otherwise, any statute could evade *Burger* simply by imposing orderly procedures after an unconstitutional search has occurred.

The district court here correctly observed that Utah's statute lacks the structural safeguards that might provide the functional regularity required under *Burger* and *Dewey*. A3:678-80. Local health department inspectors have been granted nearly unfettered discretion in enforcing the Inspection Program and in

36

determining whether to inspect "all, some, or none" of the covered retailers. A3:680.

This creates an intolerable risk of arbitrary or standardless searches that violate

business owners' Fourth Amendment rights.

> **C.    Alternatively, the Inspection Program's sweeping scope reinforces its constitutional deficiency under *Burger*'s third prong.**

Although the district court enjoined the Inspection Program based on its

failure to satisfy the certainty-and-regularity requirement, this Court may affirm on

the alternative ground that the Inspection Program's scope is unconstitutionally

overbroad.[16]

The Inspection Program fails *Burger*'s requirement that the warrantless

inspection regime be "carefully limited in time, place, and scope." 482 U.S. at 703

(quoting *Biswell*, 406 U.S. at 315). In relevant part, the statute permits "[a] local

health department" to "inspect the premises and all desks, safes, vaults, and other

fixtures and furniture contained in or upon the premises for the purpose of

ascertaining whether an electronic cigarette product is held or possessed in violation

of Section 59-14-810." UTAH CODE ANN. § 26A-1-131(1)(b). Onsite inspections are

---

[16] The district court declined to reach this issue only because its threshold Fourth Amendment analysis concerning the certainty and regularity of inspections was dispositive. *See* A3:673. Whether the scope of the Inspection Program is unconstitutionally broad presents a legal question, fully briefed and preserved in the record, that this Court may resolve in the first instance as an alternative basis for affirmance.

37

permissible "at any time during ordinary business hours." *Id.*

Utah's Inspection Program does not provide careful limitations as to place and scope of inspections and thus fails to restrain an inspecting officer's discretion as required under *Burger*. *See* 482 U.S. at 711. Even though the Inspection Program identifies certain locations that may be inspected (*e.g.*, desks, safes, vaults, and other fixtures and furniture), the permissible scope of inspections is significantly broader than that. Section 26A-1-131(1)(b) is written in the conjunctive and permits local health departments to inspect "the premises *and* all desks, safes, vaults, and other fixtures and furniture contained in or upon the premises." (Emphasis added.) In other words, no portion of the premises is off limits from the search—not even locations where e-cigarette products are not and cannot be stored. *See Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978) (holding that OSHA regulation was overly broad because it allowed inspectors to search areas where there was no reason to believe workplace safety violations were likely to be found).

The State presented no evidence that RTSBs are selling contraband products to customers, or storing said contraband products in locked safes, offices, vaults, closets, desks, or furniture. Appellants submitted evidence, which the State did not rebut, that the vast majority of UVBA members, including The Smoke House, do not store any e-cigarette products (including flavored products) in these areas, especially during ordinary business hours when inspections are authorized. A2:379,

SL_8737201.1
4920-1781-7995, v. 1 / 326230.001000

384. Instead, UVBA members, including The Smoke House, store these products on open shelves viewable to customers and inspectors alike. *See id.* As such, there is no indication that warrantless searches of both the public and private areas of RTSBs are necessary to enforce the Act. Because the Inspection Program is overly broad as to its permissible scope, it violates the Fourth Amendment and should be enjoined on this independent basis.

> **D.    The State does not contest the remaining preliminary injunction factors, which are satisfied if this Court affirms the district court's Fourth Amendment ruling.**

Under the district court's order, Appellants satisfied all four elements required for a preliminary injunction. *See* A3:672–84. On appeal, the State does not meaningfully challenge the district court's conclusions on irreparable harm, the balance of harms, or the public interest. *See generally* Appellees' Br. Instead, the State asserts only that the district court's decision on these factors "was based entirely on the fact that the Inspection Program likely violates the Fourth Amendment." *Id.* at 56 n.21. Thus, if this Court agrees that Appellants are likely to succeed on its Fourth Amendment challenge, the remaining injunction factors are effectively undisputed, and the preliminary injunction should be affirmed.

> **IV.    The District Court Erred in Holding the Inspection Program Severable from the Remainder of the Act.**

In determining whether a statutory provision is severable, Utah law asks two statute-specific questions: (1) whether the Legislature would have enacted the

39

relevant statute without the unconstitutional provision, and (2) whether the remainder of the statute is independently operable and capable of furthering the Legislature's intended purpose as designed. *See Vega v. Jordan Valley Med. Ctr., LP*, 2019 UT 35, ¶ 17, 449 P.3d 31.

As a threshold matter, the State understates the significance of the Legislature's decision during the 2025 legislative session not to clarify whether the Inspection Program was intended to be severable from the remainder of the Act. The procedural posture and sequence of events here is important: the Legislature convened on January 21, 2025 for its general session—this was a month *after* the preliminary injunction proceedings in this matter were underway and Appellants had specifically raised severability arguments on Dec. 23, 2024. A3:455. The district court did not rule on severability until March 24, 2025 (A3:669), which was more than two weeks after the legislative session had ended on March 7, 2025. The Legislature was therefore on notice that severability was a live issue, and it could have passed a clarifying amendment adding an express severability provision if that was the intent of that body. But it chose not to do so, despite submitting a bill on January 30, 2025—S.B. 186—that specifically addressed the Electronic Cigarette provisions. This is not a case in which the Legislature simply failed to include a severability clause in an uncontested statute. Rather, despite a clear opportunity to act—and every incentive to do so if severability were intended—the Legislature

enacted no amendment and made no statement during floor debate indicating that it would have passed the Act absent the Inspection Program. That deliberate choice to leave the Inspection Program in the law, and not to enact a severability provision, speaks volumes as to the Legislature's intent that the provisions stand or fall together.

Additionally, the State mischaracterizes severability by arguing that the Flavor Ban, Registry, and other restrictions are "independent" simply because they appear in separate code titles or impose distinct obligations. *See* Appellees' Br. at 60. That approach ignores Utah's requirement that operability be assessed in relation to the stricken provision, not in isolation. *See Vega*, 2019 UT 35, ¶ 17 (noting that courts "examine the remaining constitutional portion of the statute in relation to the stricken portion"). The Inspection Program is the engine that drives every other substantive provision of the Act. Once the Inspection Program is removed, the Act's core enforcement, verification, embargo, follow-up, and penalty mechanisms lose the ease of their intended functionality. The statutory cross-references make this explicit.

Section 26A-1-131 authorizes local health departments to inspect retailers' "books, papers, and records," and to search "desks, safes, vaults, and other fixtures and furniture" to detect violations of the Registry statute, Utah Code Annotated section 59-14-810. UTAH CODE ANN. § 26A-1-131(a)–(b). This is the primary statutory mechanism for verifying whether a product is in fact listed on the Registry; whether the flavor, nicotine-level, premarket authorization disclosures are accurate;

41

and whether an unlisted, non-authorized, or flavored e-cigarette product is being offered for sale unlawfully by a retailer on violation of Section 76-10-113.

Section 59-14-810 expressly incorporates this enforcement link: e-cigarette products that are not listed or subsequently removed from the Registry are considered contraband "subject to . . . seizure, forfeiture, and destruction under Section 26A-1-131." *Id.* § 59-14-810(6)(b); *see id.* § 26A-1-131(1)(e). Without inspections, products cannot be deemed contraband, seized, embargoed, or removed under the Act. *See id.* § 26A-1-131(1)(e)–(g). If inspections disappear, embargo authority becomes difficult (if not impossible) to exercise, and the Act's enforcement framework, including civil and criminal penalties collapses.

Even the Act's fee-funding mechanism presumes active inspections: "All fees and penalties collected under this section shall be used for administration and enforcement of this section and Section 26A-1-131." *Id.* § 59-14-810(12). This shared funding structure confirms the Legislature created *one unified enforcement program*, not a set of independently operable provisions.

In sum, without Section 26A-1-131, the following statutory components cannot function as the Legislature designed: registry verification becomes purely self-attested; contraband designation, seizure, and destruction becomes more difficult and costly; civil penalties cannot readily be triggered; follow-up inspections cannot occur; publication mandates lose meaning; fee revenue cannot be used for

42

enforcement of a nonexistent Inspection Program; and the Flavor Ban becomes effectively unenforceable because no mechanism exists to determine whether a product is flavored or listed on the Registry.

These failures are structural, not incidental. They demonstrate that the Legislature intended a unified regulatory system whose components cannot be disentangled. Severing the Inspection Program leaves behind a statute that does not resemble what the Legislature enacted. Enforcement and deterrence go hand in hand.

Indeed, the State recognized the necessity of the Inspection Program in arguing for its constitutionality. When confronted with that admission, the State's response brief says only that *Burger* prong two and severability are "not the same inquiry." Appellees Br. at 62. But whether a warrantless inspection program is "necessary," and whether it is needed for the remainder of the statute to be "operable" are really not that different of an inquiry. The State cannot have it both ways—either it needs the inspection program, or it does not, and here, it expressly told the district court that it does need it. That ends the inquiry.

Finally, the State has not justified its failure to adequately present an argument for severability in its briefing below (as confirmed by its improper, and rejected, attempt to brief that issue in its supplemental reply brief below). *See* A3:684 n. 87. While the State argues this Court can reach issues that were passed upon by the district court, it was the district court who should have declined to reach this issue

43

after the State forfeited it. In any event, this Court should reverse the severability ruling and direct entry of an injunction prohibiting enforcement of the Act in its entirety.

## CONCLUSION

Based on the foregoing, this Court should reverse the district court's partial denial of Appellants' motion for a temporary restraining order and preliminary injunction as to the Flavor Ban and affirm the partial grant of injunctive relief as to the Inspection Program. Appellants further respectfully request that the Court hold the Inspection Program is not severable from the Act and, on that basis, enjoin further enforcement of the Flavor Ban.

Dated: January 26, 2026.

**WILSON SONSINI GOODRICH & ROSATI**
Deno G. Himonas
W. Bradford Barber
*Attorneys for Utah Vapor Business Association, Inc.*

**DENTONS DURHAM JONES PINEGAR**
Trinity Jordan
Jordan E. Westgate

**DYER LAW GROUP PLLC**
Benjamin R. Dyer

**CLYDE SNOW & SESSIONS**
Walter A. Romney
Katherine E. Pepin

*Attorneys for Plaintiffs Utah Vapor Business Association, Inc. and The Smoke House, LLC*

44

## <u>CERTIFICATE OF COMPLIANCE</u>

**Certificate of Compliance with Type-Volume Limitations, Typeface**

**Requirements, and Type Style Requirements**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains 10,598 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Then Circuit Rule 32(B).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(A)(5) and 32(A)(6) and Tenth Circuit Rule 32(A) because it has been prepared in a proportionately spaced typeface using Microsoft Word of Office 365 in 14-point Times New Roman Font.

Dated this __26th__ day of January 2026:

> /s/ WALTER A. ROMNEY
> Walter A. Romney
> *Attorneys for Plaintiffs Utah Vapor Business*
> *Association, Inc. and The Smoke House,*
> *LLC*

SL_8737201.1
4920-1781-7995, v. 1 / 326230.001000

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing Appellants'/Cross-Appellees' Reply and Response Brief:

(1) Any required privacy redactions have been made;

(2) The paper copies of the brief to be filed with the Court are exact copies of the scanned brief; and

(3) The digital submissions have been scanned for viruses with Secure Client UI Version 5.0.00837/Secure Endpoint Version 8.2.1.21650 and according to the program are free of viruses.

Dated this 26th day of January 2026:

/s/ WALTER A. ROMNEY
Walter A. Romney
*Attorneys for Plaintiffs Utah Vapor Business Association, Inc. and The Smoke House, LLC*

46

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of January, 2026, I caused the foregoing

**APPELLANTS'/CROSS-APPELLEES' REPLY AND RESPONSE BRIEF** to

be e-filed which in turn caused notification of such filing to be sent to all counsel of

record who are identified as e-filers with this Court.

*/s/ MICHELLE  NORTHAM*

SL_8737201.1
4920-1781-7995, v. 1 / 326230.001000